IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LEAGUE OF WILDERNESS
DEFENDERS/BLUE MOUNTAINS
BIODIVERSITY PROJECT, et al.,

       Plaintiffs,

                            No. 3:12-cv-02271-HZ

                            OPINION & ORDER

    v.

CONNAUGHTON, et al.,

       Defendants.

Thomas Charles Buchele
EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, OR 97219

       Attorney for League of Wilderness Defenders/Blue Mountains Biodiversity
       Project

Jennifer Ripley Schemm
602 O Avenue
La Grande, OR 97850

1 - OPINION & ORDER

Attorney for Hells Canyon Preservation Council

Beverly F. Li
US DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
601 D Street, NW
P.O. Box 7611
Washington, DC 20044

Attorney for Kent P. Connaughton, United States Forest Service, United States
Fish and Wildlife Service, and Gary Miller

Scott W. Horngren
AMERICAN FOREST RESOURCE COUNSEL
5100 SW McAdam Blvd., Suite 350
Portland, OR 97239

Caroline Lobdell
WESTERN RESOURCES LEGAL CENTER
5100 SW Macadam, Suite 350
Portland, OR 97239

Attorneys for Union County, Boise Cascade Wood Products, American Forest
Resource Council, Chary Mires, and Oregon Small Woodlands Association

HERNANDEZ, District Judge:

The Snow Basin Vegetation Management Project ("Project") is located within the

Wallowa Whitman National Forest ("WWNF") Whitman Ranger District within Baker

County, Oregon.[1]  It comprises 28,545 acres and is primarily located within two main

subwatersheds Paddy Creek-Eagle Creek and Little Eagle Creek, and has minor acreages

in three other subwatersheds, including Goose Creek, Lower Eagle Creek, and East Fork

Eagle Creek.  The Project area is delimited primarily by subwatershed boundaries.

---

[1] The United States Forest Service developed four alternatives when considering whether to implement the Project: a no action alternative, the proposed action, and two other action alternatives.  It ultimately chose Alternative 3, which aims to remove 48 million board feet ("mmbf") of timber volume, a third of which will come from large trees and old growth stands.  AR 12184, 12188-89, 12190.

The Project seeks to manage forest structure, composition, and density. It also seeks to improve sustainability and reduce disturbances to the forest by minimizing the risk of wildfires, insects that are harmful to the forest, and disease harmful to the forest. Finally, the Project plans to provide a supply of forest products to the public to utilize forest resources and to provide a supply of materials to local markets.

The United States Forest Service ("FS") seeks to accomplish the Project's goals by commercially harvesting 11,495 acres of forest, performing post-harvest noncommercial harvesting on 9,926 acres of forest, performing non-commercial thinning on 81 acres, and performing post-harvest fuels treatments (prescribed burning) on 10,467 acres. The Project will also achieve its goals by removing trees along 230 miles of open system haul roads, constructing approximately 11 miles of temporary roads and reconstructing approximately 41 miles of existing roads to support timber log hauling. Road maintenance will be performed on approximately 230 miles of roads and replace an existing bridge. Commercial logging under the Project will be conducted through two sales, the Empire and Skull sales, which are scheduled to occur in July 2013 and September 2013, respectively.

Now before the Court is a motion for preliminary injunction (dkt. #32) filed by the League of Wilderness Defenders/Blue Mountains Biodiversity Project and Hells Canyon Preservation Council. Plaintiffs' motion seeks a temporary injunction of the Empire and Skull sales before July 18, 2013, the date logging is set to begin under the Empire sale. Also before the Court is Plaintiffs' motion to strike (dkt. #59); the motion to strike (dkt. #43) filed by the FS, the United States Fish and Wildlife Service ("FWS"), and Gary Miller, the Field Supervisor for the FWS (collectively, "Federal Defendants");

and Plaintiffs' motion to strike the declaration of Joe Sciarrino (dkt. #74).[2]  For the

reasons that follow, Plaintiffs' motion for preliminary injunction is denied, Plaintiffs'

motion to strike and second motion to strike are moot, and Defendants' motion to strike is

granted.

## STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right."

Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  The standards for a

temporary restraining order and a preliminary injunction are the same.  See, e.g.,

Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839 n.7 (9th

Cir. 2001).  A preliminary injunction "should not be granted unless the movant, by a clear

showing, carries the burden of persuasion."  Mazurek v. Armstrong, 520 U.S. 968, 972

(1997) (emphasis in original and citation omitted).

"A plaintiff seeking a preliminary injunction must establish that he is likely to

succeed on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in

the public interest."  Winter, 555 U.S. at  20.  The Ninth Circuit has "glossed that

standard by adding that there is a sliding scale approach which allows a plaintiff to obtain

an injunction where he has only shown serious questions going to the merits and a

balance of hardships that tips sharply towards the plaintiff . . . so long as the plaintiff also

shows that there is a likelihood of irreparable injury and that the injunction is in the

---

[2] Baker County, Union County, Boise Cascade Wood Products, American Forest
Resource Council, Chary Mires, and Oregon Small Woodlands Association are
Defendant Intervenors in this case.

public interest." <u>Developmental Serv. Network v. Douglas</u>, 666 F.3d 540, 544 (9th Cir. 2011) (internal quotation marks and citations omitted).

## DISCUSSION

Plaintiffs contend that they are entitled to a preliminary injunction because they can establish a likelihood of irreparable harm, a likelihood of success on their Endangered Species Act ("ESA") and the National Environmental Policy Act ("NEPA") claims, and that the balance of hardships and public interest weigh in their favor.  For the reasons that follow, I conclude that a weighing of the factors does not establish that Plaintiffs are entitled to a preliminary injunction in this instance.

### I. Overview of ESA and NEPA

#### A. ESA

ESA "is a comprehensive scheme with the broad purpose of protecting endangered and threatened species." <u>Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.</u>, 698 F.3d 1101, 1106 (9th Cir. 2012) (citation and quotes omitted); <u>see also</u> 16 U.S.C. § 1531.  A court's review of an agency's compliance with the ESA is governed by the Administrative Procedure Act ("APA").  <u>E.g.</u>, <u>Greater Yellowstone Coal., Inc. v. Servheen</u>, 665 F.3d 1015, 1023 (9th Cir. 2011) (citation omitted).  Under the APA, a reviewing court may set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "A decision is arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  <u>Lands</u>

Council v. McNair, 629 F.3d 1070, 1074 (9th Cir. 2010) (citation and internal quotation marks omitted).  On the other hand, "[a]gency action is valid if the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made."  Native Ecosystems Council v. Dombeck, 304 F.3d 886, 901 (9th Cir. 2002) (citation and internal quotation marks omitted).  "[S]cientific uncertainty generally calls for deference to agency expertise."  Servheen, 665 F.3d at 1028 (citation omitted).

Substantively, section 7(a)(2) of ESA requires federal agencies such as the FS to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species."  16 U.S.C. § 1536(a)(2).  The ESA defines "critical habitat" for a threatened or endangered species to mean areas that are "essential to" or "essential for" the species' conservation. Conservation Congress v. U.S. Forest Serv., 2013 WL 2631449, No. 12-16452, at *2 (9th Cir. 2013) (citing 16 U.S.C. §§ 1532(5)(A)(i)-(ii)).  Procedurally, ESA requires a consulting federal agency, such as the FS, to consult with a consulting agency, such as the FWS, to determine the likely effects of any proposed action on species and their critical habitat before initiating any action in an area that contains threatened or endangered species.  Natural Res. Def. Council v. Houston, 146 F.3d 1118, 1126 (9th Cir. 1998).  Specifically,

> [b]efore initiating any agency action in an area that contains threatened or endangered species or a critical habitat, the agency must (1) make an independent determination of whether its action "may affect" a protected species or habitat, or (2) initiate a formal consultation with the agency that has jurisdiction over the species.  If an agency determines that an action "may affect" critical species or habitats, formal consultation is mandated. Formal consultation is excused only where (1) an agency determines that

its action is unlikely to adversely affect the protected species or habitat,
and (2) the relevant Service . . . concurs with that determination.

Id. (citations omitted and emphasis in original).

The ESA and its implementing regulations establish a framework for such inter-
agency consultation.  Before beginning any "major construction activities," an acting
agency–here the FS–must prepare a "biological assessment" which must "evaluate the
potential effects of the action on listed and proposed species and designated and proposed
critical habitat and determine whether any such species or habitat are likely to be
adversely affected by the action . . . ."  50 C.F.R. § 402.12(a).  If the answer is yes,
"formal consultation" with the appropriate consulting agency, in this case the FWS, is
required.  50 C.F.R. §§ 402.14(a)-(c).  During the formal consultation process, the FWS
must "[f]ormulate its biological opinion as to whether the action, taken together with
cumulative effects, is likely to jeopardize the continued existence of listed species or
result in the destruction or adverse modification of critical habitat."[3]  50 C.F.R. §
402.14(g)(4).  If the FWS concludes in its biological opinion that no jeopardy or adverse
modification is likely, but that the project is likely to result only in the "incidental take"
of members of listed species, then the FWS will provide, along with its biological
opinion, an incidental take statement authorizing such takings.[4]  50 C.F.R. § 402.14(i).

---

[3] The ESA defines the term "cumulative effects" as "those effects of future State or
private activities, not involving Federal activities, that are reasonably certain to occur
within the action area of the Federal action subject to consultation."  Conservation
Congress v. U.S. Forest Serv., 2013 WL 2631449, No. 12-16452, at *4 (9th Cir. 2013)
(citations omitted).
[4] "Incidental take refers to takings that result from, but are not the purpose of, carrying
out an otherwise lawful activity conducted by the Federal agency or applicant."  50
C.F.R. § 402.02.

An action agency may bypass formal consultation if it determines, and the consulting agency agrees, that the proposed action "is not likely to adversely affect listed species or critical habitat". 50 C.F.R. § 402.13(a). When that occurs, "the consultation process is terminated, and no further action is necessary." Id.

**B. NEPA**

NEPA "declares a broad national commitment to protecting and promoting environmental quality." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348 (1989). NEPA "is a procedural statute that does not 'mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions.'" High Sierra Hikers Ass'n v. Blackwell, 390 F.3d 630, 639 (9th Cir. 2004) (quoting Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1070 (9th Cir. 2002)). "The goal of NEPA is two-fold: (1) to ensure the agency will have detailed information on significant environmental impacts when it makes its decisions; and (2) to guarantee that this information will be available to a larger audience." Inland Empire Public Lands Council v. U.S. Forest Serv., 88 F.3d 754, 758 (9th Cir. 1996) (citation omitted). "NEPA and ESA call for different regulatory review, and [a court] must defer to the procedural mechanisms established by the implementing agency." See Conservation Congress, 2013 WL 2631449, No. 12-16452, at *5 (citation omitted).

To accomplish the "hard look" requirement, NEPA requires all agencies to prepare an environmental impact statement ("EIS") for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS must include:

(i) the environmental impact of the proposed action,
(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Id.

The EIS serves two important purposes: "[i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and it "guarantees that the relevant information will be made available to the larger [public] audience." Robertson, 490 U.S. at 349. An agency takes the requisite "hard look" at environmental consequences when its EIS contains all the items listed in 42 U.S.C. § 4332(2)(C) and includes "a full and fair discussion of environmental impacts." McNair, 537 F.3d at 1001. An EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives" to the proposed action, including "reasonable alternatives not within the jurisdiction of the lead agency." 40 C.F.R. § 1502.14. This analysis of the comparative environmental impacts of alternative courses of action "is the heart of the environmental impact statement." Id. An agency need not, however, "consider an infinite range of alternatives, only reasonable or feasible ones." City of Carmel-By-The-Sea v. U.S. Dep't of Transp., 123 F.3d 1142, 1155 (9th Cir. 1997). Nor need it consider "alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences." Headwaters, Inc. v. Bureau of Land Mgmt., 914 F.2d 1174, 1181 (9th Cir. 1990). The agency does not need to consider remote or speculative alternatives or alternatives not reasonably related to the project's purpose. Id. at 1180 (agency need not

"consider alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area"). There is no minimum number of alternatives that must be considered, as long as the EIS "discusses in detail all the alternatives that were feasible and briefly discusses the reasons others were eliminated." Laguna Greenbelt, Inc. v. U.S. Dep't. of Transp., 42 F.3d 517, 524 (9th Cir. 1994).

After the agency has taken this "hard look," it is free to decide that other values outweigh any environmental costs it has identified. See Robertson, 490 U.S. at 350-51 ("NEPA merely prohibits uninformed–rather than unwise–agency action."). Courts will not "substitute [their] judgment for that of the agency concerning the wisdom or prudence of a proposed action." City of Carmel-by-the-Sea, 123 F.3d at 1150 (quotation omitted). A court reviews a federal agency's compliance with NEPA under the APA's arbitrary and capricious standard. McNair, 537 F.3d at 987.

## II. Likelihood of Irreparable Harm

Plaintiffs contend that there is a likelihood of irreparable harm because thousands of large trees, including those over 21 inches diameter at breast height ("dbh"), would be logged. They argue that this harm outweighs the economic and forest health issues presented by Defendants. Plaintiffs also argue that violations of the ESA and the balance of hardships always tip in favor of the threatened species. At oral argument on July 8, 2013, Defendants did not contest that there is a likelihood of irreparable harm caused by the cutting of trees as planned under the Project.

The Supreme Court has recognized that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages, and is often permanent or at least of long duration, i.e., irreparable." Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531,

545 (1987).  The Ninth Circuit, however, has "decline[d] to adopt a rule that <u>any</u> potential

environmental injury <u>automatically</u> merits an injunction, particularly where . . . the

plaintiffs are not likely to succeed on the merits of their claim."  <u>Lands Council</u>, 537 F.3d

at 1005 (emphasis in original).  Even assuming that Plaintiffs could show a likelihood of

irreparable harm, as discussed below, Plaintiffs fail to establish a likelihood of success on

the merits and that the balance of harms and public interest weigh in their favor.

Accordingly, this factor alone is insufficient to tip the scales in favor of a preliminary

injunction.

**III. Likelihood of Success on the Merits**

      **A. ESA**

            **1. The Biological Assessment**

Plaintiffs argue that the FS's biological assessment ("BA") dated December 8,

2011, violates ESA because Defendants failed to use the best available science when

analyzing the Project's effects on bull trout.  Plaintiffs assert that the BA ignored contrary

scientific information when analyzing the Project's effects on bull trout and did not

provide a rational explanation for its conclusion that bull trout are not present in the

Eagle Creek watershed.  Plaintiffs contend that the FWS's Letter of Concurrence

("LOC") dated January 11, 2012, agreeing with the BA's findings that the Project "may

affect, but is not likely to adversely affect, designated critical habitat for bull trout" failed

to disclose that the status of bull trout in the Eagle Creek watershed remains unknown as

determined in a the Oregon Department of Fish and Wildlife ("ODFW") 1997 report

("Buchanan Report") and 2005 Native Fish Report.

Defendants respond that Plaintiffs are unlikely to succeed on their ESA claims because the BA is not reviewable and that even if the BA is reviewable, its contents are discretionary.  Defendants also argue that Federal Defendants used the best available science when preparing the BA and properly considered the impacts on bull trout in the final environmental impact statement ("FEIS").[5]

## 2. Reviewability

A biological assessment must "evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action and is used in determining whether formal consultation or a conference is necessary."  50 C.F.R. § 402.12(a).  The contents of a biological assessment are at the "discretion "of the federal agency and "depend on the nature of the Federal action".  50 C.F.R. § 402.12(f).  A biological assessment may include on-site inspections of the affected area, experts views, literature reviews, and analysis of alternative actions, as well as "consideration of cumulative effects, and the results of any related studies."  Id.

Defendants argue that the Court may not review the BA because it does not constitute a final agency action subject to review, citing Oregon Natural Desert Association v. Tidwell, 716 F. Supp. 2d 982, 995 (D. Or. 2010).  Defendants also argue that even if the BA were reviewable, its contents are discretionary.  Plaintiffs concede that a BA is not reviewable because it is not a final agency action under the ESA.  They,

---

[5] Under NEPA, "federal agencies must specifically discuss at appropriate points in the final [EIS] any responsible opposing view which was not adequately addressed in the draft [EIS] and . . . indicate the [agencies]'s response to the issues raised."  WildWest Inst. v. Bull, 547 F.3d 1162, 1171 (9th Cir. 2008) (citations and quotation marks omitted).

however, contend that the BA is reviewable because it was expressly adopted and relied upon by the LOC.  I conclude that the BA here is subject to review.

Although both parties concede that biological assessments are generally not subject to review by a court, the LOC expressly relied on the BA when determining that bull trout did not exist in the Eagle Creek watershed.  AR 9277.  Here, the FWS concluded in the LOC that "[b]ased on information provided in the [BA], . . . [the FWS] . . . concur[red] that the proposed project **may affect, but [was] not likely to adversely affect,** designated critical habitat for bull trout."  Id. (emphasis in original).  I am aware that in Tidwell, 716 F. Supp. 2d at 995, Judge Haggerty concluded that the biological assessments there did not constitute final agency actions within the meaning of the APA.  The biological assessments in that case, however, "were followed by . . . [a biological opinion] and [incidental take statement]", which Judge Haggerty concluded were subject to the court's review.  In contrast to Tidwel, the LOC here expressly relied on the information provided in the BA when determining that bull trout were not present in the Eagle Creek watershed and that no formal consultation on bull trout was needed.  AR 09277; FWS 82.  Suffice it to say, no biological opinion or incidental take statement were drafted in this case.  Accordingly, Tidwell is not persuasive.  In short, the BA is subject to review because the LOC expressly relied on the BA when determining that bull trout did not exist in the Eagle Creek watershed and that no formal consultation was needed.

### 3. Effects on Bull Trout

Plaintiffs argue that Federal Defendants only considered the Project's impacts on bull trout habitat and not on bull trout themselves as required under ESA.  They contend that Federal Defendants did not use the best available science and ignored contrary

scientific information when analyzing the Project's effects on bull trout, including the conclusions in the 1995 ODFW report, the Buchanan Report, and the 2005 ODFW Native Fish Report, which concluded that the status of bull trout remains unknown. Plaintiffs' arguments are unavailing.

### a. The 1995 ODFW Report, the Buchanan Report, and 2005 ODFW Native Fish Report

Under the ESA, agency action must be based on "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). The purpose of the best science requirement "is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise." Bennett v. Spear, 520 U.S. 154, 176 (1997). When there are differing views as to the impact of an agency action on a protected species, however, an agency has "discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." McNair, 537 F.3d at 1000 (overruled on other grounds). An agency is not obliged to conduct independent studies to improve upon the best available science or to resolve inconclusive aspects of scientific information. Sw. Ctr. for Biological Diversity v. Babbitt, 215 F.3d 58, 61 (D.C. Cir. 2000) (stating it is improper for the district court to impose an obligation upon the government to find better data).

Here, Federal Defendants relied on the 1995 ODFW report when concluding that "[e]xtensive snorkeling surveys conducted between 1991 and 1994 failed to find bull trout in Eagle Creek". AR 9174. Although the 1995 ODFW report recognized that the 1991 and 1994 surveys found no bull trout, it also concluded that despite "extensive sampling over the last five years, the status of bull trout in Eagle Creek remains a

question mark". AR 2772. An analysis by the FS of the Eagle Creek watershed in April 1997 recognized a "[d]ata [g]ap" with regard to bull trout in the Eagle Creek watershed and the need to "confirm[] . . . bull trout presence/absence". AR 3135, 3216. Similarly, a report by the ODFW in October 1997 concluded that despite "[e]xtensive snorkeling surveys conducted between 1991 and 1994", the "status of Eagle Creek bull trout remain[ed] a question mark" and that if bull trout were present, "their distribution and number [were] extremely limited." FWS 268. Like the above reports, the ODFW's 2005 Oregon Native Fish and Status Report –Volume II concluded that "[d]ata [was] not available to adequately assess the current abundance of adult bull trout in each population" and stated that the "only quantitative population estimate in the Pine Creek basin was conducted 11 years ago in [the 1994 snorkeling surveys]", which it determined "may not capture current conditions." AR 15445. The LOC even recognized the existence of "angler reports of bull trout" in the 1990s. FWS 92.

Federal Defendants relied on the best available science when concluding that bull trout do not exist in the Eagle Creek watershed. Although the 1991 and 1994 snorkeling surveys were approximately fifteen years old at the time the determination was made that bull trout did not exist in the area–Federal Defendants were not obligated to conduct new surveys or studies. See Babbitt, 215 F.3d at 61. Indeed, at oral argument on July 8, 2013, Plaintiffs conceded that Federal Defendants were not obligated to do so. Federal Defendants were simply required to use the best available science, which at that time were the 1991 and 1994 snorkeling surveys–not the other reports on which Plaintiffs rely, including the 1990s angler reports. Indeed, many of the reports that Plaintiffs cite relied on the same 1991 and 1994 snorkeling surveys. Where the opinions of specialists

conflict with regard to the interpretation of the same data, Federal Defendants may

properly rely on the opinions of its own specialists as they did here. See N. Plains Res.

Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1075 (9th Cir. 2011) ("[w]hen

specialists express conflicting views, an agency must have discretion to rely on the

reasonable opinions of its own qualified experts even if, as an original matter, a court

might find contrary views more persuasive") (citation omitted); McNair, 537 F.3d at

1000 (the FS does not act arbitrarily and capriciously "in relying on its own data and

discounting the alternative evidence offered") (citation omitted).  Despite any uncertainty

regarding the status of bull trout in the area, it is clear that by the time Federal Defendants

had issued their decisions, they were certain that bull trout did not exist in the area and

had properly relied on the conclusion of their own specialists when making that

determination.  AR 9171; FWS 82, 92.

Federal Defendants properly determined that bull trout did not exist in the Eagle

Creek watershed in the first instance.  The FS and FWS considered the best available

science, including the 1991 and 1994 snorkeling surveys finding no bull trout in the

Eagle Creek watershed, and properly relied on the opinions of their own experts for the

conclusion that bull trout did not exist in the area.  As discussed in the following sections,

Federal Defendants also properly assessed bull trout habitat to conclude that bull trout do

not and cannot exist in the Eagle Creek watershed.

### b. Effects on Bull Trout Habitat

Federal Defendants properly considered the effects on bull trout by analyzing bull

trout habitat.  Under the ESA, a "biological assessment" must "evaluate the potential

effects of the action on listed and proposed species and designated and proposed critical

habitat and determine whether any such species or habitat are likely to be adversely affected by the action . . . ."  50 C.F.R. § 402.12(a).  "The only relevant requirement is that a biological assessment determine whether any [endangered] species or [critical] habitat are likely to be adversely affected by the action."  Conservation Congress, 2013 WL 2631449, No. 12-16452, at *6 (citing 50 C.F.R. § 402.12(a)).  "The contents of a biological assessment are at the discretion of the federal agency, depend on the nature of the Federal action, and may include on-site inspections of the affected area, experts views, literature reviews, and analysis of alternate actions, as well as consideration of cumulative effects, and the results of any related studies."  Id. (citing 50 C.F.R. § 402.12(f), Medina Cnty. Envtl. Action Ass'n, 602 F.3d at 699-700, and City of Sausalito v. O'Neill, 386 F.3d 1186, 1216 (9th Cir. 2004)).

Here, the BA designated "bull trout critical habitat" as that including "approximately 5730.8 miles of streams for the Mid-Columbia River Recovery Unit including Eagle Creek and Little Eagle Creek in the Snow Basin project area."  AR 9171. Federal Defendants analyzed the "potential direct and indirect effects on bull trout and their designated critical habitat[,]" as well as the Projects cumulative effects on bull trout critical habitat, including their spawning and rearing, migrations, and hybridization with other fish.  AR 9174, 9209, 9225-27; FWS 10, 47, 91-92, 461-62.  The BA even assessed the effects on the primary constituent elements ("PCE") of bull trout, which the FS had determined are elements "essential for the conservation of bull trout".  AR 9210.  Federal Defendants also considered the Project's effects on the quality, quantity, and temperature of bull trout habitat; bull trout migration habits; their food base; and their predators.  AR 9206, 9210-13; FWS 42, 47.  Also considered were the Project's indirect effects on bull

trout habitat, including those caused by sediment, timber harvests, transportation systems, chemicals, and migration.  AR 9213-25.  Federal Defendants ultimately concluded that the Project "**May Affect**, but [was] **NOT Likely to Adversely Affect** bull trout designated critical habitat."  AR 9226 (emphasis in original); FWS 92 (emphasis in original).  Based on the record before me, I conclude that Federal Defendants thoroughly analyzed the effects on bull trout by assessing the Project's effects on bull trout habitat.

In sum, Federal Defendants adequately analyzed the Project's effects on bull trout and bull trout habitat.  The conclusions by the FS and FWS regarding bull trout were not arbitrary and capricious and did not violate the ESA.

### B. NEPA

Plaintiffs argue that the FEIS violates NEPA by inadequately considering the effects of the Project on bull trout.  They also contend that the FS failed to prepare a supplemental EIS ("SEIS") after withdrawing its Travel Management Plan ("TMP") from the Project.  Plaintiffs' arguments lack merit.

#### 1. Bull Trout

The parties make essentially the same arguments concerning Plaintiffs' ESA claims as they do for Plaintiffs' NEPA claims insofar as they relate to bull trout. Plaintiffs argue that they are likely to succeed on their NEPA claims because the FEIS failed to take a hard look at the effects the Project would have on bull trout.  They argue that like the BA and LOC, the FEIS quotes only selective portions of the Buchanan Report, namely the findings of the 1991 and 1994 snorkeling surveys finding no bull trout, while selectively excluding the report's conclusion that the status of bull trout remains a question mark.  Plaintiffs also argue that the FEIS fails to discuss the 2005

Native Fish Report.  Finally, Plaintiffs argue that the FEIS violates NEPA because it did
not ensure that relevant information would be made available to the public as required
under NEPA.

  For the same reasons explained in the ESA section above, the FEIS did not violate
NEPA.  The FS properly relied on the 1991 and 1994 snorkeling surveys and its own
experts' opinions that bull trout did not exist in the Eagle Creek watershed.  Additionally,
the FEIS properly considered the Project's impacts on the "habitat necessary to sustain
the essential bull trout life-history functions" by assessing the PCE "essential for the
conservation of bull trout".  AR 12315.  With regard to fine sediment, the FS determined
that the Project would "result in a reduction in fine sediment generated by roads".  AR
12312.  The FS also found that the Project would not affect "water quality and quantity"
with regard to bull trout because it would create a "[b]uffer width . . . 100 feet around the
perimeter of springs and seep" and because the Project was "primarily a thinning
project."  AR 12315, 12317.  The FS analyzed bull trout migration habits, finding that
because "[b]arriers to migration [would] not occur as result of the [Project's] proposed
activities", the Project would not affect the migration habits of bull trout.  AR 12315.
The FS further found that the Project would "not affect the potential food base for bull
trout".  AR 12316.  The FS stated that the Project would not affect "pool habitat and
stream banks" because Project activities would "not occur within 200 feet of fish bearing
streams."  Id.  In addition, the FS concluded that "increases in stream temperatures"
would not affect existing stream shading because "thinning activities" would be restricted
to the outer edges of the riparian habitat conservation and proposed burning activities
under the Project would be limited to "[u]nderstory trees" that do not typically provide

significant levels of stream shading.  Id.  The FS also found that although "bull trout populations are present in the Wallowa Mountains", their "spawning areas" were generally located in the upper watersheds of stream systems outside of the Project area. AR 12317.

In addition to the above, the FS also analyzed the effects of the Project on bull trout under various alternatives.  Under Alternative 1, the "no action" alternative, the FS concluded that "[c]urrent habitat conditions and the presence of an established population of brook trout are unlikely to create conditions conducive to the reintroduction of CR bull trout."  AR 12318.  Under the activities proposed in Alternatives 2, 3, 4, the FS concluded that effects to bull trout PCE in the short-term would result in "immeasurable increases in fine sediment and water temperature", but that a "decrease in erosion from road surfaces [would]  likely occur as result of the proposed road improvements" and would result in a "mid to long-term decrease in fine sediment in Eagle Creek and Little Eagle Creek in the analysis area."  Id.  Finally, the FS concluded that fine sediment from "ongoing road maintenance activities" in the long-term would be lowered "by reducing overall erosion rates from the road system" and that fine sediment caused by "grazing activities" would be "minimized by meeting INFISH Standards and Guidelines for grazing activities and WWNF PACFISHINFISH utilization levels."  Id.

It is clear that the FS gave a hard look at the Project's effects on bull trout and bull trout habitat as required under NEPA.

### 2. Cumulative Effects

Plaintiffs assert that the FEIS violates NEPA by inadequately considering the Project's cumulative impacts from logging, grazing, and road activities.  Environmental

impact statements must discuss cumulative impacts.  See 40 C.F.R. §§ 1502.16, 1508.8, 1508.25; City of Carmel-by-the-Sea, 123 F.3d at 1160.  A cumulative impact "is the impact on the environment which results from the incremental impact of the [proposed] action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7.  A merely perfunctory cumulative impacts analysis is insufficient.  Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt., 387 F.3d 989, 994 (9th Cir. 2004).  An analysis falls short if it only considers the impacts of the proposed action or only the beneficial impacts of cumulative actions.  See Te-Moak Tribe of W. Shoshone v. U.S. Dep't. of the Interior, 608 F.3d 592, 603-04 (9th Cir. 2010); Klamath-Siskiyou Wildlands Ctr., 387 F.3d at 994-96.  "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided."  Neighbors of Cuddy Mountain, 137 F.3d at 1380.  In particular, "some quantified or detailed information is required.  Without such information, neither the courts nor the public, in reviewing the Forest Service's decisions, can be assured that the Forest Service provided the hard look that it is required to provide."  Id. at 1379.

The court reviews the agency's cumulative effects analysis under the APA's arbitrary and capricious standard, and it must be particularly deferential "to an agency's determination in an area involving a high level of technical expertise."  McNair, 537 F.3d at 987, 993.  Given this deference, "the Forest Service is free to consider cumulative effects in the aggregate or to use any other procedure it deems appropriate.  It is not for [a] court to tell the Forest Service what specific evidence to include, nor how specifically

to present it." League of Wilderness Defenders v. U.S. Forest Serv., 549 F.3d 1211, 1218

(9th Cir. 2008).

### a. Cumulative Impacts on Thermally-Stressed Fish

Plaintiffs argue that the FEIS failed to address the cumulative impacts that

sediment caused from logging, grazing, and road activities would have on bull trout and

redband trout that are already thermally stressed from living in high temperature waters.

A "cumulative effects analysis must be more than perfunctory; it must provide a useful

analysis of the cumulative impacts of past, present, and future projects." Or. Natural Res.

Council Fund v. Brong, 492 F.3d 1120, 1133 (9th Cir. 2007) (citations and quotation

marks omitted).  As discussed above, the FS properly analyzed the Project's effects on

bull trout by looking at bull trout habitat and thoroughly considered, among other things,

the effects of fine sediment and water temperature on bull trout.  With respect to redband

trout, the FS properly considered the cumulative effects that sediment would have on

redband trout living in relatively high-temperature waters.  The FS recognized that "Little

Eagle Creek does not meet the ODEQ standard for redband trout" and that "redband trout

likely experience thermal stress as result of the high water temperatures."  AR 12292.

The FS considered that sediment caused by ongoing road and grazing activities could

"result in increases in fine sediment in aquatic habitat" and that "[i]ncreases in fine

sediment can reduce spawning success and overall fitness of redband trout."  AR 12318.

The FS, however, concluded that with regard to "ongoing road maintenance activities,

short-term effects from road maintenance activities" would be "minimized by following

INFISH standards and guidelines and, road maintenance [best management practices

("BMPs")]."  AR 12320.  The FS also concluded that in the long-term, road maintenance

activities would "reduce adverse effects to aquatic habitat by reducing overall erosion rates from the road system." Id.  With respect to grazing activities, the FS concluded that the potential cumulative effects would be "minimized by meeting INFISH Standards and Guidelines for grazing activities and WWNF PACFISHINFISH utilization levels." Id.

The FS gave the requisite hard look at the cumulative effects the Project would have on bull trout and redband trout.  The FS considered the temperature of the water in which bull trout and redband trout live and even recognized that fish in the area may be thermally stressed from high-water temperatures.  The FS also considered the effects of fine sediment on bull trout and redband trout living in such high-temperature waters.  The FS, however, concluded that the cumulative effects to such fish would be minimized by meeting INFISH Standards and Guidelines and WWNF PACFISH/INFISH utilization levels.  AR 12315-18.

The FS gave the Project the requisite "hard look" at the cumulative effects the Project would have on bull trout and redband trout and their critical habitats. Accordingly, the FS's determination was not arbitrary and capricious.

### b. Cumulative Impacts Related to Increased Cattle Grazing

Plaintiff argues the FEIS violates NEPA because it fails to consider the cumulative impacts of grazing.  Plaintiffs contend that grazing reduces the density and vigor of native grasses and forbs which otherwise create a dense sod and outcompete tree seedlings.  Plaintiffs assert that this results in less of the desired grasses and forbs, and more of the undesirable tree seedlings and saplings.  Plaintiffs assert that without the fine

fuels[6] to spread the frequent low intensity surface fires, severe fires were more likely to occur, citing a white paper by David C. Powell entitled "Active Management of Dry Forests in the Blue Mountains: Silvicultural Considerations" ("2011 Powell Report").

Plaintiffs' arguments are unpersuasive. The record shows that the FS took a hard look at the cumulative effects of grazing. The FS recognized "[wi]ldfire [a]s the most likely cumulative effect for rangeland resources that has potential for negative impacts" and stated that the Project "would reduce the risk [of] . . . large scale uncontrolled wildfire." AR 12451. The FS further stated that much of the lands in the Project area are presently "unsuitable for livestock use due to available forage or dense canopy cover." AR 12450. To remedy this shortfall, the FS stated the Project would "convert unsuitable rangelands (those currently not available for forage utilization due to dense canopy cover or lack of understory vegetation) to suitable by reducing the overstory canopy cover." AR 12450-51. According to the FS, the "reduction in canopy cover" would result in increases in "herbage production available forage and overall desired ecological range condition." AR 12450. The FS further stated that in the short term (approximately 1 to 3 years), "natural fuels prescribed fire . . . would reduce forage availability", but that in the long term (4 to 20 years), the "reintroduction of fire disturbance and thinning the overstory [would] create general shift in . . . plant . . . stage" resulting "in an increase in herbage production . . . and available forage". AR 12451. The FS provided that this would "enhance[e] overall desired ecological range condition through improved livestock distribution." Id. The FS even provided a plan on how it would continue to evaluate the "short-term risk of reduced forage availability" post-burn "to determine the size of the

_____

[6] Fine fuels include grass and forbs, as well as forest litter (i.e., pine needles). Fed. Defs.' Resp., p. 23.

treated area", fire intensity, and any modifications to annual permittee grazing instructions.  Id.  When analyzing the cumulative effects of grazing, the FS recognized that the Project would have "negative a effect on annual grazing management", but that to counter this effect, it would monitor Project activities, including prescribed burning, and would be ready to alter "annual operations" if needed.  AR 12452.  Based on the above, the FS determined that there would "be no additional cumulative effects from project activities or wildfire" because the Project would increase livestock distribution and forage availability by reducing "over story cover" and shifting plant seral stages.  Id.

The FS's cumulative effects analysis with regard to cattle grazing was not arbitrary and capricious.  The FS addressed the cumulative effects of cattle grazing. Plaintiffs' disagreement and reliance on extra-record evidence, which according to Plaintiffs show that cattle grazing would reduce grasses and forbes and increase tree seedling and sapling densities is insufficient.  Defendants are afforded deference, as here, in choosing the scientific method for modeling data and may rely on the reasonable opinions of its own qualified experts.  See Lands Council, 537 F.3d at 988 (explaining that the court is not to impose its own scientific judgment on the agency).  As shown above, the FS addressed the cumulative effects cattle grazing would have on plant seral stages and story cover in the short and long term and analyzed how the cumulative effects of cattle grazing would affect, among other things, wildfire and prescribed burn fuels and livestock distributions.  In fact, the FEIS even addressed how the FS would monitor prescribed burns after the Project was implemented.

In short, the FS adequately considered the cumulative effects of cattle grazing and took the requisite "hard look" at the cumulative impacts of cattle grazing.

### c. Cumulative Effects of Carbon Stores

Plaintiffs argue the FEIS violated NEPA by failing to discuss the impacts of

logging on carbon storage.  The FS, however, adequately addressed the issue in the draft

EIS ("DEIS").

Under NEPA's implementing regulations, a federal agency must prepare a draft

EIS when analyzing a proposed action and must consider the direct, indirect, and

cumulative environmental impacts of a project under reasonable alternatives.  40 C.F.R. §

1502.14.  The agency must circulate the draft EIS for public review and comment.  40

C.F.R. §§ 1502.19, 1503.1.  The agency reviews and responds to any comments, makes

any appropriate changes to the EIS, and then circulates the final EIS.  40 C.F.R. § 1503.4.

In the final EIS, the agency must address "any responsible opposing view which was not

adequately discussed in the draft statement and shall indicate the agency's response to the

issues raised."  40 C.F.R. § 1502.9(b).  The "disclosure requirement obligates the agency

to make available to the public high quality information, including accurate scientific

analysis, expert agency comments and public scrutiny, before decisions are made and

actions are taken."  Ctr. for Biological Diversity v. U.S. Forest Serv., 349 F.3d 1157,

1167 (9th Cir. 2003) (citing 40 C.F.R. § 1500.1(b)).  Finally, the agency must select an

alternative and issue a decision.  40 C.F.R. § 1505.2.

Under NEPA, the FS is only required to focus on the issues "that are truly

significant to the action in question."  40 C.F.R. § 1500.1(b).  Although the Chief of the

FS has recognized "climate change as one of the most urgent tasks facing the Forest

Service", it has also recognized that it "is not presently possible to conduct quantitative

analysis of actual climate change effects based on individual or multiple projects".  AR

5461, 5465.  The FS Chief further recognizes that "it is not possible to determine the cumulative impact on global climate from emissions" and that "such disclosure would [not] provide practical or meaningful effects analysis for project decisions."  AR 5465-67.  The FS Chief has provided that the FS may appropriately respond to comments regarding climate change by explaining "why the comments do not warrant further agency response" and by "citing the sources authorities or reasons which support the Agency's position and, if appropriate, indicate those circumstances that would trigger agency reappraisal or further response."  AR 5468.

Here, the FS adequately responded to Plaintiffs' comments concerning carbon storage and global climate change in the DEIS.  Plaintiffs' comments expressed concerns that the thinning and logging of 12,000 of acres of trees under the Project would release significant amounts of carbon and would impact the global climate.  AR 12791-92.  In response, the FS concluded that the Project would "create forests" and "improve forest conditions and capacity to grow trees" and therefore, the Project would positively affect carbon sequestration.  AR 12792.  The FS also explained that the Intergovernmental Panel on Climate Change ("IPCC") lists "the top three anthropogenic human-caused contributors to greenhouse gas emissions from (1970-2004) a[s]: fossil fuel combustion (56.6% of global total), deforestation (17.3%), and agriculture/waste/energy (14.3%)."  Id.  The FS further explained that the IPCC "subdivides the deforestation category into land use conversions and large scale deforestation" and defines the term "deforestation" as the "removal of all trees, most notably the conversion of forest and grassland into agricultural land or developed landscapes".  Id.  The FS articulated that because the "[f]orested land [under the Project] will not be converted into developed or agricultural

condition" and "are being retained and thinned to maintain vigorous forested condition", the Project would "continue to support trees and sequester carbon long-term." Id.  The FS also determined that the Project is "consistent with IPCC recommendations for land use to help mitigate climate change" because consistent with the IPCC's recommendation that "forest management . . . improve tree species and increase biomass", the Project would "increase forest resilience to disturbances that result in an even greater loss of sequestered carbon." Id.

The FS adequately addressed the Project's impacts on carbon sequestration and climate change in the DEIS.  The FS provided sufficient qualitative analysis supporting its determination that the Project would positively affect carbon sequestration and that carbon sequestration was insignificant because the Project would retain and thin trees rather than clear-cut treas.  Considering such qualitative factors was proper.  See Hapner v. Tidwell, 621 F.3d 1239, 1245 (9th Cir. 2010) (concluding the environmental assessment appropriately considered the project's impact on global warming in proportion to its significance where the project involved 30,000 acres of pine stands and would thin rather than clear-cut trees).  In sum, the FS adequately addressed the issue of carbon sequestration and global climate change in the DEIS.

### d. 130 Acre Area

Plaintiffs argue that the FEIS violates 40 C.F.R. 1508.7 because its cumulative impacts analysis did not include the analysis of a second project involving a 130-acre group selection treatment area.  They contend that although the DEIS originally included

a 170-acre "regeneration harvest"[7], a Correction Notice by the FS dated July 18, 2012, eliminated this component of the Project from the FEIS and replaced it with a 130-acre group selection treatment project. Plaintiffs maintain that by withdrawing an area of logging, only to reintroduce it as a separate project after the appeal period, the FS unlawfully avoided consideration of the cumulative effects of the 130-acre group selection project in the FEIS.

Defendants contend that the FEIS did not need to analyze the 130-acre project in the FEIS because it did not amount to a "proposal" requiring consideration under NEPA. They argue that to this day, the FS still has not set forth a proposal for the 130-acre group selection treatment project. Defendants argue that the FS will analyze the environmental impacts of the 130-acre group selection treatment project at the appropriate time in the future when it constitutes a proposal within the meaning of NEPA, and at that time, the FS will assess the cumulative effects of the treatment project on the environment.

Although Plaintiffs rely heavily on 40 C.F.R. § 1508.7 in support of their position, that implementing regulation simply defines the term "cumulative impact". Suffice it to say, it does not define the term "proposal", let alone help me to determine whether the FS was required to analyze the cumulative effects of the 130-acre group selection treatment in the FEIS. More important, 40 C.F.R. § 1502.4(a) establishes that agencies such as the FS are responsible for properly defining a proposal and determining whether to perform an environmental impact statement for that proposal. 40 C.F.R. § 1502.4(a) provides:

> Agencies shall make sure the proposal which is the subject of an environmental impact statement is properly defined. Agencies shall use the criteria for scope (§ 1508.25) to determine which proposal(s) shall be

---

[7] A "regeneration harvest" establishes a new tree crop on previously harvested land. AR 12574.

the subject of a particular statement. Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement.

Plaintiffs' mere disagreement with the FS's determination that the 130-acre group selection treatment does not fall within the meaning of the term "proposal" under NEPA, by itself, is insufficient to support the conclusion that the FS erred in this instance. As stated above, the determination of whether a project constitutes a "proposal" lies with the FS, not Plaintiffs. See Id. Under the circumstances here, I conclude that the FS did not err when determining that the 130-acre group selection treatment was not a "proposal" and did not need to be analyzed in the FEIS.

### e. Withdrawal of the TMP

Plaintiffs argue the FS erred by not preparing a supplemental environmental impact statement ("SEIS") addressing the Project's impacts after it withdrew the TMP. Defendants respond that the FS was not required to prepare a SEIS after withdrawing the TMP from the Project because the FEIS considered the effects of the TMP separately.

I conclude that the FEIS considered both the effects of the Project without the TMP and the effects of the Project with the TMP. Accordingly, the withdrawal of the TMP did not require a SEIS because the FEIS had already considered the effects of the Project without the TMP.

The record shows that the TMP record of decision was signed on February 21, 2012, and would have resulted in a net reduction of approximately 12 miles of road in the Project area. AR 12358. The TMP, however, was withdrawn on April 17, 2012, after the TMP record of decision was signed. AR 12527, 14704. Because the FS withdrew the

TMP record decision while administrative appeals of the TMP record of decision were pending, no final agency decision on the TMP record of decision was reached.[8]

A careful review of the FEIS shows that the FS analyzed the effects of the Project without the TMP.  For example, with respect to the gray wolf, the FS determined that the "only activity with potential cumulative impacts to wolves is implementation of the [TMP]."  AR 12354.  With respect to the Columbia Spotted Frog, the FS recognized that there was a "possibility that direct mortality of spotted frogs may occur particularly during periods of adult dispersal as result of log haul traffic . . .[,]" but determined that "[w]ildlife connective corridors [would] mitigate these impacts by maintaining higher cover thus facilitating overland dispersal of frogs."  AR 12360.  The FS recognized "there may be cumulative impact on direct mortality of dispersing individuals with improved road maintenance and subsequent increased speed and traffic" and provided that the TMP "may mitigate some of these effects by reducing the overall density of roads in the project area."  Id.  The FS, however, also recognized that "[r]oad maintenance is an ongoing activity throughout the project area" and that short-term effects from road maintenance would be "minimized by INFISH standards and guides and road maintenance [best management practices]" and in the long-term, road maintenance would reduce "adverse effects to aquatic habitat by reducing overall erosions rates."  AR 12361.  The FS ultimately concluded that "none of the proposed activities in any of the action alternatives [would] degrade or impact potential habitat for [the Columbia Spotted Frog]" and although "the action alternatives may impact individual frogs[, they] . . . would not likely lead to a downward trend in the population or trend toward federal listing."  Id.

---

[8] According to Defendants, the TMP record of decision is currently on hold.  Sciarrino Decl., Ex. 1, pp. 2, 20, 35.

The FS properly considered the effects of the Project without the TMP with respect to the gray wolf and Columbia Spotted Frog and properly concluded that the Project would not likely result in reducing the frog's population.

The FEIS also considered the Project's effects without the TMP with respect to the Inland Tailed Frog.  The FS concluded that sediment levels and "direct mortality of tailed frogs may occur . . . as a result of log haul traffic and increased speed and traffic on roads" and "reductions in ground", but determined that "[w]ildlife connective corridors [would] mitigate these impacts by maintaining higher cover thus facilitating overland dispersal of frogs."  Id.  The FS also recognized "[r]oad maintenance" as an "ongoing activity throughout the project area", but determined that short-term effects from road maintenance would be minimized by INFISH standards and guides and road maintenance best management practices.  Id.  The FS also concluded that in the long-term, road maintenance would reduce "adverse effects to aquatic habitat by reducing overall erosions rates."  Id.  The FS ultimately concluded that "[a]ny of the action alternatives may impact individual frogs[,] . . . but would not likely lead to downward trend in the population or trend toward federal listing."  AR 12363.  Although the FS concluded that there may be cumulative impacts on direct mortality of dispersing individuals with improved road maintenance and subsequent increased speed and traffic and that the TMP may mitigate some of these effects by reducing the overall density of roads in the project area, it is clear that such analysis was performed separately.

The FS also analyzed the Project's effects on the American Martin without the TMP.  The FS concluded that because the Project "impacts less than 0.003 percent of suitable habitat across the Forest, the overall direct indirect and cumulative effects

[would] result in small negative effect to marten habitat." AR 12378.  Although the FS included an analysis of the TMP's impacts on the American Martin, it recognized the TMP as an "upcoming" plan that would further benefit the American Martin by "provid[ing] additional habitat . . . free from disturbance from motor vehicles". Id.  In short, the FS considered the effects of the Project on the American Martin both without the TMP and with the TMP.

With regard to Rocky Mountain Elk, the FS stated that the "increase in elk security habitat that [would] result from the TMP could not be quantified at the time . . . because the final decision for the TMP had not been made." AR 12405.  Although the FS considered the effects of the TMP on elk, stating that "the TMP [was] a reasonably foreseeable future project" that was expected to "bring [the Project] area in line with road density standard[,]" the FS also stated that because the TMP had not been "finalized during the FEIS analysis", it was "not possible" to calculate the elk habitat effectiveness index ("HEI"). AR 12521, 12471.  Moreover, the FS assessed the Project's effects on elk without the TMP.  For example, when assessing the disturbance to elk caused by motorized access, the FS expressly disclaimed that the analysis on elk did not "reflect the pending [TMP] that would have an estimated net reduction in roads of 12 miles and eliminate unregulated cross country travel in the Snow Basin project area." AR 12402.  The FS also determined that the Project would "contribute to security habitat for big game" by decommissioning approximately 5.83 miles of road. AR 12416.  The FS recognized that although the "[d]ecommissioning of 5.83 miles of road [would] have minor positive effect to elk . . .[,] . . . [it would result in a] . . . small increase in available forage for big game . . . ." Id.

In sum, the FS adequately considered the effects of the Project both with and without the TMP.  The FS was not required to provide a SEIS after withdrawing the TMP because the FEIS had already considered the effects of the Project without the TMP.

Based on the reasons above, Plaintiffs are not likely to succeed on the merits of their claims.  This factor therefore, tips heavily in favor of Defendants.[9]

## IV. Balance of Harms and Public Interest

When balancing the harms, a court must weigh the potential environmental injuries asserted by plaintiffs against the risks from enjoining the timber sale.  Lands Council, 537 F.3d at 1004.  Plaintiffs assert that the logging under the Project would irreparably harm their recreational and spiritual opportunities.  Defendants respond that a preliminary injunction would forestall their ability to improve the resiliency and sustainability of the forest and their ability to provide jobs and other economic benefits to the public.  With regard to public interest, Plaintiffs assert the public's interest in preserving the environment.  Defendants assert the public's interest in selling timber and improving forest health and public safety.  Under the circumstances here, I conclude that

---

[9] Plaintiffs argue that Defendants failed to provide sufficient analyses and information in the FEIS to inform the public.  A FEIS under NEPA must "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  Or. Natural Desert Ass'n v. Bureau of Land Mgmt., 625 F.3d 1092, 1100 (9th Cir. 2010) (citations omitted).  "The touchstone for courts reviewing challenges to an EIS under NEPA is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation."  Id.  "An EIS cannot be found wanting simply because the agency failed to include every alternative device thought conceivable by the mind of man."  Id.  Here, the FEIS adequately discussed the Project's environmental impacts and adequately provided a full and fair discussion of the Project's environmental impacts and the reasonable alternatives it considered to foster informed public participation.

the balance of harms and public interest asserted by the parties are equal and do not tip in either of the parties' favor.

When considering all the factors, I conclude that the scale does not decidedly tip in favor of a preliminary injunction. As discussed above, Plaintiffs fail to establish a likelihood of success on the merits. The alleged harm to the environment are simply insufficient to justify a temporary injunction where Plaintiffs fail to establish that they are likely to succeed on their ESA and NEPA claims and where the balancing of harms and pubic interest are equal. The Court therefore denies Plaintiff's motion for preliminary injunction. Plaintiff's request that the Court waive the bond requirement under Rule 65(c) is moot.

**V. Motions to Strike**

Review of Plaintiffs' claims is generally limited to the administrative record and usually includes only the evidence that was before the agency when it made its decision. Lands Council v. Powell, 395 F.3d 1019, 1029 (9th Cir. 2004). There are, however, four "narrow exceptions" to this general rule. Id. at 1030. In limited circumstances, district courts are permitted to admit extra-record evidence:

> (1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith.

Id. (citations and internal quotation marks omitted).

The four "limited exceptions operate to identify and plug holes in the administrative record." Id. "[I]n NEPA cases, the court may extend its review beyond the administrative record and permit the introduction of new evidence where the plaintiff

alleges that an environmental impact statement has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept 'stubborn problems or serious criticism ... under the rug." <u>Or. Natural Res. Council v. Lowe</u>, 109 F.3d 521, 526-27 (9th Cir. 1997) (citation and internal quotation marks omitted).

I address each of the parties' motions to strike in turn.

**A. Defendants' Motion to Strike**

**1. Exhibits to Tom Buchele Declaration**

Defendants seek to strike all seven exhibits attached to the Buchele Declaration (dkt. #35). Plaintiffs respond that the exhibits show the FS neglected to mention a serious environmental consequence concerning bull trout or otherwise swept stubborn problems or serious criticism about bull trout under the rug. I disagree.

Exhibit 1 is 60-day notice of intent to sue under the ESA served on the FS in July 2012 as required under 16 U.S.C. §1540(g)(2)(A)(i). Exhibit 2 is the FS's response to the 60-Day Notice on September 11, 2012, which requests additional information regarding the status of bull trout in Eagle Creek. Exhibit 3 is Plaintiffs' October 19, 2012, response to the FS's September 11, 2012, 60-Day Notice. Exhibits 4 through 7 are documents from ODFW scientists that Plaintiffs attached to their October 19, 2012, response.

None of the exhibits demonstrate that the FS neglected to mention a serious environmental consequence or otherwise swept stubborn problems or serious criticism under the rug. Defendants' motion to strike the exhibits to the Buchele declaration is granted.

/ / /

## 2. Exhibits B, C, E to Jennifer Schemm Declaration

Defendants seek to strike Exhibits B, C, and E attached to the Schemm Declaration. Exhibit B is a page of a website showing how much wood goes into a house. Schemm Decl., Ex. B, p. 1. Plaintiffs argue that Exhibit B is necessary to illustrate how much timber may be at stake here and requests, without any reasoning, that the Court take judicial notice of Exhibit B. Exhibit C to the Schemm Declaration is an article co-authored by Malcolm P. North ("2011 North Article"), a FS employee The article is entitled, "High severity wildfire effects on carbon stocks and emissions in fuels treated and untreated forest." Id., Ex. C, p. 1. Exhibit E is an excerpt from a white paper by David C. Powell about the Umatilla National Forest titled "Active Management of Dry Forests in the Blue Mountains: Silvicultural Considerations" ("2011 Powell Report"). Id., Ex. E, p. 1. Plaintiffs contend that Exhibits C and E show the FEIS neglected to mention a serious environmental consequence or otherwise swept stubborn problems or serious criticism under the rug.

A court "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Plaintiffs fail to establish that Exhibit B meets the requirements of FRE 201. Defendants' motion to strike this evidence is granted.

Exhibits C and E do not fit into any of the four limited exceptions allowing the admissibility of extra-record evidence. Accordingly, Defendants' motion to strike this evidence is also granted.

/ / /

### 3. Paragraphs 13-22 of the David Mildrexler Declaration

Defendants seek to strike paragraphs 13-22 of the Mildrexler Declaration. Paragraphs 13-22 provide the potential effects of the Project on the forest's carbon stores and are proffered to show that the issue of the forest's carbon stores and its ability to mitigate climate change are important factors warranting discussion in the FEIS. This evidence does not fit into any of the four limited exceptions allowing the admissibility of extra-record evidence. Defendants' motion to strike this evidence is granted.

### B. Plaintiffs' Motion to Strike

Plaintiffs move to strike the Declaration of Robyn L. Darbyshire, the Declaration of Joshua P. White, and paragraphs 10-15 of the Declaration of Steven B. Hawkins on the basis that the evidence does not fit any exception to the rule limiting judicial review to the administrative record and amounts to improper post hoc rationalizations by the FS. Defendants argue that they submit this extra-record evidence for the sole purpose of rebutting Plaintiffs' extra-record evidence. As discussed above, I do not consider any of Plaintiffs' extra-record evidence. Moreover, I do not consider any of Defendants' extra-record evidence. Plaintiffs' motion to strike is therefore moot.

### C. Plaintiffs' Second Motion to Strike

Plaintiffs' second motion to strike challenges the second declaration of Joe Sciarrino, which rebuts extra-record evidence submitted by Plaintiffs. I did not consider the second declaration of Joe Sciarrino when addressing Plaintiffs' motion for preliminary injunction. Accordingly, Plaintiffs' motion to strike is moot.

/ / /

38 - OPINION & ORDER

**CONCLUSION**

For the reasons stated above, Plaintiffs' motion for preliminary injunction (dkt.

#32) is denied, Plaintiffs' motion to strike (dkt. #59) and second motion to strike (dkt.

#74) are moot, and Defendants' motion to strike (dkt. #43) is granted.

IT IS SO ORDERED.

Dated this _____ day of _____, 2013.

MARCO A. HERNANDEZ
United States District Judge