Tom Buchele, OSB # 081560
Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
Tel: (503) 768-6736
Fax: (503) 768-6642
Email: tbuchele@lclark.edu

      Attorney for Plaintiff League of Wilderness Defenders/Blue Mountains
      Biodiversity Project

Jennifer Schemm, OSB # 970086
Attorney at Law
602 O Ave.
La Grande, Oregon 97850
Tel: 541-962-0896
Fax: (541) 962-7831
Email: jschemm@eoni.com

Attorney for Plaintiff Hells Canyon Preservation Council

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| **LEAGUE OF WILDERNESS DEFENDERS/BLUE MOUNTAINS BIODIVERSITY PROJECT,** *et al.,* | Case No. 3:12-cv-02271-HZ |
| | **PLAINTIFFS' AMENDED MEMORANDUM IN SUPPORT OF THEIR AMENDED MOTION FOR SUMMARY JUDGMENT AND OPPOSING FEDERAL DEFENDANTS' AND INTERVENORS' MOTIONS FOR SUMMARY JUDGMENT** |
| Plaintiffs, | |
| v. | |
| **KENT P. CONNAUGHTON,** *et al.*, | Oral Argument Requested |
| Defendants, | |
| and | Date:        October 10, 2014 |
| | Time:       1:30 p.m. |
| **BAKER COUNTY,** a political subdivision of the State of Oregon, *et al*., | Courtroom:  14B |
| | Judge:     Hon. Marco A. Hernández |
| Defendant-Intervenors. | |

**TABLE OF CONTENTS**

Table of Authorities………………………………………………………………..iii–vii

Glossary of Acronyms…………………………………………………………...viii

I.    Introduction…………………………………………………………………1

II.   Factual Background…………………………………………………………2

III.  Standing……………………………………………………………………5

IV.   Standard of Review………………………………………………………...6

V.    Argument……………………………………………………………………7

    A.    The USFS Failed to Prepare a Supplemental EIS After Withdrawing Its Travel Management Plan in Violation of NEPA (Claim One, Count Four)………………7

    B.    The Snow Basin Project Includes Two Site-Specific Plan Amendments That Violate NFMA and NEPA (Claim One, Count 3 and Claim 2)……………………………9

        1.    Factual Background:  The Eastside Screens Amendments……………………..10

        2.    The USFS's Forest Plan Amendments Violate NFMA…………………………12

            a.    The USFS's Forest Plan Amendments Violate NFMA Because They Are Not Addressing a Site-Specific Problem………………………………………12

            b.    The Forest Service's Amendments to the Forest Plan Are Significant……..16

        3.    The USFS Violated NEPA by Improperly Limiting the Scope of Its Cumulative Impacts Analysis…………………………………………………………...18

            a.    The USFS Violated NEPA by Failing to Consider Cumulative Impacts of All the WWNF's Site-Specific Amendments to the Eastside Screens…………19

            b.    The USFS FEIS Contained a Deficient Cumulative Impacts Analysis Because of Its Unduly Narrow Geographic Scope……………………………...21

                i.    Pileated Woodpecker………………………………………………….22

                ii.   American Marten…………………………………………………….23

                iii.  The USFS Improperly Limited the Geographic Scope for the Pileated Woodpecker and the American Marten……………………………...25

C.    The USFS Failed to Ensure the Scientific Integrity of the Analysis in Violation of NEPA (Claim One, Count Eleven)……………………………………………………26

    1.    The USFS Incorrectly Referred to the Large Grand Firs as Immature and an Artifact of Fire Suppression……………………………………………………..27

    2.    The USFS Improperly Re-categorized 1,238 Acres of Very Moist Grand Fir Forest as Warm/Dry Forest…………………………………………………...31

    3.    The USFS Failed to Discuss All Aspects of Climate Change as It Relates to Logging Large Trees and Old Growth Stands…………………………………34

D.    The Chosen Alternative Does Not Meet the Purpose and Need for the Action in Violation of NEPA (Claim One, Count Six)…………………………………………..38

E.    The USFS Failed to Consider a Reasonable Range of Alternatives in Violation of NEPA (Claim One, Count Eight)…………………………………………………...39

F.    The Forest Service Violated NEPA by Failing to Include Required Detailed Analysis in Its EIS Appendices (Claim 1, Count 9) and by Issuing a DEIS for Public Comment That Differed Substantially and Materially from the FEIS (Claim 1, Count 10)…………………………………………………………………43

VI.    Conclusion…………………………………………………………………………….50

# TABLE OF AUTHORITIES

<u>Cases</u>

*Alabama-Tombigbee Rivers Coalition v. Kempthorne,*
    477 F.3d 1250 (11th Cir. 2007) …………………………………………………7

*Alliance for the Wild Rockies v. Bradford,*
    720 F.Supp.2d 1193 (D.Mt. 2010) …………………………………………...25

*Anaheim Mem'l Hosp. v. Shalala,*
    130 F.3d 845 (9th Cir. 1997) …………………………………………………7

*Ariz. Cattle Growers' Ass'n v. USFWS,*
    273 F.3d 1229 (9th Cir. 2001) ………………………………………………...7

*Blue Mountains Biodiversity Project v. Blackwood,*
    161 F.3d 1208 (9th Cir. 1998) ………………………………………………44

*Citizens for Better Forestry v. USDA,*
    341 F.3d 961 (9th Cir. 2003) …………………………………………………6

*Citizens to Preserve Overton Park v. Volpe,*
    401 U.S. 402 (1971) ………………………………………………………...6–7

*Deer Creek Valley Natural Res. Conservation Ass'n v. BLM,*
    2014 WL 458288 (D.Or. 2014) ………………………………………………43

*DHX, Inc. v. Allianz AGF MAT, Ltd.,*
    425 F.3d 1169 (9th Cir. 2005) ………………………………………………44

*DuBois v. U.S. Dept. of Agriculture,*
    102 F.3d 1273 (1ˢᵗ Cir. 1996) ………………………………………………...47

*Earth Island Institute v. Gibson,*
    834 F.Supp.2d 979 (E.D. Cal. 2011) …………………………………………38

*Earth Island Institute v. USFS,*
    442 F.3d 1147 (9th Cir. 2006) …………………………………………...26, 29

*Earth Island Institute v. USFS,*
    697 F.3d 1010 (9th Cir. 2012) ………………………………………………38

*Friends of the Earth v. Laidlaw,*
    528 U.S. 167 (2000) ………………………………………………………...6

*Gifford Pinchot Task Force v. Perez,*
  2014 WL 3019165 (D.Or. July 3, 2014) ……………………………………………6

*Habitat Educ. Center, Inc. v. Bosworth,*
  363 F. Supp. 2d. 1070 (E.D. Wis. 2005) ……………………………………21, 26

*Hapner v. Tidwell,*
  621 F.3d 1239 (9th Cir. 2010) …………………………………………35, 37, 38

*High Country Conservation Advocates v. USFS,*
  2014 WL 2922751 (D.Co. 2014) …………………………………………………36

*Idaho Sporting Congress v. Rittenhouse,*
  305 F.3d 957 (9th Cir. 2002) …………………………………………6, 21, 25

*Idaho Sporting Congress v. Thomas,*
  137 F.3d 1146 (9th Cir. 1998) …………………………………………………44

*'Ilio 'Ulaokalani Coalition v. Rumsfeld,*
  464 F.3d 1083 (9th Cir. 2006) ………………………………………………...39, 43

*Kern v. BLM,*
  284 F.3d 1062 (9th Cir. 2002) …………………………………………………18

*Klamath-Siskiyou Wildlands Ctr. v. BLM,*
  387 F.3d 989 (9th Cir. 2004) …………………………………………………...18

*Kleppe v. Sierra Club,*
  427 U.S. 390 (1976) ……………………………………………………………21

*Lands Council v. Cottrell,*
  731 F.Supp. 2d 1028 (D.Id. 2010)(Magistrate's Recommendation) ……………...48

*Lands Council v. Cottrell,*
  731 F.Supp. 2d 1074 (D.Ct. 2010)…………………………………………………48

*Lands Council v. Martin,*
  529 F.3d 1219 (9th Cir. 2008) …………………………………………...12, 13

*Lands Council v. McNair,*
  537 F.3d 981 (9th Cir. 2008)(en banc) ……………………………..7, 13, 37–38, 44

*League of Wilderness Defenders (LOWD) v. USFS,*
  689 F.3d 1060 (9th Cir. 2012) …………………………………………………26

*LOWD v. Connaughton,*
    2014 WL 1814172 (9th Cir. 2014) ……………………………………………7

*LOWD v. Martin,*
    2011 WL 2493765 (D.Or. 2011) ……………………………………………..38

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto Ins. Co.,*
    463 US 29 (1983) ………………………………………………………...6

*Native Ecosystems v. Dombeck,*
    304 F.3d 886 (9th Cir. 2002) ……………………………………………*passim*

*Native Ecosystems Council v. USFS,*
    418 F.3d 953 (9th Cir. 2005) ………………………………………………...29

*Nehemiah Corp. v. Jackson,*
    546 F.Supp2d 830 (E.D. Cal. 2008) ………………………………………...6

*Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture,*
    18 F.3d 1468 (9th Cir. 1994) ……………………………………………….6

*Ocean Advocates v. U.S. Army Corps. of Eng'rs,*
    402 F.3d 846 (9th Cir. 2004) ………………………………………….18, 24

*ONDA v. Jewell,*
    2013 WL 5101338 (D.Or. Sept. 11, 2013) ………………………………..47

*Ore. Natural Resources Council Fund v. Brong,*
    492 F.3d 1120, 1130 (9th Cir. 2007)…………………………………………25

*Organized Village of Kake v. USDA,*
    746 F.3d 970 (9th Cir. 2014) ……………………………………………….6

*Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.,*
    265 F.3d 1028 (9th Cir. 2001) ……………………………………….13, 24–25

*Pacific Rivers Council v. USFS,*
    689 F.3d 1012 (9th Cir. 2012) ……………………………………...44, 49–50, 50

*Protect Lake Pleasant, LLC v. Connor,*
    2010 WL 5638735 (D.Az. July 30, 2010) ………………………………….8

*Ranchers' Cattlemen Action Legal Fund United v. USDA,*
    499 F.3d 1108 (9th Cir. 2007) ……………………………………………...8

*Selkirk Conservation Alliance v. Forsgren,*
    336 F.3d 944 (9th Cir. 2003) …………………………………………...21

*Southwest Ctr. for Biological Diversity v. USFS,*
    100 F.3d 1443 (9th Cir. 1996) …………………………………………….28

*State of California v. Block,*
    690 F.2d 753 (9th Cir. 1982) …………………………………….43, 44

*U.S. v. Joelson,*
    7 F.3d 174 (9th Cir. 1993) ………………………………………………...44

*Western Watersheds Project v. Abbey,*
    719 F.3d 1035 (9th Cir. 2013) …………………………………………39

Statutes

5 U.S.C. §§701–706 ……………………………………………………………6
5 U.S.C. §706(2)(A) ……………………………………………………………6
16 U.S.C. § 1601, *et seq.* ……………………………………………………1
16 U.S.C. § 1604 (d) ………………………………………………………16
16 U.S.C. § 1604(f)(1) ………………………………………………………12
16 U.S.C. § 1604(f)(4) …………………………………………12, 12–13, 16
16 U.S.C. § 1604(i) …………………………………………………………...13
42 U.S.C. § 4321, *et seq.* …………………………………………………1

Regulations

40 C.F.R. § 1500.1(b) ……………………………………………26, 43
40 C.F.R. § 1500.2(d) ……………………………………………………...44
40 C.F.R. §1502.1 ………………………………………………………...27, 35
40 C.F.R. §1502.9 …………………………………………………………47
40 C.F.R. §1502.9(a) …………………………………………43–44, 44
40 C.F.R. §1502.9(c)(1)(ii) ……………………………………………………44
40 C.F.R. §1502.14(a) ……………………………………………………39
40 C.F.R. §1502.18 …………………………………………………………44
40 C.F.R. §1502.18(a) ……………………………………………………44
40 C.F.R. §1502.18(b) ……………………………………………………44
40 C.F.R. § 1502.18(d) ……………………………………………………50
40 C.F.R. §1502.19 …………………………………………………………44
40 C.F.R. §1502.21 …………………………………………………45, 50
40 C.F.R. §1502.24 …………………………………………………………26
40 C.F.R. §1503.1 …………………………………………………………44
40 C.F.R. § 1503.4(a)(3) ……………………………………………………47
40 C.F.R. § 1508.7 …………………………………………………………18
40 C.F.R. § 1508.9 …………………………………………………………38

40 C.F.R. § 1508.25(c)(3) ……………………………………………………………18

Federal Rules of Civil Procedure

65(a)(2) ……………………………………………………………………...8

Other

*Considering Cumulative Effects Under the National Environmental Policy Act*, Jan. 1997
CEQ Guidance…………………………………………………………...18–19, 21

## TABLE OF ACRONYMS

APA ........................................................................................... Administrative Procedure Act

AR .................................................................................................... Administrative Record

BA .....................................................................................................Biological Assessment

BE ....................................................................................................... Biological Evaluation

CEQ ...........................................................................................Council on Environmental Quality

DBH ....................................................................................................Diameter at Breast Height

DEIS ...........................................................................................Draft Environmental Impact Statement

EA ....................................................................................................Environmental Assessment

EIS.....................................................................................................Environmental Impact Statement

ESA ................................................................................................ Endangered Species Act

FEIS .....................................................................................................Final Environmental Impact Statement

FOIA...........................................................................................Freedom of Information Act

HCPC ...........................................................................................Hells Canyon Preservation Council

HRV ...........................................................................................Historic Range of Variability

LOS ...........................................................................................Late Old Structure Forest

LOWD...........................................................................................League of Wilderness Defenders

LRMP...........................................................................................Land and Resource Management Plan

MIS ...........................................................................................Management Indicator Species

MMBF ........................................................................................... Million Board Feet

MSLT ...........................................................................................Multistory Large Trees Common

NEPA ...........................................................................................National Environmental Policy Act

NFMA...........................................................................................National Forest Management Act

ROD ...........................................................................................Record of Decision

SEIS ...........................................................................................Supplemental Environmental Impact Statement

SSLT ...........................................................................................Single Story Large Trees Common

TMP ...........................................................................................Travel Management Plan

USFS ...........................................................................................United States Forest Service

WWNF ...........................................................................................Wallowa-Whitman National Forest

I.      **Introduction**

The Snow Basin Vegetation Management Project ("Project") is not just a timber sale of past designed to provide forest products.  It is acclaimed as restoring the forest's health, with timber a byproduct.  AR5100; 14641; 14644.  While restoration of the eastside forests is a widely supported concept, people disagree on the methods needed to improve the forest's health.  For this reason, it is paramount the Forest Service ("USFS"), the agency charged with restoring the forests, honestly disclose and assess the positive and negative impacts of controversial aspects of "restoration," including logging large trees and within old growth forests, and logging moist forests that, unlike the dry eastside forests, are in much less need of restoration.  This is particularly important here, where the agency also has decided to amend the "Eastside Screens," a region-wide Forest Plan requirement prohibiting most logging of large trees and old growth forests.  The USFS adopted the Eastside Screens for all eastern Oregon forests in the early 1990s to address problems related to a shortage of large, old trees across the region, such as loss of wildlife habitat and stress to the entire ecosystem.  AR2642–45.  Despite this shortage still existing, the Project authorizes the logging of thousands of large trees, AR12207, 12228–29, 08416, 15254, and relies on site-specific Forest Plan amendments, AR12830–31, which violate the National Forest Management Act, 16 U.S.C. § 1601, *et seq.* ("NFMA").

Unfortunately, the USFS chose to present a one-sided analysis of the impacts from these controversial matters.  It also did not analyze the cumulative impacts to the Wallowa-Whitman National Forest's old growth stands and large tree component from this Project combined with other projects on the Forest that also avoid the Eastside Screens.  Fully disclosing the positive impacts of the Project, while improperly downplaying or ignoring the negative impacts, violates the National Environmental Policy Act, 42 U.S.C. § 4321, et seq. ("NEPA"), by depriving the public of a full and fair discussion of, and "hard look" at, all of the Project's impacts.

## II.    Factual Background

The Snow Basin Project area encompasses 28,545 acres of the Wallowa-Whitman National Forest ("WWNF").  The USFS has been planning this project since 2008 and touts it as a forest restoration project, designed to create sustainable forests, improve forest health and decrease the risk of uncharacteristic wildfire.  AR5100 (initiation letter); AR12149–50.  In March 2012, the Forest Supervisor for the WWNF signed the Record of Decision ("ROD") for the Snow Basin Project ("Project"), approving approximately 11,000 acres of commercial logging, about 9,000 acres of non-commercial thinning, over 10,000 acres of prescribed burning, 38.75 miles of road reconstruction, and 5.3 miles of new temporary roads.  AR12820; 12581–53.

The ROD notes the Project area has been degraded by prior, excessive logging and fire suppression and offers a three-part purpose and need for the Project.  AR12827–28.  The USFS characterized the forest's landscape today as a "deviation" from the historic range of variability ("HRV") for tree species, tree density, and forest structure under natural, unmanaged disturbance patterns."  AR12157. [1]  To address this deviation, the USFS decided to implement two "site-specific" amendments to the WWNF Land and Resource Management Plan ("LRMP" or "Forest Plan").  AR12830.  The amendments only change the Forest Plan for this Project. The first allows logging within "late old structure" or old growth forests ("LOS") that are below their HRV.  AR12830.  Old growth forests are divided into multi-story and single story stands, and are referred to as MSLT, "multistory large trees common" and SSLT, "single story large trees common."  AR12211–12.  The second amendment allows commercial logging of live trees over

---

[1] HRV refers to "the natural fluctuation of components of healthy ecosystems over time.  In [the FEIS] it refers to the range of conditions and processes that are likely to have occurred prior to settlement of the project area by people of European descent (approximately the mid 1800s), which would have varied within certain limits over time.  AR12570.

21 inches dbh ("large trees").  AR12831.  Both these amendments allow the USFS to avoid

otherwise mandatory protections for old growth and large trees.

The forests in the Project area as well as the entire WWNF are dominated by warm dry

forest, but also have significant areas of moist and cold forest.  AR7323; 7917.  These different

types of forest require different management practices to address forest health issues.  The warm

dry forests, 71% of the Project area, are the most in need of restoration.  AR7867.  These forests

were historically developed under the influence of frequent low intensity fires, referred to as fire

regime I.  AR12239–40.[2]  Without these frequent fires, the dry sites have become "densely

stocked with small diameter trees," often grand firs, and current "vegetative conditions" have

significantly departed from those historically.  AR12239–40 ("vegetative condition departure is

very high" on warm/dry sites).  These small non-fire tolerant trees contribute to fire risk as

ladder fuels enabling fire to reach the crowns of overstory trees, resulting in non-typical high-

severity stand replacing fires.  *Id.*

Approximately 13% of the Project area comprises of warm/moist and cool/moist to

cold/dry[3] sites.  AR12239–40;[4] 12626 (FEIS table).  When discussing historical fire regimes, the

FEIS refers to these sites as "GFDF" or fire regime III.  AR12239.  GFDF is a mixed severity

fire regime which "historically experienced moderate to long fire return intervals and higher

associated fire intensities."  AR12240.  In the Blue Mountains, "the fire return interval [for

GFDF] is estimated at 45–100 years."  AR12776.  Moist forests "historically had the most

complex and variable fire history and stand structures, as a result of mixed intensity fires at

highly variable frequency and sizes."  AR7323.  In contrast to the warm dry forests, the

---

[2] The historical fire regime is the classification of the role fire would play in the absence of modern fire suppression, but including the influence of aboriginal burning.  AR7973.

[3] Cold dry sites are subalpine fir sites, none of which are proposed for logging.  *See* AR7917.

[4] The remaining 16% of the Project area is non-forested.  AR12239.

vegetative conditions on moist forests with fire regime III have departed much less from historical (natural) conditions.  AR12240 ("vegetative condition departure for these moist sites is modeled at low[]").

Project implementation will move warm dry forest conditions closer to their natural fire regime and vegetative conditions.  AR12247.  In contrast, moist forests will deviate further from their natural vegetative condition and mixed severity fire regime, AR12247, because the Project will impose a low severity frequent fire regime across the landscape.[5]

A year before issuing the ROD and its final environmental impact statement ("FEIS"), AR12135, the USFS published the Project's draft environmental impact statement ("DEIS") for public comment.  AR7854.  Both plaintiffs submitted comments pointing to numerous omissions and errors in the DEIS.  AR8866; 8549.  Plaintiffs' concerns included the need for the USFS to consider the cumulative impacts of this Project, amending the Forest Plan to log large trees and within old growth stands below HRV, along with other projects relying on similar site-specific amendments across the Forest.  AR8588–94.  Those broader, unconsidered impacts include impacts on wildlife species that depend on large old trees and old growth. Plaintiffs also argued that any Forest Plan amendment should not be site-specific, but instead forest-wide because the forest conditions the agency claims require an amendment exist across the Forest.  AR8575–79.

Additionally, plaintiffs raised concerns the DEIS analyses lacked scientific integrity, particularly in regard to logging large trees and within old growth and moist forests.  The USFS

---

[5] AR11558 (fire management report noting that the desired condition is "summer wildfires that burn primarily on the ground (low intensity)"); AR12245 (Table 31 showing that post-treatment, the GFDF, historically mixed severity stands, will have surface fires); AR12244 (the proposed logging and prescribed fire will shift fires from burning in heavier fuels to burning in light fuels "where the predominant fire spread mechanism will be surface fire"); AR7867 (DEIS stating the agency intends to restore the forest "based on the fire ecology of low and mid elevation warm dry forests"); AR12247 (moving the moist forests from their natural vegetative and fire regime is primarily due to "the impact of more frequent fire return than called for by the models").

improperly labeled large grand fir trees "immature," failed to discuss climate change as it relates to the loss of the forest's carbon stores, and proposed to log in moist forests that do not need restoring, particularly in a manner that imposes low intensity frequent fire regime.  AR8549–646 (comments on these issues throughout the document).  Plaintiffs argued logging in moist forests will not meet the Project's purpose and need, nor will logging in multi-story old growth in order to create more single-story old growth.  *Id.*  Plaintiffs urged the USFS to consider an alternative that limited the Project to warm/dry forests.  AR8567–68.

After the USFS issued its ROD and FEIS, plaintiffs submitted administrative appeals. AR14744; 15250.  However, much of the analysis in the FEIS was quite different from that in the DEIS, especially regarding impacts to old growth dependent wildlife such as the pileated woodpecker and the American marten. Plaintiffs' access to significant information created by the USFS to support its FEIS analysis was materially hindered by the USFS's failure to circulate that information with or append it to the FEIS. Plaintiffs' appeals raised objections to these matters as well as many of the same issues raised at the DEIS comment stage.  AR14746–831 (matters discussed throughout body of appeal); AR15257–309 (same).  The appeals also questioned the accuracy of the analyses because the USFS withdrew the travel management plan ("TMP") shortly after they released the FEIS, and the FEIS relied heavily on the TMP to minimize impacts of the Project on wildlife.  AR12405; 14704; 14823; 15285–86, 15299–303.

## III.    Standing

On or about April 24, 2013, plaintiffs filed declarations from their members, Michael Higgins, Karen Riener, David Mildrexler, Marilyn Miller, and Pete Martin.  Dkt. 38, 39, 40, 41, and 42.  Those declarations set forth facts establishing plaintiffs' standing to bring this action.

*See generally Friends of the Earth v. Laidlaw*, 528 U.S. 167, 180–81 (2000); *Citizens for Better Forestry v. USDA*, 341 F.3d 961, 971–72 (9th Cir. 2003).

## IV.    Standard of Review

"In challenges to final agency action, the court does not employ the standard summary judgment analysis…[T]he court's function is to determine, whether or not, as a matter of law, the evidence in the administrative record permitted the agency to make the decision it did." *Nehemiah Corp. v. Jackson,* 546 F.Supp2d 830, 838 (E.D. Cal. 2008).  Judicial review of agency actions brought under NEPA and NFMA are governed by the Administrative Procedure Act ("APA").  5 U.S.C. §§701–706; *Idaho Sporting Congress v. Rittenhouse*, 305 F.3d 957, 864 (9th Cir. 2002).  Under the APA, a court shall hold unlawful and set aside agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §706(2)(A).

> Under this standard, an "agency must examine the relevant date and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto Ins. Co.,* 463 US 29, 43,103 S.Ct. 2856,77 L.Ed.2d 443(1983).  An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise, or if the agency's decision is contrary to the governing law. *Id.*

*Gifford Pinchot Task Force v. Perez*, 2014 WL 3019165, *3 (D.Or. July 3, 2014), *quoting Organized Village of Kake v. USDA,* 746 F.3d 970, 974 (9th Cir. 2014).

Although the standard of review is narrow, "a reviewing court must conduct a searching and careful inquiry into the facts," *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th Cir. 1994), and the arbitrary and capricious standard does not shield agency action from a "thorough, probing, in-depth review." *Citizens to Preserve Overton Park v. Volpe*,

401 U.S. 402, 415 (1971).  Deference to agency expertise is required, but the agency still must

"explain the conclusions they draw from their chosen methodology and the reason [the agency]

considers the underlying evidence to be reliable." *Lands Council v. McNair*, 537 F.3d 981, 994

(9th Cir. 2008)(en banc).  "[The court] may not supply a reasoned basis for the agency's actions

that the agency itself has not given." *Alabama-Tombigbee Rivers Coalition v. Kempthorne*, 477

F.3d 1250, 1254 (11th Cir. 2007).  This Court may uphold the USFS's decision only on the basis

of the reasoning found in those decisions.  *Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 849

(9th Cir. 1997), and the agency is not entitled to deference where its "conclusions do not have a

basis in fact." *Ariz. Cattle Growers' Ass'n v. USFWS*, 273 F.3d 1229, 1236 (9th Cir. 2001).

## V.    Argument

### A.    The USFS Failed to Prepare a Supplemental EIS After Withdrawing Its Travel Management Plan in Violation of NEPA (Claim One, Count Four).

The parties already fully briefed, both before this Court and the Ninth Circuit Court of

Appeals, plaintiffs' claim that due to the withdrawal of the Forest's travel management plan

("TMP"), the USFS must prepare a supplemental EIS ("SEIS") analyzing the impacts of the

Project without the benefits from the TMP.  *See First Amended Complaint* (Dkt. 19), ¶¶ 147–150.

Pl. P.I. Memo, Dkt. 33 at 28–31; USFS P.I. Memo, Dkt. 57-1 at 28–31; Interv. P.I. Memo, Dkt.

50 at 15–18.  On appeal of this Court's denial of plaintiffs' preliminary injunction motion, the

Ninth Circuit agreed with plaintiffs on this claim, holding "plaintiffs are likely to prevail on their

claim that a supplemental EIS must be completed to show the environmental impact of the Snow

Basin project on elk and their habitat now that the TMP has been withdrawn." *LOWD v.

Connaughton*, 2014 WL 1814172 (9th Cir. 2014), *3.  The Ninth Circuit fully explained the

legal and factual basis for this holding, *id.,* and then instructed this Court to issue a preliminary

injunction "while the USFS completes a supplemental [EIS]." *Id.* at *9.

Unlike the situation presented by most preliminary injunction motions, here the parties and both courts had full access to the complete administrative record when briefing and considering this issue.  Dkt. 25 (lodging of record).  Generally, at the preliminary injunction stage, appellate rulings regarding the underlying merits of a plaintiff's claims are not considered to be law of the case because the appellate court only determines whether or not the plaintiff has a likelihood of success. However, any conclusions on pure issues of law are binding.  *Ranchers' Cattlemen Action Legal Fund United v. USDA,* 499 F.3d 1108, 1114 (9th Cir. 2007).  Moreover, as the Ninth Circuit has explained, in a record review case when the appellate court has the complete administrative record before it, the preliminary nature of the appellate court's merits ruling is more of a technicality.  *Id.; see also Protect Lake Pleasant, LLC v. Connor,* 2010 WL 5638735, * 8–9 (D.Az. July 30, 2010) (applying law of the case to issues actually litigated and decided at preliminary injunction phase based on complete administrative record).

Here, the Ninth Circuit based its ruling on the complete record and did not act hastily. The Ninth Circuit's opinion, clearly indicating that the Ninth Circuit believes an SEIS is necessary based on the TMP issue, is a ruling on a pure issue of law.  This Court should therefore treat the appellate court's ruling on the plaintiffs' TMP claim as the law of the case and convert that appellate holding into a final ruling under FRCP 65(a)(2).  Judgment should be entered for plaintiffs on that claim based on the Ninth Circuit's reasoning and legal conclusions.[6]

The federal defendants have indicated that they disagree, but because of some confusion about which claims plaintiffs were still pursuing after the Ninth Circuit's ruling, defendants' opening brief does not address plaintiffs' TMP claim.  Intervenors addressed the claim, Interv. SJ Memo, Dkt. 86, at 14–17, but submitted their brief before the Ninth Circuit ruled and their

---

[6] Similarly, plaintiffs believe the Ninth Circuit ruling against them on the merits of the other claims plaintiffs raised before that court should also be treated as law of the case.

arguments essentially repeat arguments that they raised before that court. Plaintiffs assume both

opposing parties will address in their responsive/reply briefs why they believe the Ninth Circuit's

ruling on the TMP claim should not be considered law of the case and binding on this Court as a

practical matter.  Plaintiffs will respond to those arguments in their final reply brief. [7]

### B.  *The Snow Basin Project Includes Two Site-Specific Plan Amendments That Violate NFMA and NEPA (Claim One, Count 3 and Claim 2).*

The Snow Basin Project includes two illegal site-specific amendments to the WWNF

LRMP that allow logging in hundreds of acres of LOS that are below HRV and allow for the

logging of tens of thousands of trees over 21 inches dbh.  These amendments create exceptions

to otherwise mandatory requirements called the Eastside Screens Amendments ("Eastside

Screens").  The USFS developed the Eastside Screens in the mid-1990s because of wide-spread

scientific agreement that, due to past over-logging, the national forests in eastern Oregon,  had

significant shortages of old growth and large, mature trees.  Many wildlife species, such as

pileated woodpeckers and the American marten, depend on old growth areas and other forests

with large trees.  The agency claims it needs to implement these site-specific "exceptions" to

address unhealthy forest conditions within the Project area.  However, these same unhealthy

forest conditions exist throughout the region.

Using site-specific amendments to address forest conditions that are not site-specific

violates both NFMA and NEPA.  Using such limited amendments allows the USFS to avoid

considering the forest-wide management implications and the environmental cumulative impacts

of these two amendments.  The USFS has used similar site-specific amendments to the Eastside

---

[7] While not directly relevant to the merits of plaintiffs' claims, the extra-record evidence
defendants' offered during the briefing on plaintiffs motion to determine the scope of their
preliminary injunction underscored why an SEIS regarding impacts to elk habitat is necessary.
See Pl. Scope of PI Motion, Dkt. 90 at 24–25; Pl. Reply re Scope of PI, Dkt. 107, at 27–28.

Screens in the past to address the same forest conditions that exist in many other areas of the WWNF and the entire Eastside region. The USFS is currently implementing similar amendments, and it is continuing to propose them for future projects. When the USFS considered the impacts of these Eastside Screens exceptions in the Snow Basin EIS, it arbitrarily limited the scope of the required cumulative impacts analysis under NEPA to just the Snow Basin Amendments. That unduly limited scope allowed it to avoid disclosing the actual impacts of such piecemeal abandonment of the Eastside Screens on the very wildlife species that benefit from compliance with the Eastside Screens. If the USFS believes the Eastside Screens need to be amended to address forest conditions existing in many areas of the forest, the agency should propose and evaluate forest-wide amendments and the forest-wide impacts of curtailing the Eastside Screens restrictions on logging large trees.

      1.   <u>Factual Background:  The Eastside Screens Amendments</u>

In 1992, Monitoring Reports for national forests in Oregon and Washington East of the Cascade Crest expressed concern over forest conditions due to over-logging. *See* AR2674–76. These reports acknowledged that "excess timber cutting can conflict with promoting forest health" and that "the number of trees available for nesting has been declining." AR2674; AR2675. Further, the reports indicated alarmingly low numbers of wildlife, including elk, deer, and anadromous fish. AR2675. The reports specifically noted that there were many reasons for this decline, but one reason was certainly loss of cover from timber harvest. AR2675. The reports also concluded that prior timber harvesting practices "have left numerous treated acres on the Forest without adequate dead tree densities to meet the habitat and needs of primary excavators."

AR2675.[8]  As a result of these problems, Congress "requested and funded a scientific analysis of the effects of Forest Service management practices on the forest ecosystems in eastern Washington and Oregon."  AR2675–AR2676.  Over 113 scientists contributed to the Eastside Forest Ecosystem Health Assessment, concluding that "eastside ecosystems are stressed and unstable" because of "management practices of this century that have reduced diversity…and long-term productivity…"  AR2676.

Because of these scientific findings, on August 18, 1993, the Regional Forester issued an Interim Direction that established riparian, ecosystem, and wildlife standards for timber sales in Eastside forests, including the WWNF.  AR2773; AR2667.  In addition to other requirements, the Eastside Screens prohibit logging "live trees" greater than 21-inches (dbh) and timber sale harvest activities within LOS stages that are below HRV.  AR2829.  This direction is intentionally restrictive and requires the Eastside forests to use certain standards to "screen" timber sales.  AR2774; 2657.  The purpose of the interim direction is "to preserve future planning options *until completion of the [regional] Eastside EIS*," which will assess "risks to species, ecological groupings of species, and habitats" throughout the Eastside forests, and will provide long-term strategy for ecosystem management on the Eastside forests.  AR2775; *see also* AR2657.  In 1994 and again in 1995, the Regional Forester extended a modified version of the Eastside Screens pending completion of the regional Eastside EIS.  AR2659; 2773.[9]

---

[8] Primary cavity excavators are wildlife species such as the pileated woodpecker that require dead or defective wood habitat.  Such habitat is sometimes referred to as "snags."  *See* AR12390.
[9] The Regional Forester recognized extending the Eastside Screens until completion of the Eastside EIS was appropriate for all nine Eastside forests because "no known unusual circumstances exist because the Decision does not impose any highly uncertain, unique or unknown environmental risk…[and] [n]o unique characteristic of the eastside national forest would be adversely affected."  AR2779.

Despite the previous Regional Forester's emphasis on the need for a region-wide EIS addressing this issue, in 2003, the then Regional Forester suggested site-specific amendments may be appropriate to sidestep the Eastside Screens.  AR3429.  She encouraged each Forest Supervisor "to consider site-specific Forest plan amendments [to] better meet LOS objectives by moving the landscape towards HRV, and providing LOS for the habitat needs of associated wildlife species."  AR3429.[10]  She suggested "site-specific" amendments to avoid the 21-inch diameter limitation and no harvest in stands below HRV limitation.  AR3429.  However, she also noted recent science emphasized the continuing importance of the Eastside Screens and "reinforce[d] the importance of retaining and recruiting large, old trees in the eastside landscape, particularly (but not only) in Forests historically dominated by single-story LOS."  AR3431.

        2.   The USFS's Forest Plan Amendments Violate NFMA.

           *a.   The USFS's Forest Plan Amendments Violate NFMA Because They Are Not Addressing a Site-Specific Problem.*

NFMA governs the management of all national forests, requiring a two-step management approach.  First, the USFS must develop a forest plan for every national forest.  Each forest plan must "form *one integrated plan* for each unit of the National Forest System."  16 U.S.C. § 1604(f)(1) (emphasis added).  The USFS may amend a forest plan "in any manner whatsoever." 16 U.S.C. § 1604(f)(4).  However, the agency must provide a rational basis for doing so, especially if it limits the geographic scope of an amendment to what is supposed to be an integrated, forest-wide plan.  *See Lands Council v. Martin,* 529 F.3d 1219, 1228 (9th Cir. 2008).  Any forest plan amendment that would result in a 'significant change' in the plan must comply with several additional NFMA requirements and undergo a more rigorous NEPA analysis. 16

---

[10] The Regional Forester explained that implementation of the Eastside Screens has created substantial management implications throughout the Eastside forests and "presented challenges," perhaps because the Forest Service could not authorize as much logging.  *See* AR3429.

U.S.C. 1604(f)(4)).  "Significance is determined based on an analysis of the objectives, guidelines, and other contents of the forest plan."  *Native Ecosystems v. Dombeck*, 304 F.3d 886, 898 (9th Cir. 2002). Second, after the USFS develops a forest plan, "all subsequent agency action, including site-specific plans,…must comply with the NFMA and be consistent with the governing forest plan."  *McNair*, 537 F.3d at 988–89 *citing* 16 U.S.C. § 1604(i).

The USFS's site-specific forest plan amendments for the Snow Basin Project violate NFMA because the agency improperly limited the geographic scope of the amendments to the Project area even though the purported need for the amendments is forest-wide, not site-specific. A decision that purports to "amend" such a forest-wide, integrated plan by allowing something the Plan prohibits for a one-time, site-specific timber sale is not in fact an "amendment."  It is an "exception" to the Plan's otherwise integrated and mandatory requirements.  These amendments, and many others implemented across the region, are an attempt to evade preparation of the required regional Eastside EIS that was intended to replace the Eastside Screens.

The Ninth Circuit addressed the legitimacy of a site-specific amendment instead of a general amendment applicable to the whole forest in *Lands Council v. Martin*.  There, the Court found that "the Forest Service's decision to limit the scope of an amendment [must be] *informed by site-specific characteristics* and Forest Service expertise."  529 F.3d at 1228 (emphasis added). To limit the scope, the USFS must articulate "a rational connection between the facts found and the choices made."  *Id. quoting Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001)(internal quotation marks omitted).  In *Lands Council*, the USFS chose to amend the definition of "live trees," but only for the project site.  It specifically found that the prescription it chose "may not be appropriate to assess [live] trees affected by…[various] causes of tree mortality" in other parts of the forest.  529 F.3d at 1228.

Because the definition of live trees was unique to the project site and was not appropriate for the entire forest, the USFS properly limited the scope of the amendment.

Here, the USFS has not provided any explanation for why the Snow Basin site-specific amendments would not apply to other parts of the forest suffering from the same forest conditions.  In the ROD, "Amendment 1" sets out the Eastside Screens' restriction on logging in LOS below HRV and then creates a site-specific exception to that requirement for the Snow Basin Project.  AR12830.  "Amendment 2" similarly sets out the Eastside Screens ban on logging trees larger than 21 inches dbh and then also creates a site-specific exception for logging large trees within 11,000 acres of the Snow Basin Project.[11]  Each amendment describes the forest conditions that supposedly justify the amendment, but there is no suggestion that those conditions are unusual or unique to the Project area.

In fact only a few pages earlier, the ROD acknowledged that forest conditions and forest health issues in the Snow Basin Project area are "representative" of "many western forest landscapes …at risk due to past fire suppression and logging activities."  AR12827.  In response to plaintiffs' Amended Complaint, Dkt.19, the USFS admitted that "some of the forest conditions and forest management issues addressed by the site-specific amendments for the Snow Basin Project area can be found elsewhere in the WWNF and other National Forests in Oregon and Washington located east of the Cascade Mountains."  USFS Answer, Dkt. 20, ¶ 144. Site-specific amendments like these were initially suggested by the Regional Forester to address what she clearly saw as a regional forest management issue.  AR3429.  The WWNF and other regional forest have repeatedly used such amendments, *see* AR3433, 15044 **,** and the USFS admitted that "the Forest Service has conducted treatments in multi-story [old growth] forests elsewhere in the

---

[11] Amendment 2 also allows logging large Douglas fir trees with "excessive mistletoe infestation" and large trees "affecting the health and vigor of aspen stands."  AR12831.

WWNF, creating single-story [old growth] in certain areas, and amended the Eastside Screens at a site-specific level to allow harvest in [old growth] stands in structural stages below their historic range of variability and to allow cutting of trees 21 inches or greater at diameter breast height." Dkt. 20, ¶ 140.  Moreover, the USFS has continued to use similar site-specific amendments in the WWNF after approving this Project. *See* Dkt. 46-2, at 3–5.

The ROD acknowledged the Snow Basin Project is not informed by site-specific characteristics but actually by a region-wide problem.  Unlike in *Lands Council v. Martin*, in which the USFS justified the site-specific amendment due to the unique need for a different definition, here the USFS has not provided a rational connection between creating a site-specific amendment and an acknowledged region-wide problem.  Contrary to *Lands Council* where the definition for "live trees" would not be applicable to the rest of the forest, nothing here indicates that the prescription the USFS chose to address this problem in the Snow Basin Project area would not be appropriate for other areas in the WWNF.

If the USFS believes the Eastside Screens need to include "exceptions" to address the region-wide forest health issues identified in the ROD and the Regional Forester's 2003 letter, the agency should complete the regional Eastside EIS.  In the alternative, the WWNF could propose a forest-wide amendment that could properly authorize exceptions to the Eastside Screens to address forest health issues that the USFS admits exist in many other areas of the WWNF.  Repeatedly using site-specific amendments, including the two Snow Basin amendments at issue here, to address a forest-wide and region-wide problem improperly allows the Forest Service to bypass any public consideration of the regional or forest-wide management implications of those amendments.  It is also inconsistent with NFMA's requirement for integrated forest plans and is arbitrary and capricious in violation of NFMA and the APA.

               *b.  The Forest Service's Amendments to the Forest Plan Are Significant.*

       This Court also should find that the Amendments are arbitrary and capricious because they are a significant change to the WWNF LRMP.  The Amendments are a significant change because they changed multiple goals and objectives of the Eastside Screens adopted in the WWNF LRMP.  When the Forest Service amends a forest plan, any amendment that results in a "significant change" in the plan requires compliance with a number of additional NFMA requirements, including a much longer comment period and public meetings. 16 U.S.C. § 1604 (d) and (f)(4); *see also Native Ecosystems*, 304 F.3d at 898 *citing* 16 U.S.C. § 1604(f)(4) (2000). "Significance is determined 'based on an analysis of the objectives, guidelines, and other contents of the forest plan.'" *Id.*  Based on the objectives, guidelines, and contents of the forest plan, the USFS's site-specific Amendments are significant.

       The Ninth Circuit discussed when a forest plan is significant in *Native Ecosystems Council v. Dombeck.*  In that case the Forest Service created a site-specific amendment that they claimed was not significant to the forest plan's road density requirement. *Id.* at 898.  The Ninth Circuit held that the Forest Service's amendment to the forest plan was not significant because the amendment "does not alter multiple-use goals or objectives for long-term land and resource management, nor significantly change the planned annual outputs for the forest." *Id.* at 900.

       Unlike the amendment in *Dombeck*, the amendments to the forest plan's Eastside Screens do alter long-term goals and objectives of the plan for several reasons.  First, unlike in *Dombeck*, in which the amendment was to road-use requirements, the amendments here allow logging of trees 21 inches DBH and larger on over 11,000 acres of the forest and allow logging in more than 600 acres of LOS.  The admitted negative impacts in *Dombeck* were temporary because after logging, the Forest Service would close the roads.  Here, however, the Forest Service's amendment will have significant, long-term ramifications.  Once logging of trees 21 inches dbh

and larger and logging in LOS occurs, those 100 year-old trees will be gone forever.  The permanence of the actions these amendments authorize makes them much more significant.

Second, the amendment here clearly contradicts the long-term goals of the WWNF LRMP's adoption of the Eastside Screens.  The Environmental Assessment ("EA") for the Eastside Screens establishes that "there is a need to maintain the abundance and distribution of old forest structure and to protect riparian areas for wildlife and fish species that are showing population declines as these habitat components are reduced."  AR2668.  Further it asserts that "[t]he purpose is to preserve those components of the landscape—old forest abundance, wildlife habitat in late and old structural stages, and riparian areas—which new information suggests is vitally important to certain species of wildlife and fish and to the overall vegetative structure of the forest."  AR2669.  Last, the EA found that timber harvesting "in LOS stands could threaten the ecosystem balance …[and] undermine needed habitat protection for old forest associated with wildlife species."  AR2676.  The reasoning for the Eastside Screens, which the WWNF LRMP adopted, shows the importance of retaining the LOS and large trees that still exist because without these structures the ecosystem is off-balance.  Allowing logging to occur on over 10,000 acres fundamentally contradicts the long-term goals and objectives of the WWNF LRMP, both because of the permanence of the actions and the undercutting of the goals of the Eastside Screens, adopted by the forest plan.  The Regional Forester's 2003 letter suggested amendments that would both address forest health issues *and* provide habitat for species that need LOS and large trees.  AR3429.  Although, as is discussed in the next section, the Snow Basin Project environmental analysis improperly limited its cumulative impacts analysis, even its unduly narrow analysis showed that the Snow Basin Amendments actually harm the habitat of the very species that the Eastside Screens are intended to benefit.  *E.g.*, AR12366-12400.

3.   <u>The USFS Violated NEPA by Improperly Limiting the Scope of Its Cumulative Impacts Analysis.</u>

Council on Environmental Quality ("CEQ") regulations require agencies to analyze the cumulative impacts of the proposed action.  40 C.F.R. §1508.25(c)(3).  Cumulative impacts are the impacts on the environment which result from the incremental impact of an action when added to other past, present, and reasonably foreseeable future actions.  *Id.* at §1508.7.  They can result from individually minor but collectively significant actions taking place over a period of time.  *Id.*  A cumulative impact analysis "must be more than perfunctory; it must provide a 'useful analysis of the cumulative impacts of past, present, and future projects.'"  *Kern v. BLM*, 284 F.3d 1062, 1075 (9th Cir. 2002).  "Moreover…an agency must provide 'some quantified or detailed information;…general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided.'"  *Ocean Advocates v. U.S. Army Corps. of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2004). Conclusory statements do not satisfy the "hard look" that NEPA requires.  *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 996 (9th Cir. 2004).  If the USFS restricts this cumulative impacts analysis, it "would be easy to underestimate the cumulative impacts of the timber sales, and of other reasonably foreseeable future actions…Such a restricted analysis would impermissibly subject the decisionmaking process contemplated by NEPA to 'the tyranny of small decisions.'"  *Kern*, 284 F.3d at 1078.(citation omitted).

The CEQ recognized "that the most devastating environmental effects may result not from the direct effects of a particular action, but from the combination of individually minor effects of multiple actions over time," and issued guidance documents on necessary cumulative effects analyses.  CEQ, *Considering Cumulative Effects Under the National Environmental Policy Act*, at 1, Jan. 1997 ("*Considering Cumulative Effects*") http://energy.gov/sites/prod/files/

nepapub/nepa_documents/RedDont/G-CEQ-ConsidCumulEffects.pdf.[12]  For example, "[f]or a

project-specific analysis, it is often sufficient to analyze effects within the immediate area of the

proposed action[,] [w]hen analyzing the contribution of this proposed action to cumulative

effects…the geographic scope boundaries of the analysis almost always should be expanded."

*Considering Cumulative Effects*, at 12.  The CEQ suggests a process for determining the

geographic area of a cumulative impacts analysis:

- Determine the area that will be affected by the action.  That area is the
  project impact zone.
- Make a list of the resources within that zone that could be affected by the
  proposed action.
- Determine the geographic areas occupied by those resources outside of the
  project impact zone.  In most cases, the largest of these areas will be the
  appropriate area for the analysis of cumulative effects.

*Considering Cumulative Effects*, at 15.  The USFS need not follow these exact steps, but here it

failed to provide any process for determining the geographic scope and improperly limited the

scope for analyzing the effects of the site-specific amendments on wildlife without justification.

        *a.   The USFS Violated NEPA by Failing to Consider Cumulative Impacts of All
the WWNF's Site-Specific Amendments to the Eastside Screens.*

       The USFS failed to consider the cumulative impacts of the site-specific amendments in

relation to other site-specific amendments to the Eastside Screens on the WWNF.  In *Native*

*Ecosystems* the USFS approved a site-specific amendment to the forest's road density standards

for the Darroch-Eagle timber sale.  304 F.3d at 892.  The Ninth Circuit found the EA for the sale

failed to "analyze what, if any, environmental impacts this amendment might have in

combination with the road density amendments in the [previous sales in the Gallatin National

Forest]."  *Id.* at 896.  The USFS argued "it need not consider the other road density amendment

---

[12] Though the CEQ guidance documents are not necessarily binding, several courts have cited to
the CEQ guidance document as a consideration in their decision.  *See Kern*, 294 F.3d at 1078.
The Snow Basin FEIS cites to another CEQ guidance document, but ignores the broader
guidance document discussed here.  *See AR12203.*

within the Darroch-Eagle EA because the other amendments [were] spread throughout the

Gallatin National Forest" and unrelated to the project at issue, but the Court disagreed:

> The national forest was the geographic unit within which the Forest Service chose
> to set forth binding road density standards in the Forest Plan…Unless the
> cumulative impacts of these amendments are subject to analysis even though
> distantly spaced throughout the Forest, the Forest Service will be free to amend
> road density standards throughout the forest piecemeal, without ever having to
> evaluate the amendments' cumulative environmental impacts.

*Id.* at 897.  Because the geographical unit for the USFS's binding road density standards was the

entire Gallatin National Forest, the USFS needed to consider the cumulative impacts of all

amendments that changed the road density standards even though those amendments were site-

specific for different parts of the forest.

In this case, the geographic unit for the USFS's binding Eastside Screens is at a minimum

the WWNF, though arguably it encompasses all eastside forests.[13]  Thus, the USFS should

analyze the impacts of the Snow Basin Eastside Screens' amendments with all other past, present,

and reasonably foreseeable Eastside Screens' amendments allowing logging of large trees and

within old growth forests across the WWNF.  The USFS admits it has allowed site-specific

amendments for the logging of old growth and large trees multiple times in the WWNF,. Dkt. 20,

¶ 140, *see also* AR 15044.  Further, the USFS has plans to do similar site-specific amendments

in the WWNF for future projects.  Dkt. 46-2, at 3–5. Just like in *Native Ecosystems*, the USFS is

---

[13] Intervenors argue that the FEIS' "landscape assessment" of impacts to "treatments" within
LOS is sufficient.  *See* Interv. SJ Memo. at 12, *citing* AR12618. But this analysis does not
mention a single forest plan amendment or address in any way the amendments allowing the
logging of trees over 21 inches dbh.  The FEIS acknowledges that the geographic scope of this
"landscape assessment" does not include much of the WWNF and claims that such a forest-wide
assessment is not appropriate for a site-specific project.  AR12618.  But when the USFS is
repeatedly creating exceptions to forest-wide restrictions, the case law requires that the
appropriate scale for the cumulative impacts analysis is in fact forest-wide.  *Native Ecosystems,*
304 F.3d at 897.

creating site-specific amendments in multiple areas throughout the forest, without considering the cumulative impacts of all these site-specific amendments, in violation of NEPA.

> ### b.   *The USFS FEIS Contained a Deficient Cumulative Impacts Analysis Because of Its Unduly Narrow Geographic Scope.*

The USFS's cumulative impacts analysis also is deficient because it failed to define the proper geographic scope with regards to several species affected by the Project, including the pileated woodpecker and the American marten.  Determining the geographic scope "is a task assigned to the special competency of the appropriate agencies."  *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976).  Still, "the choice of analysis scale must represent a reasoned decision and cannot be arbitrary."  *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002).  Consequently, "[a]n agency must provide support for its choice of analysis area and must show that it considered the relevant factors.  *Native Ecosystems*, 304 F.3d at 902.  Relevant factors include "the scope of the project considered, the features of the land, and the types of species in the area."  *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 958 (9th Cir. 2003).  As the CEQ stated, "geographic areas occupied by those resources [meaning species] outside of the project impact zone" are a relevant and usually crucial factor.  *Considering Cumulative Effects*, at 15; *See Habitat Educ. Center, Inc. v. Bosworth*, 363 F. Supp. 2d. 1070, 1077–78 (E.D. Wis. 2005) (holding the USFS failed to consider the presence of a species outside the project area, and consequently failed to consider the activities outside the project area that could affect the presence of the species; also holding that the court may not assume the USFS considered the other activities if the USFS cannot show that it did so).

Here, the FEIS admits the Project will harm multiple wildlife species, but it later insists that such harm will be restricted to the Project area and that wildlife will have other habitat in large trees in other parts of the forest.  The USFS analyzed the Project's impacts on these species

at a localized level but justified its conclusions that the impacts are minor using the forest-wide

level.  AR12390 (noting the impacts are "immeasurable" forest-wide).  Even if the geographic

scope were correct, the FEIS cumulative impacts analysis is inadequate because it is not specific

to the species in a way that demonstrates a comprehensive cumulative impacts analysis.

### i.   *Pileated Woodpecker*

"The pileated woodpecker is a management indicator species ("MIS") associated with

old-growth habitat, and represents species dependent on large diameter snags and logs in older-

aged forests."  AR12385.  The USFS acknowledges the Project will occur in pileated

woodpecker source habitat and will degrade that habitat.[14]  AR12388.  Currently, the source

habitat for the pileated woodpecker is 206,374 acres throughout the WWNF, 18,569 acres

throughout the Eagle Creek watershed, and 3,039 acres within the Project area.  AR12386.

Source habitat loss as a result of the Project alone will be 1,314 acres.  AR12389.

Though the USFS acknowledges pileated woodpeckers are present throughout the

WWNF, when it establishes the cumulative effects analysis area for pileated woodpecker, it only

considers effects within the Eagle Creek watershed.  AR12389.  It offers no justification or

explanation for this geographic limitation, which is quite different from the geographic scope

used in the DEIS for this same analysis.  *See* AR8100 (using the home range of the goshawk as

the geographic scope).  In its FEIS cumulative effects analysis, the USFS admits that previous

projects in the Eagle Creek watershed within the past three years have resulted in underburning,

pre-commercial thinning, and commercial timber harvest of 1590 acres, though the FEIS fails to

justify why it only used activities for the past three years when logging and underburning have

major long-term effects.  AR12389–90.  According to the FEIS, these activities *may* impact

---

[14] Source habitat is "those characteristics of macrovegetation that contribute to stationary or
positive population growth for a species in a specified area and time."  AR12367.

pileated woodpecker habitat.  AR12389–90.  Additionally, the Skookum Timber sale resulted in harvesting 97 acres after the USFS issued this FEIS.  AR12390.  However, despite the USFS not knowing whether or to what extent all of this activity will impact the pileated woodpecker, it claims that the impacts will not be substantial in comparison to the watershed.  AR12390 ("Although some commercial treatments *may occur* within pileated woodpecker source habitat, the scale of potential impacts is not substantial in comparison to source habitats currently estimated to exceed 18,500 in the watershed").  The USFS merely states that these activities are insignificant without justifying this conclusion by explaining why potential impacts are not substantial.  This "conclusory statement" does not constitute a "hard look."

Despite the USFS analysis level being only the Eagle Creek watershed, it concludes that "[b]ecause this project impacts less than 1.0 percent of suitable habitat across the Forest, the overall…cumulative effects will result in a small negative effect to pileated habitat.  The reduction in habitat will be immeasurable at the WWNF scale."  AR12390.  This conclusion fails to account for the impact of the other activities across the WWNF affecting the pileated woodpecker.  The Project's impacts in combination with other timber harvesting, pre-commercial thinning, and underburning throughout the WWNF likely amount to more than 1.0 percent of suitable habitat for pileated woodpeckers and may be significant.  The agency's failure to take these activities into consideration when analyzing the cumulative impacts to the woodpecker is arbitrary and capricious.

### ii.  *American Marten*

The USFS has an eerily similar faulty analysis with its assessment of impacts on the American marten as it has for the pileated woodpecker.  The American Marten is a MIS also associated with old-growth habitat, and it is an indicator of the abundance and distribution of mature and old-growth forests.  AR12372.  The WWNF contains 129,943 acres of source habitat

(90 percent of historical), the Eagle Creek watershed contains 12, 304 acres, and the Snow Basin Project area contains 233 acres.  AR12372–73.  Additionally, 4,735 acres of the Eagle Creek watershed and 799 acres of the Project area are secondary habitats.  AR12373.  The Project will result in degradation to 39 acres of source habitat and 398 acres of secondary habitat.  AR12376.

Just like with the pileated woodpecker, the USFS analyzes the cumulative effects on the American marten at the level of the Eagle Creek watershed and again offers no explanation or justification for that geographic limitation.  That analysis simply reiterates what the pileated woodpecker cumulative effects analysis stated and then claims that these "potential impacts are not substantial in comparison to source habitat currently estimated to exceed 12,000 acres."  AR12378.  Again, the agency simply states this without explaining what makes these impacts not substantial, even in relation to the source habitat for the Eagle Creek watershed.  Once more, this "conclusory statement" does not satisfy NEPA's "hard look" requirement.

Similar to its analysis of the pileated woodpecker, the USFS then justifies this flawed analysis by comparing the effects on suitable habitat from the Project activity to suitable habitat across the forest and improperly concludes that:  "The Snow Basin project may reduce habitat permeability at a localized scale, but impacts at the WWNF scale would be immeasurable."  AR12378.  However, again, contrary to NEPA's requirements the agency failed to consider impacts of other projects across the WWNF on this species.[15]  Moreover, using a large spatial scale to dilute the actual localized impacts of a project is also arbitrary and capricious.  *See*

---

[15] Additionally, the USFS's cumulative effects analysis for the American marten was almost identical to that for the pileated woodpecker.  This failure to consider the cumulative effects on a level unique to each species shows that the cumulative impacts analysis is simply "general statements about possible effects" and is not "detailed" information regarding cumulative effects on a species.  *Ocean Advocates*, 402 F.3d at 865.  This fails NEPA's "hard look" requirement.

*Pacific Coast Fed'n,* 265 F.3d at 1036; *Ore. Natural Resources Council Fund v. Brong*, 492 F.3d 1120, 1130 (9th Cir. 2007).

<blockquote>

iii. <u>The USFS Improperly Limited the Geographic Scope for the Pileated Woodpecker and the American Marten.</u>

</blockquote>

The USFS improperly decided that the Eagle Creek watershed was the geographic scope for the cumulative impacts analysis. The agency failed to use guidance from the CEQ's *Considering Cumulative Effects* when determining the geographic scope or provide its own logical method for determining the geographic scope. Like the CEQ stated, in most cases, the largest area will be the appropriate area for the analysis of cumulative effects. Courts have held that the geographic scope for the cumulative effects analysis often needs to be significantly greater than the project area. The court in *Alliance for the Wild Rockies v. Bradford*, 720 F.Supp.2d 1193, 1219–20 (D. Mt. 2010), explained that an agency's cumulative effects analysis regarding species that exist over a wide area must explain and justify a decision to impose a more limited geographic scope on the analysis. Absent such an explanation, a restricted analysis area violates NEPA. *See also Idaho Sporting Congress, Inc.*, 305 F.3d at 973–974 (holding that because a Monitoring Report specified that harm to a species needs to be evaluated at a landscape scale, the Forest Service acted arbitrarily in using a narrower scale).

Here, after the USFS established that the pileated woodpecker and American marten were present within the Project area, it should have "determine[d] the geographic areas occupied by those resources outside of the project impact zone." The USFS acknowledged these species occupy areas throughout the WWNF. AR12376 (the source habitat for the pileated woodpecker is 206,374 acres throughout the WWNF); AR12372 (the WWNF contains 129,943 acres of source habitat for the American marten). However, instead of using "the largest of these areas" as the "appropriate area for the analysis of cumulative effects," it arbitrarily chose the Eagle

Creek watershed without providing any rationale for this decision.  This flawed analysis is  just like that in *Habitat Educ. Center, Inc.*, where the USFS failed to justify why it had not considered other projects in the forest that would affect a species that exists within the project area but also outside the project area.  363 F.Supp.2d at 1077–78.  The USFS has acknowledged the presence of the American marten and the pileated woodpecker elsewhere in the WWNF, but it has not provided any justification for excluding consideration of other activities across the WWNF outside the Eagle Creek Watershed.  This arbitrary decision allowed the USFS to disregard incremental impacts of the Project on the pileated woodpecker and American marten when added to past, present, and reasonably foreseeable future actions throughout the Forest.

### C. The USFS Failed to Ensure the Scientific Integrity of the Analysis in Violation of NEPA (Claim One, Count Eleven).

NEPA requires the USFS to "ensure the 'scientific integrity' of the discussions and analyses in [the] EIS[.]"  *League of Wilderness Defenders (LOWD) v. USFS*, 689 F.3d 1060, 1073 (9th Cir. 2012) *citing* 40 C.F.R. §1502.24; *see also* 40 C.F.R. § 1500.1(b) (requiring "high quality information").  This safeguards the primary purpose of an FEIS: "allow[ing] for informed public participation and informed decision making."  *Earth Island Institute v. USFS*, 442 F.3d 1147, 1160 (9th Cir. 2006).  And while the court must be "most deferential when the agency is making predictions[] within its area of special expertise…[a]t the same time, courts must independently review the record in order to satisfy themselves that the agency has made a reasoned decision based on its evaluation of the evidence."  *LOWD*, 689 F.3d at 1073.

Here, rather than ensure informed public participation and informed decision making, the agency relied on faulty data and methodology, which misrepresented current forest conditions, and presented only one side of an issue.  All of these errors painted a more favorable picture of the agency's preferred alternative that allows logging of thousands of large grand firs across the

landscape, and logging within rare old growth forests and moist forests not in need of restoration. Such a skewed presentation lacks scientific integrity and is not the "full and fair discussion" of environmental impacts that NEPA requires in an EIS.  *See* 40 C.F.R. § 1502.1.

       1.   <u>The USFS Incorrectly Referred to the Large Grand Firs as Immature and an Artifact of Fire Suppression.</u>

The DEIS and FEIS consistently refer to the large grand fir trees within the Snow Basin Project area  as "immature," only about 90 years of age, and/or an artifact of fire suppression.[16] These references appear to be additional justifications for the site-specific plan amendment that allows the logging of these large (over 21 inches dbh) but supposedly "immature" trees. For the following reasons, this description of large grand firs lacks scientific integrity.  First, the agency bases its assumption thousands of large grand firs are "immature" on a sampling of 48–50 trees in 2008.  AR7918 (field sampling of 50 grand fir, summer 2008); AR7931 (random survey of 48 grand fir, summer 2008).[17]  Based on this small sample, the USFS determined the average age of the Project area's large grand fir trees was 93 years with an average diameter at breast height (dbh) of 24".  AR7918.  Assuming this is the age of the average large grand fir, the USFS never defined what constitutes an "immature" or "mature" tree and instead simply applied the

---

[16] AR12180 (some LOS stands currently contain many large, but "relatively young (approximately 90 years old) grand fir"); AR12181 (large ponderosa pines are being "out competed by an increasing number of immature grand fir"); AR12206 ("[i]mmature grand fir" have filled in the growing space during the fire exclusion period); AR12240 (current stands of "large older ponderosa pine intermixed with large younger (less than 100 year old) grand fir" supports lack of fires in the area); AR12705 ("[i]mmature large grand fir trees" on warm dry forests will be removed); AR7918 (some stands are deemed old growth based on the presence of large "immature" grand firs); AR7931 (same); AR9758 ("immature 21+ grand fir are competing with other large tree species"); AR7961 (many "stands have high numbers of immature 21+ grand fir").

[17] Despite the discrepancy in the number of trees sampled (48 v. 50), this is the same survey. Both were completed in the summer of 2008 and involved Joe Sciarrino.  Also, there is only one data sampling in the record.  AR6471–72.

"immature" label to this "average age."[18]  One 1994 USFS report cited in the FEIS for other

reasons,  defined "mature" trees as being 40-64 cm, or 15.7-25," dbh.  Lehmkuhl, *et al.*, 1994,

*Historical and Current Forest Landscapes of Eastern Oregon and Washington Part I:*

*Vegetation Pattern and Insect and Disease Hazards*, p. 81 (citation at AR12548).  According to

this definition, the average large grand fir tree in the Project area would be mature.

Assuming however, a 93 year old tree is "immature," this is not the age of the average

large grand fir tree at the time of the Snow Basin NEPA analyses.  The 2008 sampling measured

the age of the trees *at breast height* or 4.5 feet from the ground.  AR6471–72 (second column

listed "BHAge" or breast height age); *Second Brown Decl.* (Dkt. 63), ¶ 10; *Declaration of Brian*

*Kelly in Support of Plfs' SJM*, ¶ 11.[19]  The *actual* age of the trees is five to ten years older

because it typically takes a tree that many years to grow to breast height.  *Id*.  *Kelly Decl.,* ¶¶ 4,

11 (noting it is standard practice for the USFS to use this method to determine actual tree age).

Thus, assuming the survey is accurate as to the age of the trees at *breast height*, the actual

average age of the trees in 2008 was 98–103 years.  This means at the time the USFS released

the draft and final EISs in 2011 and 2012, respectively, the average age of the large grand fir was

at a minimum 101–102 years old and at a maximum 106–107 years old.  The scientist relied

upon by the USFS for determining what constitutes an "old" tree, Robert Van Pelt (AR12155;

12548), deems trees older than 100 to be "mature."  Van Pelt 2008, *Identifying Old Trees and*

---

[18] In contrast the FEIS does define "old" trees as trees at least 150 years old.  AR12155.

[19] Mr. Kelly's declaration explains technical terms or complex subject matter, i.e., the 2008 data
sampling at AR6471–72, and explains an error in the agency's conclusion that most large grand
fir trees are immature and under 100 years old.  *See Southwest Ctr. for Biological Diversity v.
USFS*, 100 F.3d 1443, 1450 (9th Cir. 1996) (exceptions to the record review rule).  Had the
USFS provided this data to plaintiffs in 2011, as requested, and not dropped all reference to it in
the FEIS, plaintiffs could have addressed this in their administrative appeals rather than, for the
first time, in litigation.  *See* AR8979–85 (HCPC's FOIA request and the USFS's decision to
withhold all data queries).  The USFS's improper withholding of most documents supporting the
Snow Basin EIS analyses is the reason Mr. Kelly's declaration is necessary.

*Forests in Eastern Washington,* Washington State Department of Natural Resources, 168 p. at p. 101. As such, the average large grand fir in the Project area at the time of the Snow Basin NEPA analyses was over 100 years and was mature.

This false assertion resulted in the decision-maker and the public believing throughout the NEPA process the large grand fir trees were considerably younger than they were. While the public may have believed the USFS is justified in logging these large grand firs based on this misrepresentation, had they known the trees were over a century old, they may have opposed the logging or raised more concerns. This misstatement is not "insur[ing]…the scientific integrity, of the discussions and analyses." *Earth Island Institute*, 442 F.3d at 1160, 1167.

The USFS also improperly led the public to believe it accurately sampled 50 trees "using an increment borer." AR07918 (DEIS footnote 12). In truth only 31 out of 47 trees were bored. AR06471-72, *Kelly Decl.,* ¶¶ 5–7. The USFS did not sample the remaining 16 trees, all over 24" dbh, because "they exceeded the capability of our increment borers." *Id*. The failure to disclose these shortcomings of the survey in the EISs violates NEPA's requirement of "up-front disclosures of relevant shortcomings in the data or models."[20] *Native Ecosystems Council v. USFS*, 418 F.3d 953, 964 (9th Cir. 2005) (agencies violate NEPA when they fail to disclose that their analysis contains incomplete information); *Earth Island,* 442 F.3d at 1167 (agency violates NEPA when it "misunderstood" or misrepresented" data).

---

[20] Similarly, the USFS failed to disclose the methodology it used to assign ages to the 16 un-sampled trees. This is of concern given the unusually young ages the USFS gave to several of the trees. AR6471–72; *Kelly Decl.*, ¶ 8. For example, two trees with 26" dbh are assigned ages of 51 and 66, and a tree with a 33" dbh was deemed 44 years old. AR6471. In Kelly's experiences boring thousands of trees in northeast Oregon, "it would be exceptional for a tree of this size to be so young, particularly when compared to the age of the trees 21–24 inches dbh that were actually sampled." *Kelly Decl.*, ¶ 8.

Under the circumstances, the USFS's decision to use a small increment borer to determine the ages of *large* grand firs is inexplicable. The agency knew the public's concern with large scale logging of large trees (over 21" dbh). AR12165–66. Yet, when gathering this data, rather than use at least a 16 inch borer as is custom for the USFS, the agency chose to use a smaller 12 inch borer. *Kelly Decl.,* ¶¶ 5, 6 (if 24" dbh tree exceeds capability of the borer, the borer is 12 inches). Professional integrity should dictate that the agency would ensure the data used to support logging large trees is accurate.

A primary concern with the USFS skewing the data to conclude large grand fir trees are typically less than 95 years and "immature" is that the agency relied on this assumption to justify logging these trees as merely artifacts of fire suppression. AR7913 (fire suppression allowed immature grand fir to fill in the growing space); AR12240 (the premise that the Project area has not had fire within the last 100 years except some prescribed fire is supported by the current stand composition of large older ponderosa pine intermixed with "large younger (less than 100 year old) grand fir"). Not only are the trees older, but the agency's assertion is incorrect that fire suppression has allowed the unnatural proliferation of grand firs *for 100 years*. AR12244 (FEIS stating grand firs have been filling in warm dry sites "since fire suppression programs were instituted a century ago"). In fact, fire suppression did not significantly affect the Project area's forests until the mid-1940s, approximately 70 years ago. In its 1997 Eagle Creek Watershed Analysis, the USFS explained it was *after* World War II when "advanced detections and suppression methods" were used that "fire *and its effects on the forested communities in the EC Watershed were significantly curbed.*" AR3175(emphasis added). Only then did fire suppression enable the establishment of significant numbers of grand fir seedlings and saplings in the area's warm dry forests.

The USFS did not disclose this important fact in its NEPA analyses, and instead consistently led the public to believe the suppression of frequent low severity fires allowed grand firs to unnaturally fill in the forest for 100 years, implicating the thousands of large "immature" grand firs. In actuality, the grand firs that have proliferated throughout the area's dry forests are more likely 70 to 80 years old at the most.  The large grand firs, which, as discussed above, average over 100 years old, were already at least 30 years old when "fire and its effects on the forested communities…were significantly curbed."  AR3175.  The low severity fires the agency claims were suppressed typically kill brush, and tree seedlings and saplings because they "burn primarily on the ground" with flame lengths typically 1–4 feet, resulting in less than 10% mortality in overstory.  AR11558; 11571 (Project fire report); AR12249 (prescribed fires typically burn understory vegetation and the mortality occurs in brush, seedlings and saplings). As such, while some of the then 30+ year old grand firs would have died had the natural fires continued, most, or at least many, would have survived.  These large grand firs predate unnatural fire suppression and belong in these areas as a part of those areas' historic range of variability.

In conclusion, all the shortcomings in the survey and the incorrect assumption that thousands of large grand fir trees are immature and exist only because of fire suppression prevented an informed public and decision-maker and led to an arbitrary and capricious decision.

2.   The USFS Improperly Re-categorized 1,238 Acres of Very Moist Grand Fir Forest as Warm/Dry Forest.

Plaintiffs have advocated limiting this "restoration" project to warm dry forests, which are substantially altered by decades of fire suppression.  Warm dry forests have significantly more vegetation than normal, including truly immature grand fir trees, due to the suppression of historical low intensity, high frequency fires.  *See* AR12239.  This uncharacteristic density of younger trees, common throughout Eastside forests, increases the risk of uncharacteristic high

severity stand replacing fires.  *Id.*  In contrast, the Project area's moist forests are only slightly altered from their natural vegetative condition and do not need drastic restorative measures. AR12240 (within moist forests, current *departure* from historical "vegetative condition" is low).

The USFS assures the public it is focusing on dry forests: "85–90 percent of the [28,545 acre] planning area" is warm dry.  AR12148.  The FEIS states only 13 percent of the area is moist forest, classified as "GFDF" fire regime III (moderate to long fire return intervals with higher associated fire intensities).  AR12148; 12208; 12240.  To account for different historical vegetative conditions, the USFS imposed logging prescriptions for "warm/dry" grand fir forests different than those for "cool/moist/dry" grand fir forests.  AR12184 (chosen alternative 3, referring to alternative 2 (AR12172) for the detailed descriptions of the logging);*See* AR12786. In cool/moist/dry grand fir forests, in which large grand fir is a natural component, the Project allows logging for grand fir trees greater than 21" dbh only if within 30 feet of a ponderosa pine or western larch.  AR12184.  There is no limitation on logging large grand firs on warm/dry grand fir forests except for those with "severe defects" and over 150 years old.  *Id.*; AR12829.

The USFS substantiates its claim of focusing on dry forests by proposing to log roughly 4,000 acres of warm/dry grand fir and only 732 acres of cool/moist/dry grand fir.  AR12184.  As explained below, however, the FEIS misclassified 1,238 acres of "warm/very moist" forest as "warm/dry grand fir."  Any of those 1,238 acres slated for logging will be subject to the prescriptions for warm/dry grand fir.  AR7928 (DEIS states intent to log 418 of these 1,238 acres).  Thus, instead of logging only large grand firs within 30 feet of ponderosas or western larch on these very moist sites, they will harvest virtually every large grand fir under the age of 150 years.  Losing these large grand firs, a natural component of very moist forests, results in

forest degradation, not restoration.  This misclassification is inconsistent with the USFS's

purported goal of properly managing forests to assure their resilience and sustainability.

Originally, in the DEIS, the USFS divided the Project area into five plant groups.

AR7917 (Table 24).  The USFS classified the 1,238 acres discussed above as "warm/very moist

grand fir."  *Id.*  Throughout the DEIS, when discussing the Project area's current and desired

forest conditions, it bundled "warm/very moist grand fir" forests with "cool/moist," not

"warm/dry" grand fir forest types.  AR7917–32.  For example, when the DEIS discussed the

desired vegetation for the forests, the current departure from these conditions, and the conditions

of the forest's old growth stands, it considered cool/moist and warm/very moist grand fir

together and separately from warm/dry grand fir forests.  AR7923; 7928–29; 7932.  A key

difference between the cool/moist and warm/very moist grand fir forests and those that are

warm/dry is their fire regimes: mixed intensity fires every 26–150 years for the former, and low

intensity fires ever 25 years or less for the latter.  AR7923.  Moreover, when discussing the

condition of old growth stands, the DEIS disclosed that like cool/moist forests, warm/very moist

grand fir forests should have large grand fir trees, whereas in warm/dry grand fir forests,

ponderosa pine, Douglas fir and/or western larch should dominate.  AR7932.

In the FEIS, however, the USFS inexplicitly dropped discussions of the "warm/very

moist" grand fir plant type.  Furthermore, when responding to DEIS comments raising concerns

with logging in "cool/moist and warm/very moist forests," the USFS addressed only "cool/moist"

grand fir forests.  AR12706; 12710; 12747; 12777.  The only mention of "warm/very moist"

forest is in FEIS Appendix B-7 where toward the bottom, one plant association "grand fir/Rocky

Mountain maple," is listed as "warm/very moist" and classified as "moist upland forest" with a

GFDF fire regime III.  AR12626.  A review of Table 12 in the body of the FEIS shows the

agency incorrectly classifies "grand fir/Rocky Mountain maple" as warm/dry grand fir. AR12208. This inconsistency is also apparent when comparing DEIS and FEIS charts depicting the percentage of each plant type within the Project area.[21]

The USFS offers no explanation for re-classifying these warm/very moist forests as warm/dry. Based on the discussions in the DEIS, these very moist forests have the same fire regime and normal vegetative condition as "cool/moist/dry" grand fir forests and thus should have the same logging prescriptions. *See* AR7917–32. Treating them as a warm/dry will move their current vegetative conditions and fire regime away from historic conditions. *See eg.,* AR12172 (logging prescriptions for warm dry grand fir forests remove almost all large grand fir trees from the landscape, whereas in cool/moist/dry forests, most large grand firs are retained). The agency's decision to re-classify them as dry forests without any explanation lacks scientific integrity and is arbitrary and capricious.

3. <u>The USFS Failed to Discuss All Aspects of Climate Change as It Relates to Logging Large Trees and Old Growth Stands.</u>

At the preliminary injunction stage, when determining whether plaintiffs were unlikely to succeed on the merits of their claims, this Court held the USFS adequately addressed the issue of carbon sequestration and global climate change in its draft EIS. Opinion and Order (Dkt. 79), p. 28. Respectfully, plaintiffs disagree because, as illustrated by the opinion, the agency's

---

[21] In the DEIS, the warm/very moist grand fir forests were 5% of the Project area and warm/dry grand fir was 35%, for a total of 40%. AR7917. Also in the draft, cool/moist grand fir comprised of 8% of the area, for a total of 48% of the Project area. AR7917. In the FEIS, there is no warm/very moist grand fir plant group, and all grand fir forests, except those labeled "cool/moist/dry" were categorized as "warm/dry" forests. AR12208. The cool/moist/dry grand fir comprises 7% of the area and "warm/dry" grand fir, 42%, for a total of 49%. AR12208. These numbers do not squarely match up with the DEIS figures, but it is clear the "warm/very moist" grand fir was not moved to the "cool/moist/dry" grand fir because the latter category did not increase its percentage of the total Project area in the FEIS, whereas the warm/dry grand fir category gained two points. AR7917; AR12208.

disclosures present only one side of the issue rather than a *full and fair* discussion of the Project's impacts on the forest's carbon stores.  As such, plaintiffs again raise the issue in this motion.[22]  Plaintiffs offer one clarification pertaining to the Court's decision at it pertains to the holding in *Hapner v. Tidwell*, 621 F.3d 1239 (9th Cir. 2010).  *See* Opinion, p. 28.  This Court suggested the *Hapner* Court concluded the agency did not need to do a qualitative discussion on global warming for a project involving 30,000 acres.  *Id.*  The Ninth Circuit was actually addressing the impacts of an *810 acre* thinning project.  *Hapner*, 621 F.3d at 1242–43.  At this small scale, the court found unnecessary a qualitative discussion on global warning.  *Id.* at 1245.  In contrast, such a discussion *would be necessary* for an underburn of 30,000 acres of pine forest.  *Id.*  Here, the Snow Basin Project is more akin to the 30,000 prescribed fire than an 810 acre timber project.  It allows logging on 11,000 acres (one-third of the volume of which comes from large trees and old growth stands) and burning on 10,000 acres.  AR12184–85, 12188–89.  These activities will have substantially more impact on climate change than thinning 810 acres.

The Snow Basin EIS presents only the beneficial impacts of the Project on climate change and the forest's ability to store carbon, and as such, lack integrity.  The USFS readily disclosed that due to making the forest more resilient to large forest fires, the Project will promote long term carbon sequestration.  The agency refused, however, to discuss the immediate impacts on the forest's carbon stores from removing 48 million board feet ("mmbf") of trees, including one-third of the volume from large trees and old growth stands where substantial amounts of carbon exist.  Disclosing only facts that support rather than detract from the agency's preferred alternative fails to provide the full and fair discussion required by NEPA.  40 C.F.R. §1502.1 (EIS "shall provide full and fair discussion of significant environmental impacts").

---

[22] Raising this matter now is also necessary to preserve it for appeal.

The forest's ability to store carbon will be drastically reduced, at least in the short term, by the proposed logging.  Forests of the Pacific Northwest help to mitigate climate change by capturing and storing large amounts of carbon dioxide, much of which is stored in mature and old growth forests and their corresponding large trees.[23]  The USFS's decision to remove vast amounts of large trees and their sequestered carbon may have significant negative impacts on this forest's ability to help mitigate climate change.

Refusing to present the negative impacts or costs of a project was recently rejected in *High Country Conservation Advocates v. USFS*, 2014 WL 2922751, *9–10 (D.Co. 2014).  That court found it was arbitrary and capricious for the USFS to quantify the *benefits* of a proposed coal mining project but refuse to conduct an analysis of the *costs*, including greenhouse gas emissions, when such an analysis was possible.  *Id.*  Here, the USFS can analyze both the benefits and costs to the forest's carbon stores for each alternative.  *See e.g.*, AR5465 (the USFS commonly uses the Forest Vegetation Simulator to estimate the total stand carbon and removed carbon under various management scenarios and forest disturbances such as fire).  Thus, the USFS's one-sided analysis of the Project's impacts on carbon stores is arbitrary and capricious.

The USFS incorrectly argues that its response to plaintiffs' DEIS comments is a sufficient analysis of the Projects' effects on the forest's carbon stores.  USFS Memo in Opp. to Plfs' PI Motion (Dkt. 45), pp. 24–25.  This response disclosed only the potential long-term positive impacts on the forest's carbon stores, not the immediate negative effects from removing significant amounts of trees.  AR12761, 12792–93.  This response should have provided the

---

[23] *Schemm Decl.*, Ex. D (Dkt 34-4) (2009 "Mitchell" study), p.1 and *Fourth Schemm Decl.,* Ex. A  ("A Synthesis of the Science on Forests and Carbon"), p. 14 (both articles cited numerous times in both HCPC's comments, *e.g.*, AR8633, and appeal, *e.g.*, AR14806; 14837).  While these should be a part of the administrative record, the USFS chose not to include most scientific authority cited by both the USFS in its EISs and plaintiffs in their comments and appeals. Plaintiffs' understanding is the USFS does not oppose the Court's consideration of these articles.

forest's current carbon stores and those under each action alternative.  Forest Service policy

supports this requirement.  In its 2009 "Climate Change Considerations in Project Level NEPA

Analysis," the agency stated that a 30,000 acre prescribed burning requires a NEPA analysis on

carbon matters.  AR5463.  Snow Basin is of similar size, 28,000 acres, and includes 10,000 acres

of prescribed burn and 11,000 acres of logging.  Although the burning will be less than in the

policy's example, the additional effects on the carbon cycle from logging 11,000 acres indicate

the Project's effects are significant enough to warrant a full and fair discussion in the FEIS.  *See*

*Hapner*, 621 F.3d at 1242–43, 1245 (a qualitative discussion on global warming is required for

30,000 acre underburn).

Next, this same policy recognized the importance of quantifying carbon "emitted and/or

sequestered" if it would "*help choose between alternatives* based on relative *direct* effect trade-

offs."  AR5464.  Moreover, a qualitative effects analysis on "emissions and carbon sequestration"

"should disclose the nature and direction (short-term and long-term) of the impact."  AR5465-66.

Here, the Project area's carbon levels will vary drastically depending upon the alternative.  The

preferred Alternative 3 allows the removal of 48 mmbf of timber volume, 16 mmbf of which is

from large trees and old growth stands.  AR12184.  In contrast, Alternative 4 provides 32 mmbf

of timber volume, none of which comes from large trees.  AR12188–89; 12190 (comparison of

timber volume for Alternatives 3 and 4).  Because most of the forest carbon stores are

concentrated in large trees and old growth forests, the difference between the forest's remaining

stores will vary considerably depending on the alternative.

Without this information, the public does not have a clear basis for choosing whether to

support widespread logging of large trees and old growth stands.  *See McNair*, 537 F.3d at 1001

(NEPA guarantees the public is informed "of the reasonable alternatives which would avoid or

minimize adverse impacts or enhance the quality of the human environment."). These are important issues to the public. AR12150 (FEIS listing these as "key issues"). Without any discussion of the benefits of old growth stands and large trees for sequestering carbon and mitigating climate change, the public is left with the impression that the best choice for the environment is to remove the large trees. *See e.g.*, AR12837–38 (ROD stating Alternative 3 is the "environmentally preferable" alternative).[24]

### D. The Chosen Alternative Does Not Meet the Purpose and Need for the Action in Violation of NEPA (Claim One, Count Six).

To create more of the desired single story old growth, the agency's chosen alternative includes logging some multistory old growth, "converting" it into single story forests. AR12832. Logging in multistory old growth forests ("MSLT") near the lower cusp of or below their historic range of variability ("HRV") will not achieve the Project's primary purpose of managing forests *toward* their historic range of variability and improving sustainability. AR12149–50 (Purpose and Needs). Neither will it advance the agency's "existing long-term objectives of increasing the number of large trees and late and old structural stands on the landscape." AR12179. "Alternatives that do not advance the purpose of [a project] will not be considered reasonable or appropriate." *Earth Island Institute v. USFS*, 697 F.3d 1010, 1022 (9th Cir. 2012).

Although not as rare as single story old growth, multistory old growth in most forest types is far from abundant. AR12212. In warm/dry grand fir forests and warm/moist Douglas fir

---

[24] Cases finding the USFS took a "hard look" at timber sale impacts on climate change without directly addressing carbon sequestration issues are distinguishable. First, each involved substantially smaller projects analyzed in an environmental assessment ("EA"). *See Hapner*, 621 F.3d at 1242-43 (EA involving 810 acres of logging); *Earth Island Institute v. Gibson*, 834 F.Supp.2d 979, 983, 990 (E.D. Cal. 2011) (EA for salvage sale after a 2,700 acre fire wherein the agency did disclose estimated greenhouse gas emissions from the project), *aff'd on other grounds*, 697 F.3d 1010 (9th Cir. 2012); *LOWD v. Martin*, 2011 WL 2493765, *4, 7 (D.Or. 2011) (EA for 1,963 acre timber sale). An EIS, which the USFS prepared for the much larger Snow Basin Project, requires more detail than an EA. *See* 40 C.F.R. § 1508.9.

forests, the multistory old growth is already at the low end of its HRV.  AR12212 (Table 15);

AR14777 (HCPC graph depicting the MSLT levels from Table 15).  The proposed logging will

move both these multistory old growth forests to the lower edge of their HRV.  AR12234;

12212.  This is not advancing the agency's long-term objective of increasing old growth forests,

nor is it managing these forests *toward* their HRV as required for sustainability.  Moving them

toward the center, not to the lower cusp of HRV, is what is needed to achieve sustainability, and

advance the Project's purposes.  The USFS has admitted the "further deviated you are from HRV

the lower the likelihood that you will have species sustainability."  AR7325.

        The most disquieting aspect of these conversions is the USFS's decision to amend the

Eastside Screens to "convert" 77 acres of multistory cool/moist/dry grand fir old growth, a forest

structure already *below* HRV, to single story old growth, *a forest structure that has never existed*.

AR12212; AR12832 (list of acreage of multistory old growth to be "converted"); AR12219

(USFS admission that "[single story old growth] did not occur in this [forest] type"); AR12229

(Table 22).  This directly conflicts with the Project's purpose of managing forests toward their

HRV.  Both multistory and single story old growth forests will further deviate from HRV.  There

is no better example of the arbitrariness of logging within multistory old growth than this.

### E.    The USFS Failed to Consider a Reasonable Range of Alternatives in Violation of NEPA (Claim One, Count Eight).

        An EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives."

40 C.F.R. §1502.14(a).  "[A] project's scope and purpose define the reasonable range of

alternatives that must be analyzed."  *Western Watersheds Project v. Abbey*, 719 F.3d 1035, 1046

(9th Cir. 2013). "The existence of reasonable but unexamined alternatives renders an EIS

inadequate."  *'Ilio 'Ulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083, 1095 (9th Cir. 2006).

Here, reasonable alternatives must achieve "the primary purposes of creating sustainable [forests] and improving forest health and a decreasing risk of uncharacteristic wildfire." AR5100. The FEIS provides the first purpose is to "[m]anage forest structure, composition and density towards landscape historic range of variability (HRV) and improve sustainability." AR12149. The agency refers to this type of management as restoration and intends to achieve it "based on the fire ecology of low and mid elevation warm dry forests." AR7867 (DEIS explanation); 5100; 12161 (FEIS noting proposed activities will restore the treated stands). The second purpose is to "[m]aintain and increase landscape resilience to the risk of uncharacteristic disturbance." AR12150. This purpose is also achieved by "mov[ing] the landscape toward historical conditions[.]" AR12160. The final purpose is to "[p]rovide a supply of forest products to the public[.]" AR12150.

The USFS developed three action alternatives to achieve these Purposes, the primary difference between the three, other than timber volume, is one does not require forest plan amendments to log large trees and within certain old growth forests. This range of alternatives is inadequate because the agency, despite urging from plaintiffs, failed to include an alternative that limits logging to warm dry forests. AR8567–68 (HCPC DEIS comments); AR14762–63 (HCPC appeal). The USFS developed the proposed Snow Basin management activities "based on the fire ecology of low and mid elevation warm dry forest;" i.e., a high frequency, low severity fire regime, also referred to as fire regime I. AR12239–40 (FEIS explaining fire regime for warm dry sites); *see also* Section II – Factual Background , pp. 3–4, for cites in DEIS and FEIS confirming project is aimed at creating forests adapted to low intensity high frequency fires. Many scientists agree forest restoration projects "must be consistent with the natural disturbance regime of a forested landscape." AR8552, AR8554 (HCPC DEIS comments citing the recent

science).  Accordingly, HCPC's proposed alternative would not log in forests with a "natural disturbance regime" other than high frequency, low severity, which would eliminate logging in warm/moist and cool/moist sites, up to 13 percent of the Project area.[25]  AR12240; AR12208. The USFS classifies warm/moist and cool/moist sites as GFDF, or fire regime III, and characterizes them by a mixed severity fire regime which "historically experienced moderate to long fire return intervals and higher associated fire intensities."  AR12239–40; AR12208 (classification of forest types); AR12626 (FEIS table noting which forest types are GFDF).

HCPC explained that the Project's purposes are best met by managing the warm/dry, not moist, forests.  *See generally* AR8551–58.  The warm/dry forests are the forests most in need of restoration, in large part, due to suppression of the frequent fires.  The FEIS states without the frequent low intensity fires, *dry sites* have become "densely stocked with small diameter trees," often grand firs, and current "vegetative conditions" have significantly departed from those historically.  AR12239–40 ("vegetative condition departure is very high" on warm/dry sites).  In contrast, the vegetative conditions on moist forests with fire regime III (GFDF) have departed considerably less from their historical conditions.  AR12240 ("vegetative condition departure for these moist sites is modeled at low[]").

Plaintiffs also urged that this alternative focus on commercial logging of smaller rather than larger mature trees as a means of reducing the risk of a large scale fire.  *Id.;* AR12711–13 (the USFS never denied it focused on logging larger trees in the 15–20.9" dbh range).  Recent science recommends logging smaller trees when designing projects to reduce fuels and restore dry forests.  AR8567 (HCPC DEIS comments citing the science).  Extensive logging of mature, large trees has been shown to increase fire risk.  *Id.*  In the DEIS, the USFS admits that one of

---

[25] Amendments to the Eastside Screens would be unnecessary under this alternative.

the four principles in reducing fire behavior potential in large fires is "retain[ing] larger trees." AR7982. Large trees, including grand fir, "create shade and moderate wind speed" during a fire and have thicker bark and taller crowns, increasing the survivability of trees. *Id.*

Plaintiffs' proposed alternative would achieve the Project's Purpose and Needs. It would "manage forest structure, composition and density towards landscape historic range of variability (HRV) and improve sustainability" on 8,000 acres of warm/dry forests by reducing tree densities. AR12149 (first purpose and need); AR12161; AR12852 (8,000 of the 10,246 acres proposed for "intermediate thinning" are on warm/dry forests). Similarly, this alternative will "maintain and increase landscape resilience to the risk of uncharacteristic disturbance," on 8,000 acres of warm/dry forests. AR12150 (second purpose and need). It also has the added benefit of not increasing the warm/moist and cool/moist forests' *departure* from their historic vegetation conditions and mixed severity, moderate to long fire intervals, unlike the current alternatives. AR12239–40; 12246–47 (USFS admission it intends to impose frequent, less severe fires across the landscape). Imposing frequent low intensity fires on the moist forests may result in less resilient forests. AR8552 (HCPC DEIS comments citing recent science explaining the consequences of projects inconsistent with a forest's natural fire regime). Finally, this alternative will provide a "supply of forest products" from logging at least 8,000 acres of warm/dry forest. AR12150 (third purpose and need); 12852. The majority of logged trees may be smaller, but still commercial sized, between 7 and 15" dbh. *See* AR12195 (FEIS noting *non*-commercial logging typically includes logging trees up to 7" dbh).

Defendants' arguments do not negate the reasonableness of the above alternative. This alternative does not focus on prescribed fire, or eliminate commercial logging or logging in forests within their HRV. *See* Fed.Defs' SJM Memo (Dkt 96), p. 21 (discussing alternatives

deemed to not meet the purpose and needs); AR12195.  Further, the range of alternatives here is

not "analogous to the range of alternatives recently upheld in *Deer Creek Valley Natural Res.*

*Conservation Ass'n v. BLM*, 2014 WL 458288 (D.Or. 2014).  *See* Fed.Defs' SJM Memo, p. 22.

First, in *Deer Creek*, the NEPA analysis was in an EA which requires only "a brief discussion of

reasonable alternatives."  *Deer Creek*, 2014 WL 458288, *8.  The obligation is higher with an

EIS, wherein the agency must "rigorously explore and objectively evaluate all reasonable

alternatives."  *Id.*  The *Deer Creek* Court recognized that if the agency fails to consider a

proposed alternative "without providing any explanation why such a course of action failed to

meet the project's objectives" the agency's range of alternatives is arbitrary and capricious.  *Id.*

at *9.  That is what happened here.  The USFS failed to explain why it would not consider an

alternative that logged only warm/dry forests or focused commercial logging on smaller trees.

In conclusion, an alternative that "restores" only warm/dry forests with or without a focus

on commercially logging the smaller trees is reasonable and meets the purpose of the Project.

The failure to consider this reasonable alternative renders the FEIS inadequate.

*See 'Ilio 'Ulaokalani Coalition*, 464 F.3d at 1095 (stating general requirement).

### F.  The Forest Service Violated NEPA by Failing to Include Required Detailed Analysis in Its EIS Appendices (Claim 1, Count 9) and by Issuing a DEIS for Public Comment That Differed Substantially and Materially from the FEIS (Claim 1, Count 10).

"NEPA's public comment procedures are at the heart of the NEPA process…To

effectuate this aim NEPA requires not merely public notice, but public participation in the

evaluation of the environmental consequences of a major federal action." *State of California v.*

*Block,* 690 F.2d 753, 770–771 (9th Cir. 1982); 40 C.F.R. § 1500.1(b) (under NEPA public

scrutiny is "essential").  To meet these goals, NEPA requires that the USFS prepare a draft EIS

that "fulfill[s] and satisf[ies] to the fullest extent possible the requirements established for final

statements." 40 C.F.R. § 1502.9(a).  The USFS also must circulate the draft EIS for public

comment. 40 C.F.R. §1503.1.  Because agencies are not required to solicit public comment on

their final EIS, the public's only meaningful opportunity to comment on and influence an

agency's NEPA analysis is at the draft EIS stage.  If an agency withholds significant information

regarding its DEIS analysis or substantially changes its analysis in its FEIS, an agency can

effectively insulate its decision-making process from public scrutiny. *See Block,* 690 F.2d at 771.

Thus, NEPA requires an agency circulate a supplemental draft when the original DEIS was "so

inadequate as to preclude meaningful analysis" or "there are significant new circumstances or

information relevant to environmental concerns."  40 C.F.R. § 1502.9(a) and (c)(1)(ii); *see also*

40 C.F.R. § 1500.2(d) ( agency must "encourage and facilitate public involvement in decisions")

     NEPA also dictates that all the required, detailed analysis must be contained in the NEPA

documents that an agency circulates to the public for comment.  *See Blue Mountains Biodiversity*

*Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998); 40 C.F.R. §§ 1502.18, 1502.19.

These analyses should be in the EIS or attached as appendices and include those materials an

agency has prepared "in connection with an [EIS]" which "substantiate[] any analysis

fundamental to the EIS."  40 C.F.R. § 1502.18(a) and (b); *see Pacific Rivers Council v. USFS*,

689 F.3d 1012, 1031(9th Cir. 2012), *vacated as moot,* 133 S.Ct. 2843 (2013).[26]  More general

reference material that an agency has not itself prepared to support the EIS may be incorporated

by reference.  *Id.*  NEPA requires that the public see not only the agency's conclusions but also

the underlying data and analysis.  *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1150 (9th

Cir. 1998), *rev'd on other grounds*, *McNair*; 537 F.3d at 997.

---

[26] The Ninth Circuit opinion in *Pacific Rivers* is arguably no longer binding precedent because
the underlying judgment was vacated as moot.  *See U.S. v. Joelson,* 7 F.3d 174, 178 n.1 (9th Cir.
1993).  However, that opinion still has informational and persuasive value.  *DHX, Inc. v. Allianz
AGF MAT, Ltd.*, 425 F.3d 1169, 1175–76 (9th Cir. 2005).

The USFS issued a draft EIS for the Snow Basin Project in March 2011.  AR7854.

Although the DEIS was lengthy, it contained only cursory descriptions of the Project's impacts

on sensitive species and species dependent on old growth or large mature trees, which are the

species most likely to be adversely impacted by the Project's extensive logging.  *See, e.g.,*

AR8059–60; 8063 (less than two pages addressing impacts to two sensitive frog species);

AR8096; 8098 (four paragraphs addressing impacts to pileated woodpecker), AR8096–97; 8099

(less than two pages addressing goshawk); AR8096, 8097–98(less than two pages addressing

American Marten).  However the DEIS did have relevant and useful tables setting forth the

number of 21 inch trees that would be removed, AR7962, Table 53, and acreages for the five

forest plant types within the Project area (AR7917, Table 24).

Despite the cursory analyses noted above, the DEIS assured the public multiple

"Specialist Reports" addressed in detail the Project's impacts on resources like "Wildlife,"

"Forested Vegetation," and "Fisheries."  AR7904.  Purportedly, the agency incorporated these

reports by reference under 40 C.F.R. § 1502.21, and stated the public could view the entire

project record (paper copy), including these reports, at its Baker City office or, upon request, the

agency would provide all documents capable of being made into electronic PDF files.  AR7904.

Both plaintiffs commented on the DEIS, AR8549, 15313,and requested underlying

information supporting the DEIS analyses.  Specifically, plaintiff League of Wilderness

Defenders ("LOWD") requested the Fisheries and Aquatic Species Biological Evaluation ("BE")

and all other Specialist Reports.  AR15322,15394.  Plaintiff Hells Canyon Preservation Council

("HCPC") submitted a FOIA request for the entire Project record.  AR8979.  LOWD did not

receive the requested DEIS documents.  AR15261.  The USFS did provide some documents in

response to HCPC's FOIA request.  AR8982.  However, it withheld the Specialist Reports from

that production, AR8984, despite the DEIS explicitly saying those reports existed, were

incorporated by reference, and available to the public.  AR7904.  None of these 2011 Specialist

Reports, except for the Biological Evaluation, are in this case's administrative record.

        The USFS then issued its FEIS and Record of Decision in March 2012.  AR12135,

AR12820. Contrary to defendants' claim that the FEIS only "included some editorial and

organizational changes intended to improve clarity," USFS SJ Memo. at 28, the FEIS is in many

respects a completely new document.  The FEIS discloses a rather lengthy list of "changes

between the DEIS and FEIS," AR12154–55, but that list does not begin to explain the extensive

revisions.  A comparison of the list of Tables and Figures in each document illustrates the real

story.  *See* AR 7858–7861, AR12143–12147.  With the exception of Tables 1-3, the numbering,

where the documents appear, and the substance of the included tables, figures and maps are

significantly different for each document.  The revisions are so extensive it is difficult for the

public to know the extent of the actual changes to the Project itself.

        Many of the analyses are completely transformed in the FEIS.  The analysis regarding

two sensitive frog species more than doubles in length.  AR8059–60; 8063; 12359–63.  The

analysis regarding the pileated woodpecker grows from four paragraphs to almost six pages, with

three new tables and a new map.  AR8096–98; 12385–90.  Goshawk impacts which merited less

than two pages in the DEIS now occupy six pages with four new tables and a new map.

AR8096–97; 8099; 12379–85.  Impacts to American Marten and its habitat, which merited less

than two pages in the DEIS are listed in the FEIS as a "significant issue," AR12201, and receive

six pages of new analysis with three new three tables and two new maps.  AR8096; 8097–98;

12372–78, 12591.[27]  The FEIS also redefines the geographic scope of its cumulative impacts

analysis for these species.  *Compare* AR8100 *with* AR12378, 12385, 12389.  Inexplicably, the

FEIS eliminates helpful tables from the DEIS.  Table 53 from the DEIS regarding the number of

21 inch trees being logged (AR7962) is replaced by the much less useful Table 21.  AR12228.

Similarly, the DEIS Table 24 identifying the five forest types (AR7917) is rearranged, less

detailed, and apparently eliminates a forest type in FEIS Table 12. AR12208.  On May 1, 2012,

the USFS posted a five page "Errata Sheet" for the FEIS. AR14705.

       These significant changes to and errors in the FEIS, which the public had no opportunity

to comment on, dictate that the USFS recirculate the FEIS as a supplemental DEIS, with all of

the errors corrected, so the public can comment on its lengthy and revamped analysis. *See* 40

C.F.R. § 1502.9; *see also DuBois v. U.S. Dept. of Agriculture,* 102 F.3d 1273, 1291–92 (1ˢᵗ Cir.

1996). Plaintiffs agree with defendants assertion that 40 C.F.R. § 1503.4(a)(3) allows for changes

to a DEIS in response to comments, USFS SJ Memo. at 28, and acknowledge that truly new

information can be included in a FEIS without necessarily triggering the need for an SEIS.  *See*

*ONDA v. Jewell,* 2013 WL 5101338, *13 (D.Or. Sept. 11, 2013).  But here, the USFS itself

identifies the changes it made to its analysis of American Marten habitat as necessary to address

a newly identified, "significant issue."  AR12201.  Moreover, many of the changes to the FEIS

are not based on new information that was unavailable to the USFS when it drafted the DEIS.

The new analysis comes almost entirely from the Specialist Reports that existed, in some form,

when the DEIS was prepared.  The record offers no legitimate reason why the DEIS could not

have contained much of the new analysis that first appeared in the FEIS.  Those significant

---

[27] Despite the new longer analysis, the complete prescription for protecting Marten habitat can
only be found in the Silviculture Report. AR12376.

changes are only compounded by the fact that the public lacked access to the specialist reports during the DEIS commenting process.  Because the USFS must already prepare an SEIS to address the flaws in its analysis of impacts to elk habitat, it makes sense to require that in the SEIS it also correct this NEPA violation and allow the public to comment on the substantial new analysis in the FEIS.  *See Lands Council v. Cottrell,* 731 F.Supp. 2d 1028, 1053 (D.Id. 2010) (Magistrate's Recommendation); 731 F.Supp. 2d 1074, 1091(District Court 2010).

The FEIS also purports to incorporate by reference Specialist Reports, and says they are available to the public.  AR12202.  Unlike the reports purportedly incorporated into the DEIS, these Specialist Reports are in the administrative record, and several of them are quite lengthy. *See eg.,* AR11910 (Wildlife Report); AR11720 (Aquatics Report).  The Project's ROD and FEIS repeatedly relied upon these Reports to provide some of the detailed impacts analysis required by NEPA.[28]  Indeed, the FEIS, when responding to DEIS comments, states that "the use of best available science is explained for each topic in the specialist reports for each topic."  AR12721.

Despite the agency's reliance on these numerous specialist reports, including the BA, to substantiate analyses fundamental to the FEIS not one of these reports was attached as an appendix to the FEIS.  Instead the USFS told the public, as it did with the DEIS, that this critical NEPA information is incorporated by reference and available to the public for inspection and may also be available as electronic files "upon request."  AR7904; AR12202.

---

[28] *E.g.*, AR12841 (ROD pointing to Biological Assessment to support its conclusions re impacts to ESA listed species); AR12310 (FEIS pointing to B E for analysis of impacts to aquatic species); AR12311 (FEIS noting effects analysis for two sensitive frog species is in Wildlife Specialist Report); AR12376 (FEIS pointing to Silviculture Report for specific modifications to prescription for American Marten); AR12378; 12380; 12386 (FEIS pointing to Wildlife Specialist Report for details regarding habitat needs for goshawk, pileated woodpecker and cavity excavator species); AR12722 (FEIS App. C explaining the complete cumulative effects analysis for bull trout is in Watershed/Aquatics Specialist Report).

The agency's responses to plaintiffs' requests for these "incorporated documents" both at the DEIS and FEIS stage are perfect examples of why NEPA requires fundamental documents to be attached to the EIS or its appendices.  In 2011, plaintiffs were denied the Specialist Reports listed in the DEIS.  Then, in anticipation of appealing the ROD and FEIS, LOWD, in 2012, requested from the USFS, via e-mail, these reports, suggesting the easiest way to provide them would be to post them on the WWNF website.  AR15416–17.  Rather than providing these documents as the agency assured the public it would do "upon request," the USFS insisted LOWD submit a formal FOIA request, which LOWD immediately did.[29]  Ultimately LOWD received most of the documents it had first requested in 2011 on April 23, 2012, long after its ability to comment on the DEIS had passed, and only about three weeks before its administrative appeal was due.[30]  It later received the BA six days before the appeal due date of May 14, 2012.  These reports contained hundreds of pages of additional analysis, and it was impossible for LOWD to review that material and formulate specific objections for its administrative appeal in such a short time.  The USFS' repeated refusals and delays in producing the specifically prepared analysis underlying the EIS  significantly hindered informed public participation and improperly avoided public scrutiny of its NEPA analyses.

This is why NEPA requires these reports—admittedly fundamental to the EIS analyses— be attached to the EIS.  A federal agency's obligation to include all of its actual NEPA analysis in the EIS and its appendices and to circulate it to the public "is not a mere formality."  *Pacific*

---

[29] LOWD objected, however, because the time consuming process would delay LOWD's receipt of the documents and impede its ability to draft a complete administrative appeal.  AR15419.  The USFS took another twelve days to provide LOWD with most of the lengthy documents, and LOWD still had to again ask for the Biological Assessment.  *See* AR15261; 15433.

[30] LOWD never received, however, the special reports referenced in the DEIS.  The Reports provided were dated 2012.  *See e.g.,* AR11720 (watershed and aquatics specialist report); AR11910 (wildlife specialist report).

*Rivers,* 689 F.3d at 1031–32.  An agency cannot use incorporation by reference under 40 C.F.R.

§ 1502.21, "if the substance of what is incorporated is an important part of the environmental

analysis."  *Id.*; 689 F.3d at 1032.  This is particularly true when, like here, an FEIS is referencing

"incorporated" specialist reports to respond to public comments regarding essential NEPA

analysis like impacts to sensitive species, cumulative impacts to a listed species and issues

regarding scientific integrity.  *E.g.*, AR12721.  Moreover, even if these fundamental reports did

not have to be attached to the DEIS and FEIS, in this case, as explained above, those reports

were not "readily available" as required by 40 C.F.R. § 1502.18(d) and were not reasonably

available during the public comment period as required by 40 C.F.R. § 1502.21.

       In conclusion, the drastic changes to the FEIS and the failure to provide reports

fundamental to the EIS "upon request" dictate that the USFS recirculate for public comment the

FEIS, including as appendices the Specialist Reports, the BE and the BA as a supplemental DEIS.

## VI.    Conclusion

       For the reasons stated above and in plaintiffs' motion, plaintiffs respectfully request that

this Court grant their amended motion for summary judgment and deny the federal defendants'

and intervenors' motions for summary judgment, Dkt. 86 and 95, on Claim 1, Counts 3, 4, 6, 8,

9, 10 and 11, and Claim 2 from plaintiffs' Amended Complaint.  Dkt. 19.

Dated: July 15, 2014                Respectfully Submitted,

                                    s/Tom Buchele
                                    Tom Buchele (OSB # 081560)
                                    Tel: (503) 768-6736
                                    Email: tbuchele@lclark.edu

                                    Attorney for Plaintiff League of Wilderness
                                    Defenders/Blue Mountains Biodiversity Project

                                    s/ Jennifer Schemm
                                    Jennifer Schemm (OSB # 970086)

Tel: (541) 962-0896
Email: jschemm@eoni.com

Attorney for Plaintiff Hells Canyon Preservation
Council



### CERTIFICATE OF COMPLIANCE


This brief complies this Court's Order approving the Stipulated Motion for Revised Briefing Schedule, which allows plaintiffs an opening summary judgment memorandum of up to 50 pages in length [Dkt. 88, 89 ], because it is 50 pages in length.


s/Tom Buchele
Tom Buchele (OSB # 081560)
Tel: (503) 768-6736
Email: tbuchele@lclark.edu

Attorney for Plaintiff League of Wilderness
Defenders/Blue Mountains Biodiversity Project