IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LEAGUE OF WILDERNESS
DEFENDERS/BLUE MOUNTAINS
BIODIVERSITY PROJECT, et al.,

        Plaintiffs,

   v.

KENT P. CONNAUGHTON, et al.,

        Defendants,

and

BAKER COUNTY, a political subdivision
of the State of Oregon, et al.,

        Defendant-Intervenors

No. 3:12-cv-02271-HZ

OPINION & ORDER

Tom Buchele
Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland, OR 97219

OPINION & ORDER- 1

Attorney for Plaintiff League of Wilderness
Defenders/Blue Mountain Biodiversity Project


Jennifer Schemm
Attorney at Law
602 O Ave.
La Grande, OR 97850

Attorney for Plaintiff Hells Canyon
Preservation Council


Scott W. Horngren
American Forest Resource Council
5100 SW Macadam, Suite 350
Portland, OR 97239

Caroline Lobdell
Western Resources Legal Center
5100 SW Macadam, Suite 350
Portland, OR 97239

Attorneys for Defendant-Intervenors


HERNÁNDEZ, District Judge:

In July of 2013, this court denied the League of Wilderness Defenders/Blue Mountain

Diversity Project and the Hells Canyon Preservation Council's (collectively "Plaintiffs") motion

for preliminary injunction that sought to block commercial logging activities in the Wallowa

Whitman National Forest ("WWNF") under the Snow Basin Vegetation Management Project

("Project"). On appeal, the Ninth Circuit affirmed that decision in large part, but reversed on a

narrow issue: that Plaintiffs were entitled to an injunction based on the inadequacy of the

Project's final environmental impact statement ("FEIS") regarding elk habitat. League of

Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton, 13-35653, 2014

OPINION & ORDER- 2

WL 1814172 at *9 (9th Cir. May 8, 2014) (hereinafter "LOWD"). The Ninth Circuit remanded

to this court with instructions to "enter a preliminary injunction sufficient to protect the status

quo while the [Forest Service] completes a supplemental environmental impact statement." Id.

Now before the court is Plaintiffs' motion to determine the scope of that injunction.

Plaintiffs assert that a blanket injunction blocking all commercial logging activities within the

Skull and Empire sales, including road building and reconstruction, is necessary to preserve the

status quo.  Defendants and Intervenors oppose a blanket injunction and argue for a narrowly

tailored injunction that allows limited logging on select parcels and some road reconstruction.

The court heard oral argument on these issues on July 21, 2014.

For the reasons stated, the court rejects Intervenors' proposed narrow injunction, rejects

Plaintiffs' proposed blanket injunction, and crafts an injunction that blocks logging and related

operations on the Skull and Empire sales, but allows Dodge Logging to finish yarding and

hauling operations on units in Empire that it has already logged.

## BACKGROUND

I.    **Ninth Circuit Decision**

The Ninth Circuit analyzed whether Plaintiffs were entitled to a preliminary injunction.

The court applied the familiar four-part Winter test, which requires the party seeking an

injunction to show it is likely to succeed on the merits, that it is likely to suffer irreparable harm

without injunctive relief, that the balance of equities tips in its favor, and that an injunction is in

the public interest. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).

a.  **Winter Analysis**

The Ninth Circuit found Plaintiffs were likely to prevail on the merits of their claim that

the United States Forest Service's reliance on the now-withdrawn Travel Management Plan

("TMP") in analyzing the Project's impact on elk was invalid. LOWD, 2014 WL 1814172 at *3.

The Ninth Circuit found the FEIS was insufficiently clear because it contained statements about the TMP's mitigating impacts interspersed with analysis that properly considered only the impacts of the Project itself. Id. at *4. "Informed public participation in reviewing environmental impacts is essential to the property functioning of NEPA," the panel reasoned, and "[w]ithout supplemental analysis of impacts absent the TMP, previously stressed in parts of the agency's assessment, the public would be at risk of proceeding on mistaken assumptions." Id. at 4. Accordingly, the Ninth Circuit concluded that Plaintiffs were likely to succeed on their claim that the Forest Service must complete a supplemental EIS to show the environmental impacts of the Project on elk and elk habitat once the TMP was withdrawn. Id.

The Ninth Circuit found that Plaintiffs' alleged harms, like many environmental injuries, would be irreparable without injunctive relief: "[t]he logging of mature trees, if indeed incorrect in law, cannot be remedied easily if at all. Neither the planting of new seedlings nor the paying of money damages can normally remedy such damage." Id. at *6.  The jobs and tax revenue temporarily lost if the court issued an injunction were outweighed by the permanent environmental injuries Plaintiffs would suffer without injunctive relief. Id. at *7. Finally, the Ninth Circuit found insufficient evidence of any imminent harm to the public interest from increased risk of fire or insect infestation to outweigh the irreversible harm to elk habitat if Intervenors were allowed to log. Id. at *8. And although the private harms alleged by Intervenors, primarily lost jobs and government revenue, were properly considered as part of the public interest analysis, they too were not sufficiently substantial to outweigh the alleged environmental injury. Id. at *8.

### b. Ninth Circuit Instructions

Having found the <u>Winter</u> factors favored granting Plaintiffs' requested injunction, the Ninth Circuit remanded the case to this court "with instructions . . . to enter a preliminary injunction sufficient to protect the status quo while the [Forest Service] completes a supplemental environment impact statement." <u>Id.</u> at *9. The primary question to address, according to the Ninth Circuit, is "whether the entire Snow Basin project must be preliminarily enjoined, or whether a more narrowly tailored preliminary injunction can be crafted that adequately preserves the status quo and the rights of the parties until a final judgment issues in the case." <u>Id.</u> (citing <u>U.S. Phillips Corp. v. KBC Bank, N.V.</u>, 590 F.3d 1091, 1094 (9th Cir. 2010) (quotation marks omitted)).

"[I]njunctive relief," the panel continued, "must be tailored to remedy the specific harm alleged, and an overbroad preliminary injunction is an abuse of discretion." <u>Id.</u> (citing <u>Natural Res. Def. Council., Inc. v. Winter</u>, 508 F.3d 1091, 1094 (9th Cir. 2010). As an example, the Ninth Circuit offered that this court "could consider, for example, limiting the injunction to specific areas of elk habitat or to trees above a certain diameter at breast height." <u>Id.</u> The Ninth Circuit did not, however, express an opinion about whether those parameters could appropriately guide the scope of the injunction; the court explicitly held "only that the Plaintiffs have adequately established their entitlement to the issuance of a preliminary injunction." <u>Id.</u>

## II.    <u>Undisputed Facts</u>

Elk are the most popular big game species in northeastern Oregon, and they are an indicator of the quality and diversity of the general forested habitat. Key components of elk habitat are forest cover created by coniferous forests, forage, and security areas away from human disturbance. Pl. Motion at 10; Def. Resp. at 3.

Elk need forest cover for shelter and refuge. Pl. Motion at 4. The Forest Service divides forest cover into two categories: satisfactory cover, and marginal cover. "Satisfactory cover" includes those forest stands with an average canopy closure of greater than or equal to 70 percent. Def. Resp. at 4. Elk prefer these closed canopy areas because they provide hiding and thermal protection like shade in summer and cover from wind and precipitation in winter. Pl. Motion at 16. "Marginal cover" means stands with an average canopy closure greater than or equal to 40 percent but less than 70 percent. Def. Resp. at 4. Elk can use marginal cover to escape and hide, but marginal stands lack the thermal properties of elk's preferred "satisfactory" stands. See Pl. Motion at 11–12. Forage is not neatly defined, but it includes areas with mostly open canopies where low brush and grass can grow. Id. at 12.

"Security areas" are "blocks of cover that are at least one-half mile from an open road and are at least 250 acres in size." Pl. Motion at 10–11. When there are fewer security areas because of high road density and motorized access, forest cover becomes more important for the elk, because elk are a "secretive species" whose "habitat selection and behaviors seem to be shaped by a strong avoidance of humans." Id. Road density, then, is a primary indicator of the quality of elk habitat. See Def. Resp. at 3; Int. Resp. at 13. Current road density in the Project area is 2.6 miles of road per square mile, which exceeds the Forest Plan threshold of 2.5 miles per square mile. Def. Resp. at 3. Plaintiffs assert there are currently few, if any, security areas in the Snow Basin Project area, and that when road densities reach just two miles per square mile, the effectiveness of summer range "can be reduced by 50%." Pl. Motion at 16 (quoting AR 09570, TMP FEIS).

The Forest Service uses a habitat effectiveness index ("HEI") to asses elk habitat at the landscape scale. Def. Resp. at 4. The HEI model considers the dispersion of cover and forage,

cover quality, and road density, and is expressed as either a percentage or a numerical value from 0 (no elk) to 1.0 (optimal elk use). The current overall HEI for the Project area is 0.57. Id.

Approximately two-thirds of the Empire sale and one-quarter of the Skull area are "critical" summer range habitat, defined as "[t]hat part of the mid-June to mid-August summer range where elk concentrations are about double . . . the surrounding elk densities." Pl. Motion at 15. These areas are important for lactating females, calf-rearing, antler growth, and other elk activities that require high quality forage and security. Most of the remaining Skull and Empire sales are summer range elk habitat, with a portion covering winter range. Id. at 4; Def. Resp. at 3.

The overall trend of the Keating elk herd between 2001 and 2011 is increasing, and the total number of elk in the Keating Wildlife Management Unit reached its Management Objective in 2011. Def. Resp. at 8.

## STANDARDS

The function of a preliminary injunction is to protect the "status quo ante litem pending the determination of the action on the merits." Washington Capitals Basketball Club, Inc. v. Barry, 419 F.3d 472, 476 (9th Cir. 1969). Status quo means the "last, uncontested status preceding the commencement of the controversy." Dep't of Parks & Recreation for State of California v. Bazaar Del Mundo Inc., 448 F.3d 1118, 1124 (9th Cir. 2006). Injunctive relief must be narrowly tailored to remedy the specific harm alleged, and "an overbroad preliminary injunction is an abuse of discretion." LOWD, 2014 WL 1814172 at *9; see also Lewis v. Casey, 518 U.S. 343, 357 (1996) ("The [injunctive] remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."). Determining the proper scope of an injunction raises "intensely factual issue." Sierra Forest Legacy v. Rey, 577 F.3d 105, 1023 (9th Cir. 2009) (citation omitted). There is no rule requiring a blanket injunction in cases involving a NEPA violation. Northern Cheyenne Tribe v. Norton, 503 F.3d 836, 843 (9th Cir.

2007). "When injunctive relief is appropriate, the court must balance the equities between the parties and give due regard to the public interest. Sometimes a full injunction is appropriate. But at other times the equities demand a partial injunction." Id.

## DISCUSSION

### I.    Intervenors' Proposed Narrow Injunction

Intervenors and Defendants seek a tailored injunction that allows limited logging operations on 180 acres of the Skull sale and 59 acres of the Empire sale during the summer and fall of 2014. Def. Resp. at 1; Int. Resp. at 9–10.[1] The proposed activities would occur on 239 total acres, or less than one percent of the 28,545 acre Snow Basin Project area. Def. Resp. at 1–2. The proposed 2014 units are as follows:

- Skull: 8, 14, 15, 16, 20A, 25, 26, 27A, 27B, 27C, 63, 63A, and 73;
- Empire: 21B, 22A, 29A, 29B, 29C, 322, and 325.

Def. Resp. at 6; Int. Resp. at 6–7.

The 2014 units are all along open roads, meaning the limited 2014 logging will not require new road construction. Def. Resp. at 6; Int. Resp. at 6. Intervenors do propose, however, to conduct some road re-construction. Boise-Cascade is one of the intervenors, and holds the contract for the Skull sale. As part of that contract, Boise Cascade is required to complete road re-construction, primarily on Forest Road 7735, consisting of adding supplemental rock to the road surface. Int. Resp. at 7. Boise Cascade also wants to install culverts and rip rap to improve drainage and stream passage in the area. Boise Cascade claims they can only complete the

---

[1] There is a significant discrepancy between Defendants' and Intervenors' briefing regarding the total acreage of the Skull and Empire sales. Defendants state that the Skull sale covers 5,000 acres and the Empire sale covers 4,000. Def. Resp. at 1. Intervenors claim that Skull is only 1,712 acres and Empire is 2,235 acres. Int. Resp. at 9.

repairs in a narrow window between July 1 and August 31; the repairs will be postponed until next year if not competed this summer. Id.

Dodge Logging, Inc., which holds the contract for the Empire sale, has "substantially completed" harvest on units 21A, 321, and 326, and intervenors propose that the court allow Dodge to complete yarding and hauling operations on those units. Id. at 7. These activities are on or adjacent to parcels Dodge has already logged and will not require road building or reconstruction. Id. at 7–8.

Intervenors admit the proposed logging will change the status of elk habitat in the Project area in the following ways:

- No change for 44 acres of marginal cover;
- No change for 23 acres of satisfactory cover;
- Convert 231 acres of marginal cover to forage;
- Convert 47 acres of satisfactory cover to forage; and
- Convert 37 acres of satisfactory cover to marginal cover.

Int. Resp. at 10.[2] There is no information on whether the proposed activities will reduce the HEI index, but according to Forest Service biologist Mark Penninger, the full Project is expected to lower the HEI index only 0.01 from 0.57 to 0.56. Def. Resp. at 5.

Defendants and Intervenors assert that the logging allowed under their proposed injunction is of such a narrow scope that it will have no appreciable impact on the elk or elk habitat at the landscape scale. They argue these small, localized changes to select portions of elk habitat preserve the status quo because the activities are not anticipated to cause irreparable harm to the elk and are, therefore, consistent with the Ninth Circuit opinion in this case. Def. Resp. at 10; Int. Resp. at 8.  The court disagrees.

_____

[2] These estimates, Intervenors explain, were provided by the Forest Service based on Intervenors' harvest plans, and assume Intervenors will log more acreage than the proposed tailored injunction allows. Int. Resp. at 10.

For one, the proposed narrow injunction mischaracterizes the status quo this court is charged with protecting. The status quo is the last uncontested status that preceded the parties' controversy. Dep't of Parks & Recreation for State of California v. Bazaar Del Mundo Inc., 448 F.3d 1118, 1124 (9th Cir. 2006). Neither Intervenors nor Defendants dispute that prior to the Plaintiffs' suit, filed in 2012, no logging or road building had occurred in the Project area pursuant to the Record of Decision ("ROD") at the heart of this controversy. Allowing the Forest Service and Intervenors to take initial steps toward completing the ultimate plan of logging the Project area is not consistent with preserving the last uncontested status of elk habitat prior to the commencement of this action about logging in the WWNF. See Se. Alaska Conservation Council v. U.S. Army Corps of Engineers, 479 F.3d 1148, 1151 (9th Cir. 2007) (denying motion to vacate injunction that would have allowed intervenors to begin constructing a ditch as part of challenged plan to fill a lake with mine tailings as inconsistent with the status quo).

Furthermore, cases interpreting NEPA have equated the "status quo" and the "no action" alternative proffered by the action agency. Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin., 126 F.3d 1158, 1188 (9th Cir. 1997) ("The 'no action' alternative may be thought of in terms of continuing with the present course of action until that action is changed.") (quoting 46 Fed. Reg. 18026, 18027)); Custer Cnty. Action Ass'n v. Garvey, 256 F.3d 1024, 1040 (10th Cir. 2001) (considering the "no-action" alternative requires comparing potential impacts of proposed action against "maintaining the status quo," i.e. "the current level of activity"). The "No Action" alternative proposed by the Forest Service in the original Snow Basin project FEIS reads: "None of the management activities described in the Proposed Action or the other action alternatives would be implemented to accomplish project goals. Commercial thinning, fuels

treatments for activity and natural fuels, and prescription burning would not be authorized." AR 12170.

Intervenors argument that the "status quo is not a prohibition on harvest operations," because the Ninth Circuit "suggested that such operations could continue" is unavailing. Int. Resp. at 3 (citing <u>LOWD</u>, 2014 WL 1814172 at *9 ("the district court could consider, for example, limiting the injunction to specific areas of elk habitat or to trees above a certain diameter at breast height.")). The Ninth Circuit's "suggestion" was merely that—an idea of what this court might consider in shaping the injunction. Intervenors argument ignores the remaining portions of the Ninth Circuit opinion that suggested this court could also consider enjoining the entire Project. <u>LOWD</u> at *9 ("On remand, the district court should determine whether the entire Snow Basin project must be preliminarily enjoined, or whether a more narrowly tailored preliminary injunction can be crafted that adequately preserves the status quo and the rights of the parties until a final judgment issues in the case.") (citation and quotation marks omitted)).

Finally, Intervenors' proposed narrow injunction asks this court to analyze the impacts the 2014 activities will have on the elk in the Project area. Int. Resp. at 1 ("The Court should . . . allow intervenors' narrowly tailored and limited harvest . . . that will have no impact on the Keating elk herd . . . ."). They argue that the "status quo should be viewed as preventing irreparable harm to the elk population until this court reaches a decision on the merits." Int. Resp. at 4. Defendants advance a similar argument—that plaintiffs' requested injunction "ignores the Ninth Circuit's suggestion that a limited preliminary injunction could allow some trees to be cut, depending on their effects on elk." Fed. Resp. at 11.

Defendants and Intervenors offered expert declarations and testimony at oral argument about the proposed 2014 logging and road building and the anticipated impacts on elk and elk

habitat. Defendants' expert, Forest Service biologist Mark Penninger, "reviewed Inte[r]venors' proposal for operations in the Skull and Empire sales in the near term and has concluded that the proposed operations in these units may have minor, negative effects on elk at the localized level, but would have a neutral effects on elk at the Project area scale." Def. Resp. at 7 (citing Penninger Decl. ¶ 23). Intervenors' expert, Dr. Robert Riggs, submitted a declaration and testified that the scattered harvest of the 2014 units is not expected to measurably impact the quality of elk habitat. Riggs Decl. ¶¶ 13–15.

But the Ninth Circuit decision made clear that it is the Forest Service, not this court, who must analyze "the environmental impact of the Snow Basin project on elk and their habitat" with a Supplemental EIS now that the TMP has been withdrawn. LOWD, 2014 WL 1814172 at *3; see also id. at *9 (remanding to this court to "enter a preliminary injunction sufficient to protect the status quo **while the [Forest Service] completes a supplement environmental impact statement**.") (emphasis added). Defendants and Intervenors cannot rely on the Riggs and Penninger declarations or testimony to pre-judge what the Supplemental EIS will show, or to correct the Forest Service's flawed NEPA analysis regarding the impacts the Project will have on elk now that the TMP has been withdrawn. Judges in this District and in other Circuits have rejected attempts by federal agencies to use declarations prepared for litigation to remedy deficient NEPA analysis. See League of Wilderness Defenders v. U.S. Forest Serv., 3:10-cv-01397-SI, slip op. at 7 (D. Or. Dec. 10, 2012) ("Precisely because the cumulative impacts discussion was inadequate in the Project FEIS, this Court cannot accept the Forest Service's representations that there will be no significant cumulative impacts from this Project. The Forest Service cannot use declarations before this Court . . . to substitute for the missing analysis in the Project FEIS."); League of Wilderness Defenders v. Forsgren, 184 F.Supp.2d 1058, 1069 (D. Or.

2002) (finding post-EA submissions and declarations insufficient to cure NEPA violation); see also N.C. Wildlife Fed'n v. N.C. Dept. of Transp., 677 F.3d 596, 604 (4th Cir. 2012) (rejecting agencies' attempt to cure flawed NEPA analysis through "after-the-fact disclosures"); Sierra Club v. Hodel, 848 F.2d 1068, 1096 (10th Cir. 1988) (explaining that documents submitted to the court were "not the functional equivalent" of NEPA analysis and that "[e]nvironmental study is for the agency to conduct in the field, not for the judiciary to construct in the courtroom."), overruled on other grounds by Vill. of Los Ranchos De Albuquerque v. Marsh, 956 F.2d 970 (10th Cir. 1992) (en banc).

The analysis about the effects of the proposed 2014 activities on elk should take place in the context of the Supplemental EIS where interested parties can scrutinize the Forest Service's analysis and make comments, because "[i]nformed public participation in reviewing environmental impacts is essential to the property functioning of NEPA." LOWD, 2014 WL 1814127 at *3. NEPA procedures "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b) (emphasis added). Neither the public nor other government agencies like the Oregon Department of Fish & Wildlife have had the opportunity to comment on Defendants' or Intervenors' internal analysis and expert declarations about the effects of the proposed activities on elk and elk habitat.

The Ninth Circuit in this case found that the NEPA analysis was deficient because it failed to consider the effects of logging and road building on elk without the mitigating benefits of the TMP. The court cannot allow a set of those challenged activities, however narrow, to move forward until the Forest Service completes the Supplemental EIS.

For those reasons, the court rejects Intervenors' proposed narrowly tailored injunction.

II.    **Plaintiffs' Proposed Blanket Injunction**

Plaintiffs urge the court to enter a broad injunction against "all commercial logging, road building, and road reconstruction, in elk summer and winter range habitat within the Skull and Empire sale areas . . . until this Court issues a final ruling on all of plaintiffs' claims." Pl. Motion at 7. They argue the "status quo" the court must protect is the last, uncontested status of elk habitat before the controversy began, meaning a certain amount of forest cover and forage, and a certain number of roads with their own current condition.

Plaintiffs assert that the logging and road building activities that would be allowed under Intervenors' proposed narrow injunction will necessarily change the status quo of elk habitat by reducing and degrading available cover, increasing forage, and reducing security areas away from motorized access. Pl. Motion at 17. All the areas slated for logging are currently closed canopy, and Plaintiffs argue that the proposed logging will convert every logged acre to "open" density forest, meaning it will be suitable for livestock grazing and available for cross-country motor vehicle use. Pl. Motion at 17–18, 20.

As stated above, the court agrees that the status quo in this case is the state of elk habitat as it existed in 2012, before Plaintiffs filed this suit. The court declines, however, to adopt Plaintiffs' proposed blanket injunction against all logging activities within the Skull and Empire sales areas. Even in cases involving a NEPA violation, there is no rule requiring automatic issuance of a blanket injunction. Northern Cheyenne Tribe v. Norton, 503 F.3d 836, 843 (9th Cir. 2007). "When injunctive relief is appropriate, the court must balance the equities between the parties and give due regard to the public interest. Sometimes a full injunction is appropriate. But at other times, the equities demand a partial injunction." Id. (quoting Norton, 503 F.3d at 843).

The parties disagree about the application of Norton to the present case. Intervenors argue that Norton requires this court to re-weigh the equities when determining the proper scope of the

OPINION & ORDER - 14

injunction. Plaintiffs distinguish <u>Norton</u> by explaining that the district court in that case balanced the equities and determined the scope of the injunction at the same time. In this case, the Ninth Circuit has bifurcated the analysis by balancing the equities and determining that Plaintiffs are entitled to an injunction, and asking this court to determine the injunction's scope.

Even if this court were to re-balance the equities between allowing Intervenors to conduct very limited operations this summer and Plaintiffs' blanket injunction, the analysis would favor Plaintiffs. The irreparable harms Plaintiffs face if the logging of mature trees is incorrect in law far outweighs the temporary economic harms Intervenors face if not allowed to log 239 acres. The public interest in preserving mature trees also outweighs the temporary loss of jobs or government revenue—the 11,000 total acres of thinning for the project as a whole supports about 300 jobs and $275,000 in government revenue over five years, and the number of jobs and revenue supported by the 239 acres is significantly less. <u>LOWD</u>, 2014 WL 1814172 at *7–*8.

One key factor in <u>Norton</u> was the narrowly tailored injunction fully remedied the harm alleged. The plaintiffs in <u>Norton</u> challenged a Bureau of Land Management environmental impact statement analyzing the development of coal bed methane resources in the Powder River Basin in Montana and Wyoming. 503 F.3d at 840. They argued the EIS should have considered a "phased development" alternative; the district court agreed, and ordered the BLM to consider "phased development." <u>Id.</u> at 840–41. But the court upheld the EIS in all other respects and tailored the injunction accordingly:

> [T]he court bears in mind that . . . the EIS generally passed muster under NEPA, with the exception of the failure to consider a phased development alterative. The plan designed by BLM is tailored to address this deficiency by allowing a type of phased development to proceed at the same time BLM analyzes the efficacy of such an alternative. The proposal will assist BLM in choosing between alternatives by permitting the agency to study the effects of the phased development while preparing the SEIS.

Id. at 841. The court allowed development on seven percent of the project area, but blocked it on the remaining ninety-three percent. In other words, "the district court allowed . . . 'phased development' . . . to proceed while BLM decided whether to adopt it." Id. The Ninth Circuit upheld the partial injunction because it fully remedied the BLM's failure to consider phased development in the FEIS. Id. at 844. It also prevented irreparable harm because each drilling site, including those among the seven percent the district court approved for development, required a site-specific NEPA analysis. Id. at 841, 844.

That is not the case here. Plaintiffs' alleged harm is the logging of mature trees without sufficient NEPA analysis. The Ninth Circuit ruled the balance of equities favors Plaintiffs and that an injunction should issue to protect the status quo while the Forest Service completes a Supplemental EIS that examines the effect of logging and road building on elk without the mitigating benefits of the TMP. There is no narrow injunction the court can draw that allows further logging without improperly prejudging the outcome of the Supplemental EIS, i.e. whether logging and road construction, however narrow, will impact the elk. And there is no additional procedural safeguard, such as the site-specific NEPA analysis in Norton, to ensure the Forest Service considers the environmental impacts of the proposed activities before they occur.

The court is aware, however, that Dodge Logging has completed logging some of the units in the Empire sale, specifically units 21A, 321, and 326. Int. Resp. at 7. Intervenors propose that Dodge be allowed to complete yarding and hauling operations on those units. Id. Since those trees have been cut down, Plaintiffs' proposed blanket injunction cannot prevent irreparable harm on those units.

Accordingly, the court grants Plaintiffs' motion to determine the scope of the preliminary injunction, but rejects Plaintiffs' proposed blanket injunction and draws a narrower one as detailed below.

**ORDER**

For the reasons stated, the court **GRANTS** Plaintiffs' motion to determine the scope of the preliminary injunction as follows:

It is hereby **ORDERED** that implementation of, and operations on, the Skull sale are enjoined pending a decision on the merits. No logging can begin, and no new roads or temporary roads may be constructed or reconstructed.

It is further **ORDERED** that implementation of, and operations on, the Empire sale are enjoined pending a decision on the merits, except that yarding and hauling operations on Empire units 21A, 321, and 326 may be completed. No new logging can begin, and no new roads or temporary roads may be constructed or reconstructed.

Dated this ___7___ day of _Aug_ ., 2014.

MARCO A. HERNÁNDEZ
United States District Judge

OPINION & ORDER - 17