IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LEAGUE OF WILDERNESS
DEFENDERS/BLUE MOUNTAINS
BIODIVERSITY PROJECT, et al.,

            Plaintiffs,

     v.

KENT P. CONNAUGHTON, et al.,

           Defendants,

and

BAKER COUNTY, a political subdivision
of the State of Oregon, et al.,

           Defendant-Intervenors.

No. 3:12-cv-02271-HZ

OPINION & ORDER

Tom C. Buchele
EARTHRISE LAW CENTER
10015 SW Terwilliger Blvd.
Portland, OR 97219

1 – OPINION & ORDER

Attorney for Plaintiff League of Wilderness
Defenders/Blue Mountain Biodiversity Project

Jennifer R. Schemm
Attorney at Law
602 O Ave.
La Grande, OR 97850

Attorney for Plaintiff Hells Canyon
Preservation Council

Sam Hirsch
Beverly F. Li
US DEPARTMENT OF JUSTICE
Environmental & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044

Attorneys for Federal Defendants Kent P.
Connaughton, United States Forest Service,
United States Fish and Wildlife Service,
and Gary Miller

Scott W. Horngren
AMERICAN FOREST RESOURCE COUNCIL
5100 SW Macadam, Suite 350
Portland, OR 97239

Caroline Lobdell
WESTERN RESOURCES LEGAL CENTER
5100 SW Macadam, Suite 350
Portland, OR 97239

Attorneys for Defendant-Intervenors

HERNÁNDEZ, District Judge:

In this environmental case, Plaintiffs The League of Wilderness Defenders/Blue

Mountain Diversity Project and the Hells Canyon Preservation Council (collectively,

"Plaintiffs") challenge the Record of Decision (ROD) and underlying final Environmental

Impact Statement (EIS) issued by Defendant the United States Forest Service approving the

2 – OPINION & ORDER

Snow Basin Vegetation Management Project ("Project"), which would allow a certain amount of commercial logging of large trees and old forests in the Project area. Kent P. Connaughton is also named as a defendant in his official capacity as Regional Forester in the Pacific Northwest Region of the Forest Service.[1] On March 14, 2013, the Court granted the motion to intervene by Baker County, Union County, Boise Cascade Wood Products, American Forest Resource Council, Chary Mires, and Oregon Small Woodlands Association (collectively, "Intervenors").

In July of 2013, this Court denied Plaintiffs' motion for preliminary injunction that sought to block the Project's plan for commercial logging activities. On appeal, the Ninth Circuit affirmed that decision in large part but reversed on a narrow issue by finding that Plaintiffs were entitled to an injunction based on the inadequacy of the Project's final EIS regarding elk habitat. See League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton, 752 F.3d 755, 767 (9th Cir. 2014). The Ninth Circuit remanded to this Court with instructions to "enter a preliminary injunction sufficient to protect the status quo while the [Forest Service] completes a supplemental environmental impact statement." Id. On August 7, 2014, this Court issued a preliminary injunction blocking all logging activities in the Project's two commercial logging sales, pending a decision on the merits.[2] (ECF #129).

Following the Ninth Circuit decision, Plaintiffs dropped a number of their claims. Two claims remain. The remaining claims, Claim 1, counts 3, 4, 6, and 8-11; and Claim 2; allege

---

[1] Plaintiffs' Complaint also named as defendants the United States Fish and Wildlife Service and Gary Miller, Field Supervisor, United States Fish and Wildlife Service, in his official capacity. Plaintiffs chose not to pursue some of their claims, including those against the Fish and Wildlife Service, after the Ninth Circuit ruled on their preliminary injunction motion. See Pls.' Am. Mot. Summ. J. at 2. Therefore, the Court now dismisses Claim 1, counts 1, 2, 5, 7, and 12; Claim 3; and Claim 4.

[2] However, the injunction did allow one company, Dodge Logging, Inc., to complete yarding and hauling operations on three units in the sale that it had already logged.

violations of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., and the National Forest Management Act (NFMA), 16 U.S.C. §§ 1601 et seq.

Now before the Court are cross-motions for summary judgment filed by Plaintiffs, Defendants, and Intervenors. For the reasons explained below, the Court grants summary judgment to Plaintiffs on Claim 1, counts 3, 4, 9, 10, 11; and Claim 2. The Court grants summary judgment to Defendants and Defendant-Intervenors on Claim 1, counts 6 and 8.

## BACKGROUND

Since 2008, the Forest Service has been developing a plan for logging in the Project area, a nearly 29,000 acre portion of the Wallowa Whitman National Forest (WWNF) in northeastern Oregon. The Forest Service issued a draft EIS in March 2011 and a final EIS and ROD in March 2012. Admin. Rec. (AR) 7854; 12135; 12820. The Project has three purposes: (1) "Manage forest composition, structure, and density toward the historic range of variability across the landscape and improve sustainability"; (2) "Maintain and increase landscape resilience to reduce the risk of uncharacteristic disturbance, including the risk of high severity, stand replacing fires, insect outbreaks, and disease," and; (3) "Provide a supply of forest products for the public to utilize, and provide a supply of materials to local markets." AR 12827-28. Historic range of variability (HRV) refers to "the natural fluctuation of components of healthy ecosystems over time." AR 12570.[3] The intent of the Project is to "reestablish and retain resilience of forest ecosystems across the [Project] landscape." AR 12827.

The Forest Service seeks to accomplish the Project's goals through approximately 11,000 acres of commercial logging, using a combination of intermediate thinning and overstory

---

[3] In the final EIS, HRV "refers to the range of conditions and processes that are likely to have occurred prior to settlement of the project area by people of European descent (approximately the mid-1800s), which would have varied within certain limits over time." AR 12570.

4 – OPINION & ORDER

removal, and approximately 9,000 acres of non-commercial thinning. The ROD also authorizes

fuels treatments[4], including prescribed fires and machine and hand piling and burning, on

approximately 19,000 acres, most of which would occur after commercial harvest activities. The

Project calls for removing trees along approximately 225 miles of system haul roads,

constructing approximately 9 miles of temporary roads, and reconstructing approximately 39

miles of existing roads to support timber log hauling.  Road maintenance will be performed on

approximately 224 miles of roads and replace an existing bridge.

The resilience of the forest in the Project area "is at risk due to past fire suppression and

logging activities," which have caused "considerable changes in species composition, structure,

and densities" over the last several decades. AR 12827. The ROD states that the desired

condition for the Project area is "a mosaic landscape that has a distribution of forested species

compositions, structural stages, tree diameters, and relative densities within the natural (historic)

range of variability for these sites." AR 12828. In order to achieve the desired condition, the

ROD calls for the removal of some trees, primarily grand fir, that are 21 inches or larger in

diameter at breast height (DBH).[5] Large mistle-toe infected trees would also be removed to

promote the growth and health of desirable understory tree species. Old trees (defined as 150

years or more) of all species would be retained.

In order to implement the Project, the Forest Service seeks to amend the "Eastside

Screens." The Eastside Screens, a region-wide WWNF Plan amendment adopted in the early

---

[4] According to the final EIS, "[c]reating fire resilient forests with fuels treatments implies a three part approach: reduce surface fuels through prescribed burning, reduce ladder fuels through small diameter thinning and burning, and reduce crown density in both the understory and overstory. AR 12241.

[5] "Diameter at breast height" (DBH) is defined as "a measure at breast height (4.5 feet), outside bark, of the tree bole, perpendicular to the tree bole. USDA Forest Service, Common Stand Exam Users Guide—Appendix M: Glossary of Terms, p. M-2 (Feb. 2014), http://www.fs.fed.us/nrm/documents/fsveg/cse_user_guides/APPEND_M_glossary.pdf.

1990s, are a set of interim riparian, ecosystem, and wildlife standards for timber sales applicable to public lands east of the Cascade Mountains. The Screens prohibit logging late and old seral and/or structural (LOS) trees 21 inches DBH or greater until a long-term strategy for protection and restoration is developed. In essence, the Screens prohibit the harvest of old-growth trees.

The Forest Service proposes to amend the Eastside Screens in two ways. First, the Forest Service seeks a Project area exception to the WWNF Plan in order to allow logging of LOS trees in Project areas that are below the HRV. AR 12830. The ROD states that this amendment is needed to "change multi-story stands dominated by large grand fir trees to single story stands dominated by large early-seral ponderosa pine and western larch trees." Id. The amendment would help "maintain declining desired tree species, such as ponderosa pine and western larch, by reducing competition with over represented large grand fir." Id. The second amendment allows logging of "a limited amount of grand fir of any size from all units and logging of trees 21 inches diameter at breast height (DBH) and greater, where there is excessive mistletoe infestation impeding development of healthy conditions in Douglas-fir or where large trees of other species are affecting the health and vigor of aspen stands." AR 12831. The ROD states that this amendment is needed "to remove conifers within harvest treatment stands based on the greatest benefit to residual tree survival and stand sustainability rather than based on conifer diameter." Id.

Plaintiffs submitted comments during the public comment period for the draft EIS. AR 8866, 8459. Once the ROD and final EIS were issued, Plaintiffs submitted administrative

appeals. AR 14744, 15250. Now, Plaintiffs challenge the ROD and its underlying final EIS in

this Court by bringing the following claims which allege violations of NEPA[6]:

1) Failure to disclose and analyze in the final EIS the cumulative impacts of prior timber sale projects across the WWNF and failure to properly consider and analyze the impacts of reasonably foreseeable future sales and plan amendments in similarly situated areas of the WWNF, (Claim 1, Count 3);

2) Failure to prepare a supplemental EIS and instead preparing the final EIS relying on a Travel Management Plan that had been withdrawn, (Claim 1, Count 4);

3) Failure to take a "hard look" at whether the Project's proposed logging within old forests and logging of big trees will achieve the Project's purpose and need; and failure to consider a reasonable range of alternatives, (Claim 1, Counts 6, 8);

4) Failure to include documents critical to the Forest Service's analysis in the final EIS and failure to prepare a new or supplemental draft EIS for the Project, in light of significant reworking of its analysis, (Claim 1, Counts 9, 10); and

5) Failure to ensure the scientific integrity of the discussions and analyses pertaining to logging large trees and old forests, (Claim 1, Count 11).

In addition, Plaintiffs bring the following claim under NFMA:

1) Improper use of site-specific amendments to the Forest Plan, (Claim 2).

Plaintiffs seek declaratory and injunctive relief as follows: (1) declare that Defendants

violated NEPA and NFMA in all the ways that Plaintiffs allege; (2) vacate and set aside the final

EIS and ROD for the Project; (3) enjoin the Forest Service from implementing the ROD until

Defendants comply with NEPA and NFMA; (4) declare that the Forest Service's failure to

prepare a supplemental EIS violated NEPA and the APA, and order the Forest Service to prepare

a supplemental EIS; (5) enjoin Defendants from taking any further actions towards proceeding

with the Project until they have complied with NEPA; and, (6) award Plaintiffs their reasonable

---

[6] The Claim and Count numbers reflect the way they were numbered in Plaintiffs' First Amended Complaint. See ECF [19].

costs, litigation expenses and attorney fees associated with this litigation pursuant to the Equal

Access to Justice Act, 28 U.S.C. § 2412 et seq.

## STANDARDS

### I.     Standards of Review

####     A.  Summary Judgment

Summary judgment is appropriate if there is no genuine dispute as to any material fact

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The

moving party bears the initial responsibility of informing the court of the basis of its motion, and

identifying those portions of "'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)

(quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine

issue of material fact, the burden then shifts to the nonmoving party to present "specific facts"

showing a "genuine issue for trial." Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927-28 (9th

Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the

pleadings and designate facts showing an issue for trial. Bias v. Moynihan, 508 F.3d 1212, 1218

(9th Cir. 2007) (citing Celotex, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. Suever v.

Connell, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the

light most favorable to the nonmoving party. Earl v. Nielsen Media Research, Inc., 658 F.3d

1108, 1112 (9th Cir. 2011).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

B.   The Administrative Procedure Act

All of the claims in this case are governed by the Administrative Procedure Act, 5 U.S.C. §§ 701–706(APA). Under the APA, a federal court "shall ... hold unlawful and set aside agency action, findings, and conclusions found to be [:] (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] without observance of procedures required by law [.]" 5 U.S.C. § 706(2).

Under this standard,

> an "agency must examine the relevant data and articulate a satisfactory explanation for its action." Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise, or if the agency's decision is contrary to the governing law. Id.

Organized Village of Kake v. U.S. Dep't of Agric., 746 F.3d 870, 974 (9th Cir. 2014).

In deciding whether the agency's action complied with the APA, the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." San Luis & Delta–Mendota Water Auth. v. Jewell, 747 F.3d 581, 601 (9th Cir. 2014) (internal quotation marks omitted). The court's "inquiry must be thorough," but "the standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency." Id. (internal quotation marks omitted). "Where the agency has relied on relevant

evidence such that a reasonable mind might accept as adequate to support a conclusion, its

decision is supported by substantial evidence." Id. (internal quotation marks and brackets

omitted). "Even if the evidence is susceptible of more than one rational interpretation, the court

must uphold the agency's findings." Id. (internal quotation marks omitted). The Ninth Circuit has

endorsed summary judgment motions as "'an appropriate mechanism for deciding the legal

question of whether the agency could reasonably have found the facts as it did.'" City & Cnty. of

S.F. v. United States, 130 F.3d 873, 877 (9th Cir. 1997) (quoting Occidental Eng'g Co. v. INS,

753 F.2d 766, 770 (9th Cir.1985)).


## II.    Substantive Standards

### A.  National Environmental Policy Act

NEPA has two principal aims. Baltimore Gas & Elec. Co. v. Natural Resources Defense

Council, 462 U.S. 87, 97 (1983). First, NEPA requires government agencies to "consider every

significant aspect of the environmental impact of a proposed action." Id. (internal quotation

marks omitted). "Second, NEPA mandates that government agencies inform the public of the

potential environmental impacts of proposed actions and explain how their decisions address

those impacts." Citizens Committee to Save Our Canyons v. United States Forest Service, 297

F.3d 1012, 1021 (10th Cir. 2002).

"NEPA is a procedural statute that does not 'mandate particular results but simply

provides the necessary process to insure that federal agencies take a hard look at the

environmental consequences of their actions.'" High Sierra Hikers Ass'n v. Blackwell, 390 F.3d

630, 639–40 (9th Cir. 2004) (internal citation omitted).

To accomplish the "hard look" requirement, NEPA requires all agencies to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS must include:

> (i) the environmental impact of the proposed action,
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
> (iii) alternatives to the proposed action,
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Id.

The EIS serves two important purposes: "[i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and it "guarantees that the relevant information will be made available to the larger [public] audience." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989). An agency takes the requisite "hard look" at environmental consequences when its EIS contains all the items listed in 42 U.S.C. § 4332(2)(C) and includes "a full and fair discussion of environmental impacts." Lands Council v. McNair, 537 F.3d 981, 1001 (9th Cir. 2008) (en banc), overruled in part on other grounds by Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7 (2008).

After the agency has taken this "hard look," it is free to decide that other values outweigh any environmental costs it has identified. See Robertson, 490 U.S. at 350-51 ("NEPA merely prohibits uninformed–rather than unwise–agency action."). Courts will not "substitute [their] judgment for that of the agency concerning the wisdom or prudence of a proposed action." City of Carmel-By-The-Sea v. U.S. Dep't of Transp., 123 F.3d 1142, 1150 (9th Cir. 1997) (quotation

omitted). A court reviews a federal agency's compliance with NEPA under the APA's arbitrary and capricious standard. Lands Council v. McNair, 537 F.3d at 987.

    B.  National Forest Management Act

        Unlike NEPA, which is purely procedural, NFMA also imposes substantive constraints on management of forest lands, such as a requirement to insure biological diversity. Native Ecosystems Council v. Dombeck, 304 F.3d 886, 898 (9th Cir. 2002). The NFMA and its implementing regulations subject forest management to two stages of administrative decision making. At the first stage, the Forest Service is required to develop a Land and Resource Management Plan, also known as a Forest Plan, which sets forth a broad, long-term planning document for an entire national forest. At the second stage, the Forest Service must approve or deny individual, site-specific projects. These individual projects must be consistent with the Forest Plan. Great Old Broads for Wilderness v. Kimbell, 709 F.3d 836, 851 (9th Cir. 2013) ("the NFMA prohibits site-specific activities that are inconsistent with the governing Forest Plan"); see also Neighbors of Cuddy Mtn. v. Alexander, 303 F.3d 1059, 1062 (9th Cir.2002) ("[s]pecific projects ... must be analyzed by the Forest Service and the analysis must show that each project is consistent with the plan"). The Forest Service's "interpretation and implementation of its own forest plan is entitled to substantial deference." Great Old Broads, 709 F.3d at 850 (9th Cir. 2013) (internal quotation marks omitted).

## DISCUSSION

I.    **NEPA Violations**

    A.  Cumulative Impacts Analysis (Claim 1, Count 3)

        Plaintiffs allege that the Project's final EIS failed to disclose and analyze the cumulative impacts of prior timber sale projects and reasonably foreseeable future sales and plan

amendments throughout the Forest. Specifically, Plaintiffs allege that Defendants failed to consider the cumulative impacts of all the WWNF's site-specific amendments to the Eastside Screens and improperly limited the geographic scope of its cumulative impacts analysis on pileated woodpeckers and American martens. Defendants and Intervenors counter that the Forest Service adequately analyzed the cumulative impacts of amendments to the Screens, and that the Court must defer to the Forest Service's decision not to analyze the cumulative impacts on a forest-wide scale. The Court finds that the Forest Service failed to properly analyze the cumulative impacts of past amendments to the Eastside Screens within the WWNF and did not provide any explanation for limiting the scope of the cumulative impacts analysis on pileated woodpeckers and American martens to the Eagle Creek Watershed.

The Council of Environmental Quality (CEQ) regulations require a federal agency to analyze the cumulative impacts of a proposed action. 40 C.F.R. § 1508.25(c)(3). Cumulative impacts are those "impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7; see also Kern v. U.S. Bureau of Land Management, 284 F.3d 1062, 1075 (9th Cir. 2002). The focus of NEPA is on proposed actions and "it does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement." Kleppe v. Sierra Club, 427 U.S. 390, 410 n.20 (1976).

Cumulative impacts analysis requires "some quantified or detailed information." Ocean Advocates v. U.S. Army Corps. Of Eng'rs, 402 F.3d 846, 868 (9th Cir. 2004). Conclusory statements about "possible effects" or "some risk" do not satisfy the "hard look" required under NEPA. Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Management, 387 F.3d 989, 996 (9th Cir. 2004). Defining the geographic scope of the cumulative impacts analysis, however, is

"a task assigned to the special competency of the appropriate agenc[y]." Kleppe, 427 U.S. at

414; see also Native Ecosystems, 304 F.3d at 894 (explaining that "federal agencies are given

considerable discretion to define the scope of NEPA review").

A CEQ guidance document recognizes that "the most devastating environmental effects

may result not from the direct effects of a particular action, but from the combination of

individually minor effects of multiple actions over time."[7] CEQ, Considering Cumulative Effects

Under the National Environmental Policy Act, at 1 (Jan. 1997),

http://energy.gov/sites/prod/files/nepapub/nepa_documents/RedDont/G-CEQ-

ConsidCumulEffects.pdf; see also Kern, 284 F.3d at 1078 (explaining that a limited cumulative

impacts analysis "impermissibly subject[s] the decisionmaking process contemplated by NEPA

to the tyranny of small decisions"). When determining the geographic scope of the cumulative

impacts analysis, the CEQ recommends the following process:

1. Determine the area that will be affected by the action. That area is the project impact
   zone.
2. Make a list of the resources within that zone that could be affected by the proposed
   action.
3. Determine the geographic areas occupied by those resources outside of the project
   impact zone. In most cases, the largest of these areas will be the appropriate area of
   the analysis of cumulative effects.

Id. at 15.

In Native Ecosystems, the Ninth Circuit Court of Appeals provided additional guidance

about conducting a cumulative impacts analysis. 304 F.3d 886. The plaintiffs in Native

---

[7]"The CEQ's interpretation of NEPA is entitled to substantial deference." Andrus v. Sierra Club,
442 U.S. 347, 358 (1979). See also League Of Wilderness Defenders Blue Mountains
Biodiversity Project v. Allen, 615 F.3d 1122, 1136 (9th Cir. 2010).

Ecosystems challenged a 226-acre timber sale in the Gallatin National Forest in Montana that was part of a package of twelve timber sales authorized by Congress. Id. at 890. The Gallatin National Forest Plan contained a maximum road density standard expressed as the Habitat Effectiveness Index (HEI), which measured the amount of area in the forest suitable for use as elk habitat—the higher the HEI, the lower the amount of roads. Id. The challenged sale called for both road construction and reconstruction that would lower the HEI in the Project area to well below the Forest Plan mandated threshold. Id. at 890–91. The Forest Service chose to adopt a site-specific amendment waiving the HEI requirement for the project area. Id. at 891. Despite the fact that the Forest Service anticipated that many of the other Gallatin sales would also fail to meet the HEI standard and would require site-specific amendments, the Forest Service prepared an environmental assessment[8] that only analyzed the challenged sale and determined the sale would not significantly affect the environment. Id.

The Court agreed with the plaintiffs, who argued that the Forest Service violated NEPA when its environmental assessment of the timber sale failed to consider the cumulative impacts of the road density amendment in combination with the other amendments to the Gallatin Forest Plan. Id. at 893. The future road amendments had to be included in the cumulative impacts analysis because they were "reasonably foreseeable future actions." Id. at 897. Evidence in the record revealed that the Forest Service repeatedly acknowledged that many road density amendments would be required to implement the sales, all of the other sales were proposed to occur within two years of the challenged sale, all were "proposed for the same national forest," and they would cause "separate but additive changes to the density of roads within that

---

[8] NEPA requires the Forest Service to prepare an environmental assessment (EA) to determine whether the proposed action will have a significant effect on the environment. If the EA reveals that the proposed action will significantly affect the environment, the agency must prepare an EIS. Native Ecosystems, 304 F.3d at 893.

15 – OPINION & ORDER

geographic area." Id. "The national forest was the geographic unit within which the Forest Service chose to set forth binding road density standards in the Forest Plan," and "[u]nless the cumulative impacts of these amendments are subject to analysis, even though distantly spaced throughout the forest, the Forest Service will be free to amend road density standards throughout the forest piecemeal, without ever having to evaluate the amendments' cumulative environmental impact." Id. at 897.

i.    Other Site-Specific Amendments in the Cumulative Impacts Analysis

Here, Plaintiffs argue that the WWNF is the geographic unit within which the Forest Service chose to set forth binding limitations (the Eastside Screens) on the logging of large trees and within old-growth forests.[9] Plaintiffs assert that the Forest Service has allowed site-specific amendments in the WWNF in the past and it has plans to do similar site-specific amendments in the future. Plaintiffs rely on Native Ecosystems and assert that the Forest Service was required to analyze the impacts of the Project's amendments with all other past, present, and reasonably foreseeable Eastside Screens' amendments allowing logging of large trees and within old growth forests across the WWNF. Plaintiffs allege that the Forest Service failed to do so.

Defendants and Intervenors argue that Native Ecosystems is distinguishable because the future road amendments in that case were already part of the record for the challenged sale and were slated to occur within roughly the next two years. Native Ecosystems, 304 F.3d at 896-97. Here, Defendants contend that there were no future site-specific amendments sufficiently developed at the time of the ROD so as to require analysis as part of the cumulative impacts analysis. In addition, Defendants and Intervenors argue that the Forest Service did in fact consider the cumulative effects of the plan amendments in connection with past projects,

---

[9] Plaintiffs also argue that the chosen geographic unit "arguably encompasses all eastside forests" instead of just the WWNF. Pl. Am. Memo. Supp. Mot. Summ. J. at 20.

including any projects that involved plan amendments to the Eastside Screens in the WWNF, in the final EIS's "Late and Old Structure Forest (LOS)—Landscape Assessment." AR 12618. The Landscape Assessment states that it considers treatments of late-old structure forests including "all commercial harvesting activities including: commercial thinning, single tree selection, improvement cut, and salvage." AR 12618. Defendants also point to a Forest Service response to a comment in the final EIS that stated: "past Forest Plan amendments have [resulted] in no net decrease in old-growth habitat." AR 12736.

The Court agrees with Defendants that the record is not developed to the extent it was in Native Ecosystems and does not demonstrate that there were future site-specific amendments sufficiently developed at the time of the ROD so as to require inclusion in the cumulative impacts analysis.

However, the Court agrees with Plaintiffs that the Forest Service failed to adequately consider the cumulative impacts of past amendments to the Eastside Screens within the WWNF. The Landscape Assessment that Defendants and Intervenors point to only considers the treatment of old-growth forests within a 300,000 acres assessment area, rather than the entire Forest. As discussed below, the Forest Service fails to provide an explanation as to why it did not examine cumulative impacts on a forest-wide scale. In addition, the Landscape Assessment does not address any cumulative impacts of logging of trees 21 inches DBH and greater, which would be allowed under this Project's amendments to the WWNF Plan. The final EIS lists "Potential Cumulative Activities" but does not provide any analysis regarding the activities' cumulative impacts. And the Forest Service response to the comment about past amendments is simply a conclusion, not an analysis, and it does not satisfy the "hard look" that NEPA requires.

For all the reasons above, the Forest Service's cumulative impacts analysis of other site-specific amendments is deficient under NEPA.

   ii.  Geographic Scope of Cumulative Impacts Analysis

Plaintiffs challenge the Forest Service's choice of geographic scope used to analyze the Project's cumulative impacts on the pileated woodpecker and American marten, which are management indicator species for old-growth habitat. AR 12372, 12385. Plaintiffs argue that the Forest Service improperly limited the geographic scope of the analysis to the Eagle Creek watershed instead of the whole WWNF without providing any justification or explanation. Defendants and Intervenors counter that the Forest Service is entitled to "considerable deference" in determining the scope of the cumulative impacts assessment and that the Forest Service decision was reasonable. While acknowledging that the agency is entitled to considerable deference, the Court finds that the Forest Service failed to provide any explanation in the record as to why it chose a smaller area (the Eagle Creek Watershed) instead of the WWNF to analyze the cumulative impacts of the Project on the pileated woodpecker and American marten. The Court cannot defer to the agency when there is an absence of evidence supporting the agency's decision.

"[T]he determination of the scope of an analysis area requires application of scientific methodology and, as such, is within the agency's discretion. Native Ecosystems, 304 F.3d at 902 (citing Kleppe, 427 U.S. at 414). However, in exercising this discretion, the agency "must provide support for its choice of analysis area" in the record. Id.

The Forest Service analyzed the Project's cumulative impacts on the pileated woodpecker and American marten using the scale of the Eagle Creek Watershed, which covers 123,377

acres.[10] AR 12389, 11997, 3142. Defendants point to a number of cases where courts have

upheld the agency's decision to use project boundaries as the scope of the cumulative impacts

analysis. (See, e.g., Kleppe, 427 U.S. at 412; Inland Empire Pub. Lands Council v. Forest

Service, 88 F.3d 754, 763–64 (9th Cir. 1996); Natural Res. Def. Council, Inc. v. Callaway, 524

F.2d 79, 90 (2d Cir. 1975). However, the ability of courts in other cases to find support for an

agency's choice of analysis area does not relieve the Forest Service of its duty to adequately

explain its choice in this case.

   The portions of the record that Defendants and Intervenors cite do not offer support for

the agency's choice of analysis area. For example, the final EIS statement regarding cumulative

impacts states simply: "Cumulative effects for pileated woodpecker are analyzed for the Eagle

Creek watershed." AR 12389. The Biological Evaluation and Wildlife Specialist Report have

identical language. See AR 11997. Document AR 3142 is simply a watershed report that

describes the general characteristics of Eagle Creek (e.g. acreage, boundaries). An introductory

section of the final EIS that explains the "default spatial scale to be considered for this project is

within the 6th Code HUC watersheds that may be affected by the proposed action and all

alternatives," but that a "cumulative effect area can be different and possibly larger or even

smaller depending on the resource area." AR 12202–03. None of these portions of the record

explain the reason the Forest Service analyzed cumulative impacts within the Eagle Creek

Watershed. At oral argument, Defendant's attorney cited three portions of the final EIS, but these

are similarly unhelpful. See AR 12386, 12389, 12373.

---

[10] Defendants make an argument that the Forest Service also assessed the viability of pileated
woodpeckers and martens at a Forest-wide scale across the WWNF. That argument would be
relevant under the NFMA.

Additionally, Intervenors argue that the Forest Service appropriately excluded the remainder of the WWNF from the cumulative impacts analysis because "[c]hanges to late/old structure forest conditions at [the forest-wide] scale are more appropriately addressed in a Forest Plan than a site-specific project." Intv. Memo at 12–13. Since the three Blue Mountain Forests were in a plan revision process, Intervenors argue, it was "within the Forest Service's discretion to defer and tier" the Project analysis to the forthcoming Forest Plan analysis. Id. at 13.

NEPA makes clear that agencies may "tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review." 40 C.F.R. § 1502.20. When a broad environmental impact statement already exists, a subsequent statement on an action included within the entire program or policy may summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference, rather than conducting a separate environmental impact statement on the same issues. Id. However, the Forest Service cannot tier its analysis to a forthcoming, uncompleted NEPA document. See California ex rel. Imperial Cnty. Air Pollution Control Dist. v. U.S. Dep't of the Interior, 12-55856, 2014 WL 3766720 (9th Cir. Aug. 1, 2014) (stating that "CEQ regulations encourage agencies to tier with a previous EIS") (internal quotations omitted) (emphasis added); see also Kern, 284 F.3d at 1073 (explaining that "tiering to a document that has not itself been subject to NEPA review is not permitted, for it circumvents the purpose of NEPA."). To the extent Defendants seek to tier the Project final EIS to the forthcoming Forest Plan, the regulations only permit tiering to an existing EIS. 40 C.F.R. § 1502.20; 40 C.F.R § 1502.28; see also Muckleshoot Indian Tribe v. U.S. Forest Service, 177 F.3d 800, 811 (9th Cir. 1999) (rejecting an attempt to tier an EIS to prior watershed report). Moreover, there is no guarantee that the as-yet-to-be completed Forest Plan will contain

sufficiently specific analysis regarding the cumulative impacts of this Project to allow tiering at all. League of Wilderness Defenders/Blue Mountains Biodiversity Project v. U.S. Forest Service, 883 F.Supp.2d 979, 1011 n.36 (D. Or. 2012) (stating that "[a] cumulative impacts analysis is inadequate when it relies on the analysis of a prior FEIS that did not discuss the specific cumulative effects of the proposed project.") (citing Klamath-Siskiyou Wildlands, 387 F.3d at 997).

In sum, the Eagle Creek watershed may be the proper scope in which to analyze the cumulative impacts of this Project on pileated woodpeckers and American martens. However, without any support in the administrative record, the Court is unable to conclude that the agency considered the relevant factors and, therefore, grants summary judgment to Plaintiffs on this claim.

B.  Travel Management Plan and the Need for a Supplemental EIS (Claim 1, Count 4)

As the parties note, this issue has already been fully briefed, both before this Court and the Ninth Circuit Court of Appeals. In granting Plaintiffs a preliminary injunction, the Ninth Circuit found that Plaintiffs were "likely to prevail on their claim that a supplemental EIS must be completed to show the environmental impact of the Project on elk and their habitat now that the [Travel Management Plan] has been withdrawn." League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton, 752 F.3d at 761.

While this Court's decision at summary judgment is "technically. . . not bound by [the Ninth Circuit's] earlier conclusions" regarding preliminary relief, it is important to note in this case that the Ninth Circuit based its preliminary ruling on the complete administrative record, the parties did not engage in discovery after the ruling, and there are no additional facts for this Court to consider. See Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v.

U.S. Dep't of Agr., 499 F.3d 1108, 1114 (9th Cir. 2007). Therefore, this Court adopts the Ninth Circuit's legal conclusion and finds that due to the withdrawal of the Forest's Travel Management Plan (TMP), the final EIS' reliance on the TMP in analyzing the impact of the Project on elk within the Forest is invalid, and the Forest Service must complete a supplemental EIS. The Court grants summary judgment to Plaintiffs on this claim.

    C.   The Project's Purpose and Needs, and a Reasonable Range of Alternatives (Claim 1, Counts 6 and 8)

Plaintiffs argue that the Project's plan to allow some logging of multistory old-growth forests is inconsistent with the Project's stated purpose and needs. In addition, Plaintiffs claim that the Forest Service violated NEPA when it failed to consider an alternative put forward by Plaintiff Hells Canyon Preservation Council (HCPC) that would limit logging to only "warm/dry" forest areas and trees smaller than 21 inches DBH. Defendants and Intervenors cast these arguments as disagreements about whether the Project will accomplish its intended result and, therefore, argue that the agency is entitled to deference to its scientific conclusions. The Court agrees with Defendants and Intervenors that the Forest Service is entitled to deference in its determination that the Project's plan will meet its purpose and needs and its decision that Plaintiff's proposed alternative will not.

NEPA's implementing regulations require that the agency state the underlying purpose and need for the proposed action. 40 C.F.R. § 1502.13. Agencies enjoy "considerable discretion" to define the purpose and need of a project. Friends of Southeast's Future v. Morrison, 153 F.3d 1059, 1066 (9th Cir. 1998).

Federal agencies must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). The analysis of alternatives to

the proposed action is the heart of an agency's environmental impact statement. 'Ilio'ulaokalani Coalition v. Rumsfeld, 464 F.3d 1083, 1085 (9th Cir. 2006). The project's scope and purpose define the reasonable range of alternatives the agency must consider and examine. Western Watersheds Project v. Abbey, 719 F.3d 1035, 1046 (9th Cir. 2013). If a reasonable alternative exists that the agency did not consider, the subsequent EIS is deficient. 'Ilio'ulaokalani, 464 F.3d at 1085. It follows that an agency's choice of an alternative that does not advance the purpose of the project "will not be considered reasonable or appropriate." Native Ecosystems, 428 F.3d at 1247.

An agency need not, however, "consider an infinite range of alternatives, only reasonable or feasible ones." City of Carmel-By-The-Sea, 123 F.3d at 1155. Nor need it consider "alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences." Headwaters, Inc. v. Bureau of Land Mgmt., 914 F.2d 1174, 1181 (9th Cir. 1990). There is no minimum number of alternatives that must be considered, as long as the EIS "discusses in detail all the alternatives that were feasible and briefly discusses the reasons others were eliminated." Laguna Greenbelt, Inc. v. U.S. Dep't. of Transp., 42 F.3d 517, 524 (9th Cir. 1994).

i.    Consistency of the Project with Stated Needs and Purposes

The Forest Service identified three purposes for the Project: 1) "[m]anage forest structure, composition and density towards landscape historic range of variability (HRV) and improve sustainability"; 2) "[m]aintain and increase landscape resilience to the risk of uncharacteristic disturbance"; and 3) "[p]rovide a supply of forest products to the public . . . ." AR 12149–50. The Forest Service initially evaluated seven alternatives but eliminated three of these from consideration for detailed study.

Plaintiffs argue that the Project's plan to allow logging of some Multistory Large Trees Common (MSLT) forests already at the lower range of their HRV is inconsistent with the Project's stated needs and purpose. One of the Project's purposes is to manage forest structure towards the landscape HRV; however, in the short-term, the Project would reduce the HRV for MSLT in warm/dry grand fir forests and warm/moist Douglas-fir forests.[11] AR 12234. While the trees would still be within the HRV, the logging would place them at the lowest point within their range. Id. And, according to a Forest Service report, "the further deviated you are from HRV the lower the likelihood that you will have species sustainability." AR 7325. In addition, Plaintiffs argue that because the cool/moist/dry grand fir forest has never had Single Story Large Trees Common (SSLT), Defendants' decision to "convert" 77 acres of MSLT in these forests to SSLT is arbitrary and capricious, given the Project's stated purposes.

Both Defendants and Intervenors argue that the Court should defer to the Forest Service's conclusions about current and historical forest stand conditions and appropriate treatments to reach desired conditions. The final EIS notes that "[a]ll of the major biophysical environments in the planning area currently contain far more acres of grand fir and Douglas-fir dominated forest than existed historically." AR 12157. These fir trees are shade tolerant and have proliferated throughout the forest. This creates problems both for existing ponderosa pines and western larches and their seedlings because the firs increase competition for tree resources like water and sunlight and the overcrowding of the understory means the forest is more susceptible to catastrophic fire and insect infestations. AR 12157–58. According to Defendants, reducing the

---

[11] According to the final EIS, warm/dry grand fir forests have historically had anywhere from 5-25% MSLT; currently, MSLT for this forest type is 10%; and the Forest Service's chosen alternative would reduce the MSLT to 5%. AR 12234. Warm/moist Douglas fir forests were historically 10-30% MSLT; currently, MSLT for this forest type is 15%; and the Forest Service's chosen alternative would reduce the MSLT to 10%. Id.

HRV for MSLT in the warm/dry grand fir and warm/moist Douglas-fir forests in the short term will allow the stands of ponderosa pine and western larch to improve in the future, which is in line with the Project's stated needs and purposes. AR 12149, 12234.

The parties' arguments can be characterized as a difference in opinion as to whether the short-term loss of large fir trees will ultimately result in a more sustainable forest long-term. While the arguments on each side are persuasive, given established principles of deference to agency expertise and decision-making, the Court grants summary judgment in favor of Defendants on this claim.

                ii.      Reasonable Range of Alternatives

Plaintiffs argue that the range of alternatives the Forest Service considered is inadequate because the agency failed to consider an alternative put forward by the HCPC that limits logging to warm/dry forests and trees smaller than 21 inches DBH. See AR8567-68 (HCPC DEIS comments); AR 14762-63 (HCPC appeal). According to Plaintiffs, the Project's purposes are best met by managing the warm/dry, not moist, forests; because the warm/dry forests are the forests most in need of restoration. In addition, Plaintiffs argue that focusing on the commercial logging of smaller rather than larger mature trees would be more effective as a means of reducing the risk of a large scale fire. Plaintiffs argue that the Forest Service's chosen alternative moves cool/moist grand fir stands away from their historic fire intervals and vegetative conditions, which jeopardizes the moist forests' sustainability and is not consistent with the purposes of the Project. Furthermore, Plaintiffs point out while that Alternative 4 (which the Forest Service considered but rejected) shares a limitation with the HCPC proposal with regard to the limit on the harvest of large trees, it does not address the targeted nature of the treatments

proposed in HCPC's alternative. For all of the above reasons, Plaintiffs claim that it was unreasonable for the Forest Service not to consider the HCPC proposed alternative.

Defendants' and Intervenors' response is two-fold: 1) HCPC's proposed alternative would not meet the purposes of the Project because it would not allow the Forest Service to move cool/moist forests toward the HRV; and 2) the Forest Service considered Alternative 4 in detail, and that alternative essentially mirrors HCPC's proposed alternative, meaning the final EIS did not have to further address HCPC's duplicitous proposal. Defendants point to the final EIS, which explains that conditions in the Project area "have deviated from historic conditions," including in cool/moist areas. AR 12213. According to Defendants, limiting logging to only dry forest areas would not move the cool forest areas towards their HRV and, therefore, would not meet the Project's identified purposes. In addition, Defendants state that allowing the amount of grand fir on the landscape to remain as it currently exists would not meet the purpose and need of managing forest structure composition and density towards HRV or maintaining and increasing resilience to the risk of uncharacteristic disturbance. Finally, Defendants argue that Alternative 4 (which was considered but not selected) encompassed Plaintiff's proposal to prohibit the harvest of trees 21 DBH or greater. Ultimately, Defendants claims that the HCPC proposal "merely constitute[s] another mid-range alternative" that the Forest Service was not required to consider in order to comply with NEPA. At oral argument, Defendants reiterated that if the treatment were limited as the plaintiffs proposed the project would not move towards its historic range of variability.

The Forest Service looked at the HCPC alternative but did not consider it after determining that it would not meet the Project's purposes. While the Court recognizes Plaintiffs' opinion that the proposal does meet the Project's purposes, the Court finds that the Forest

Service's decision did not violate NEPA because it determined that the HCPC proposal would not move the forest towards its HRV and would not improve the forest's resistance to catastrophic disturbance. The Forest Service is not required to consider proposals that do not meet the Project's purposes. Therefore, the Court grants summary judgment to Defendants on this claim.

   D.   <u>Disclosure of Wildlife Specialist Reports (Claim 1, Counts 9 and 10)</u>

   Plaintiffs contend that the Forest Service was required to include certain Wildlife Specialist Reports in the appendices to its draft EIS and final EIS, yet failed to do so and also failed to disclose these reports during the comment period.  Plaintiffs assert that there were major changes between the draft EIS and final EIS, and accordingly, the Forest Service was required to circulate a supplemental EIS for comment.  Defendants respond that the Forest Service permissibly incorporated the Specialist Reports by reference and that deliberative privilege permitted it not to disclose them during the comment period.  Defendants further argue that the changes between the draft EIS and the final EIS were the result of properly responding to comments and were not significant enough to require supplementation.  The Court finds that the Forest Service violated NEPA by failing to make the Specialist Reports accessible to the public. The Forest Service's failure to include the Specialist Reports in the appendices of the draft EIS accompanied by its refusal to disclose during the comment period material on which it relied in the draft EIS is contrary to the spirit of NEPA and the letter of the CEQ regulations.

        i.   Incorporation of the Wildlife Specialist Reports by Reference

   The draft EIS explained that the underlying data and analysis for its conclusions with respect to the environmental consequences of the Project could be found in Specialist Reports, that these Specialist Reports were incorporated by reference, and that they were available for

review by the public either upon request or at the Forest Service's Baker City, Oregon office. AR 07094. However, when Plaintiffs requested the Specialist Reports, the Forest Service refused to provide them and instead required Plaintiffs to submit a Freedom of Information Act (FOIA) request. Then, when Plaintiffs submitted a FOIA request, the Forest Service declined to provide the Specialist Reports on the grounds that they were protected from disclosure by deliberative privilege. AR 08979–85. The Forest Service only disclosed the final versions of these reports in response to a second FOIA request, after the final EIS and the ROD were completed, and three weeks before the deadline for Plaintiffs to file their administrative appeal. The draft versions of the Specialist Reports have never been disclosed.

The Supreme Court has held that the CEQ NEPA regulations (40 CFR § 1500.1 et seq.) are entitled to substantial deference. Andrus, 442 U.S. at 357. "Although initially advisory in nature, the [CEQ] regulations were made binding on the administrative agencies by [an executive order.]" Churchill Cnty. v. Norton, 276 F.3d 1060, 1072 n.7 (9th Cir. 2001) opinion amended on denial of reh'g, 282 F.3d 1055 (9th Cir. 2002). However, the regulations do not provide litigants with a means to "fly speck" an EIS for technical compliance. See 40 C.F.R. § 1500.3 ("[I]t is the Council's intention that any trivial violation of these regulations not give rise to any independent cause of action."); Oregon Envtl. Council v. Kunzman, 817 F.2d 484, 492–93 (9th Cir. 1987) ("The reviewing court may not fly speck an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies.") (internal quotation omitted).

The CEQ regulation related to appendices provides:

If an agency prepares an appendix to an environmental impact statement the appendix shall:
(a) Consist of material prepared in connection with an environmental impact statement (as distinct from material which is not so prepared and which is incorporated by reference (§ 1502.21)).

(b) Normally consist of material which substantiates any analysis fundamental to the impact statement.

(c) Normally be analytic and relevant to the decision to be made.

(d) Be circulated with the environmental impact statement or be readily available on request.

40 C.F.R. § 1502.18.  The regulation related to incorporation by reference explains:

Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action.  The incorporated material shall be cited in the statement and its content briefly described.  No material may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment.  Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference.

40 C.F.R. § 1502.21 (emphasis added).

Section 1502.21 plainly prohibits an agency from relying on information in the preparation of an EIS while refusing to make that information available to the public.  See Save Our Ecosystems v. Clark, 747 F.2d 1240, 1248 n.13 (9th Cir. 1984) ("[Amicus] is opposing the disclosure of EPA health and safety data before the Supreme Court while it argues here that the Forest Service may rely on that data [in an EIS].  These two positions appear irreconcilable.  Any data relied upon in an EIS must be made available to the public." (citing, inter alia, 40 C.F.R. § 1502.21)).  When the Ninth Circuit has approved an agency's incorporation of documents by reference into an EIS, it has made clear that the incorporated documents were available to the public.  See, e.g., Imperial Cnty, 767 F.3d at 794 (explaining that all of the documents incorporated in the EIS were available for inspection by interested persons); City of Sausalito v. O'Neill, 386 F.3d 1186, 1214 (9th Cir. 2004) ("[Plaintiff] does not contend that the biological opinions at issue were not available for inspection by interested persons or that they consisted of proprietary data not available for review.").

An agency may not discharge its obligation to provide the public with analysis of the environmental impacts of a project simply by incorporating documents by reference.  Pacific Rivers Council v. U.S. Forest Serv., 689 F.3d 1012, 1031 (9th Cir. 2012) vacated as moot, 133 S. Ct. 2843 (2013).[12]  Documents containing analysis of environmental impacts should instead be "described and analyzed in the text" and included in an appendix.  Id.  The scientific data and methodologies underlying an expert's conclusions may be incorporated by reference, but they still must be available for the public to review.  City of Sausalito, 386 F.3d at 1213–14; Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1150 (9th Cir. 1998), as amended on denial of reh'g (May 13, 1998), overruled on other grounds by Lands Council v. McNair, 537 F.3d 981. A CEQ guidance memorandum explains the distinction between materials that should be included in an appendix and materials which may be incorporated by reference.  An appendix "should contain information that reviewers will be likely to want to examine," including "material that pertains to preparation of a particular EIS."  Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 FR 18026-01, 18034 [hereinafter "FAQ"].  For example, "[r]esearch papers directly relevant to the proposal, lists of affected species, discussion of the methodology of models used in the analysis of impacts, extremely detailed responses to comments, or other information, would be placed in the appendix."  Id.  In contrast, the following may be incorporated by reference: "[m]aterial that is not directly related to preparation of the EIS, other EISs, research papers in the general literature, technical background papers or

---

[12] Opinions that have been vacated as moot may still have persuasive value. DHX, Inc. v. Allianz AGF MAT, Ltd., 425 F.3d 1169, 1176 (9th Cir. 2005) ("[A]t minimum, a vacated opinion still carries informational and perhaps even persuasive or precedential value."). Because Pacific Rivers is consistent with the CEQ regulations, this Court finds its analysis to be persuasive regarding the circumstances under which materials should be included in an appendix.

other material that someone with technical training could use to evaluate the analysis of the proposal." Id.

Plaintiffs argue that the Forest Service violated NEPA by incorporating by reference a Fisheries and Aquatic Species Biological Evaluation and Specialist Reports related to "Wildlife," "Forested Vegetation," and "Fisheries"; instead of including them in the appendices of the draft EIS.  Specifically, Plaintiffs assert that the draft EIS provided only "cursory" discussions of project impacts on two sensitive frog species, the pileated woodpecker, the goshawk, and the American marten, and that the information necessary to meaningfully comment on Project impacts on these species was contained in the Specialist Reports that the Forest Service refused to disclose.  Plaintiffs therefore contend that the draft EIS was insufficient to provide the public with a meaningful chance to comment on the Project.  Plaintiffs also argue that the Forest Service further violated NEPA by failing to include the Specialist Reports in the appendices to the final EIS.  Defendants counter that they are permitted to incorporate the Specialist Reports by reference in both the draft EIS and the final EIS, and assert that they were permitted to withhold the Specialist Reports as privileged documents.[13]

The Forest Service should have placed the Specialist Reports in an appendix which it either "circulated with the environmental impact statement or [made] readily available on request" because the reports were "prepared in connection with," and pertained "directly to the preparation of the EIS."  See 40 C.F.R. §§ 1502.18(a) & (d); FAQ, 46 FR at 18034.  The Forest

_____

[13] The only distinct argument made by Intervenors is that Plaintiffs lack standing to bring this claim because they ultimately received the Specialist Reports. Intervenors are incorrect because the draft Specialist Reports have never been disclosed. Moreover, Plaintiffs do not argue that they suffered an injury simply because they did not receive the documents, but that they were denied their opportunity to comment because they could not access them. Assuming Plaintiffs otherwise have a "concrete interest" affected by the project, they can meet the "actual injury" element of standing through a procedural injury, such as loss of the opportunity to comment. See Summers v. Earth Island Institute, 555 U.S. 488, 496–97 (2009).

Service identified the reports as the source of its conclusions in the draft EIS. AR 7904 (The Specialist Reports "contain the detailed data, methodologies, analyses, conclusions, maps, references and technical documentation that the resource specialists relied upon to reach the conclusions in this environmental analysis.").

Further, regardless of whether the Specialist Reports should have been included in an appendix or were permissibly incorporated by reference,[14] the Forest Service violated NEPA by failing to make them available. Had the Forest Service simply referred to the Specialist Reports as "incorporated by reference," instead of as a part of its appendices—while also making them "readily available on request"—this claim would likely be an exercise in "flyspecking." Instead, the Forest Service declined to make the Specialist Reports available at all, even after receiving a FOIA request.

Defendants' contention that the Specialist Reports were privileged does not excuse the Forest Service's failure to make them available to the public. Defendants cite no authority for a "privilege exception" to NEPA's requirement that the agency involve the public in its decisionmaking process. The CEQ regulations do not contemplate the incorporation of unavailable material in an EIS. In fact, the regulations plainly state that "[n]o material may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment." 40 C.F.R. § 1502.21. Moreover, incorporating privileged material is analogous to incorporating "proprietary data which is itself not available for review and comment," which is also forbidden by § 1502.21.

---

[14] Although the experts' analysis and conclusions certainly should certainly have been included in an appendix, the Forest Service may have properly incorporated by reference the portions of the Specialist Reports including underlying data and methodologies. See, e.g., City of Sausalito, 386 F.3d at 1213–14 (finding no NEPA violation where underlying data was incorporated by reference and available).

Defendants nevertheless contend that, regardless of whether the Specialist Reports were disclosed, the Forest Service could rely on those reports because it provided a sufficient summary of their contents in the draft EIS to facilitate public comment on the issues in the reports. In support of this proposition, Defendants rely on Forestkeeper v. Elliott, No. 1:13-CV-1721 AWI JLT, 2014 WL 4803024, at *1 (E.D. Cal. Sept. 25, 2014).[15] However, Defendants' reliance on Forestkeeper is misplaced.[16]

In Forestkeeper, the District Court for the Eastern District of California determined that the defendants had complied with NEPA, despite the fact that the defendants had not released certain documents to the public during the public comment period preceding the creation of an Environmental Analysis (EA). The court concluded that the defendants did not violate NEPA because there was a "lack of any evidence that, had [p]laintiffs been informed of the scientific reports underpinning the final EA prior to its finalization, they would have been able to put information before [d]efendants that would have been substantially different from what [d]efendants did consider." Id. at *15. In other words, there was no NEPA violation because the record showed that the plaintiffs had everything they needed to comment on the project with or without the unreleased documents.

Several distinctions are important. First, Forestkeeper concerned an EA and not an EIS, and NEPA requires a lesser degree of public involvement for EAs than EISs. See Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Engineers, 524 F.3d 938, 952 (9th Cir. 2008) (holding that an agency does not always need to circulate an EA for public comment).

---

[15] Defendants first referenced Forestkeeper at oral argument and did not address the case in their briefing because the case was released a month after Defendants filed their reply brief.

[16] Defendants cite other cases in support of their argument, but they also do not stand for the proposition that an agency may incorporate material by reference if those materials are unavailable to the public. See City of Sausalito, 386 F.3d at 1214; Cascadia Wildlands v. U.S. Forest Serv., 937 F. Supp. 2d 1271, 1276–77 (D. Or. 2013).

Forestkeeper expressly evaluated whether the defendant had fulfilled its duty to ensure public participation in the preparation of an EA under Bering Strait and its progeny. Forestkeeper, 2014 WL 4803024 at *13–14.

Second, unlike the plaintiffs in Forestkeeper, Plaintiffs in this case never received the draft Specialist Reports on which the Forest Service relied during the comment period. The plaintiffs in Forestkeeper received the undisclosed documents after the comment period and were unable to identify "any specific information that they would have included in their comments but did not for the failure of the [defendants] to provide the scientific reports[.]" Id at *14. Here, Plaintiffs never had the opportunity to identify such information because the Forest Service have never disclosed the draft Specialist Reports. Now, Plaintiffs and the Court can only speculate as to how the draft Specialist Reports compared with the text of the draft EIS or with the final Specialist Reports.

Finally, even if there were no substantial changes between the draft and final Specialist Reports, Plaintiffs have identified at least one piece of "specific information" in the final Specialist Reports on which they would have commented if they had been given the opportunity. One Specialist Report states that "in northeast Oregon, the pileated woodpecker prefers mature unlogged grand fir stands[.]" AR 11988. Neither the draft nor final EIS included this information, which is directly relevant to Plaintiffs' objections to the Project. Plaintiffs challenge the Forest Service's assessment of the Project's cumulative impacts on the pileated woodpecker and its decision to permit mature grand fir trees to be logged. Accordingly, the omission of the fact that "the pileated woodpecker prefers mature unlogged grand fir stands" from the both the draft and final copies of the EIS by the Forest Service is significant.

In a recent decision, the Ninth Circuit explained that under some circumstances an agency may permissibly incorporate documents by reference in a final EIS, even if those documents were not cited in the draft EIS.  Imperial Cnty, 767 F.3d at 794.  Although seemingly similar to this case, Imperial Cnty does not help Defendants' position.  There, the plaintiffs argued that the defendants had violated NEPA by incorporating a "new" document into the final EIS which had not been released to the public during the comment period and which had not been incorporated in the draft EIS.  Id.  The court first explained that the plaintiffs were incorrect, and that the record showed that all of the documents cited in the final EIS had been available for the public to review during the comment period.  See id. at 794 n.9.  Additionally, the "new" document cited in the final EIS was not prepared in connection with the EIS and was used by the agency "only to respond to comments . . . and to further discuss secondary environmental consequences of the [the project], not to identify a new proposal or to describe previously unconsidered environmental consequences."  Id. at 794.  Accordingly, the court determined that there had been no NEPA violation.

There are two major distinctions between Imperial Cnty and this case.  First, in this case the Specialist Reports were incorporated by reference into the draft EIS, and they were not available during the comment period.  Second, the Specialist Reports were more important than the incorporated documents in Imperial Cnty.  The Specialist Reports were prepared in connection with the draft EIS and provided the information underlying the Forest Service's conclusions in the draft EIS with respect to Project impacts on wildlife; they were not used only to respond to comments or provide information about "secondary" environmental consequences.  As discussed above, Plaintiffs have discovered at least one piece of important information relating to the environmental impacts of the project in the final versions of the Specialist Reports.

ii.    Re-circulation of the EIS for Further Comment

Plaintiffs also argue that changes between the draft EIS and the final EIS require the Forest Service to recirculate the final EIS for public comment.  Plaintiffs contend that the changes were not based on public comment, but instead on the Specialist Reports, which were withheld during the comment period.  In support of this assertion, Plaintiffs point to text in the final EIS regarding the American marten, the goshawk, and the pileated woodpecker, that is identical to text in the Specialist Reports related to those animals.  Defendants and Intervenors respond that the changes between the draft EIS and final EIS were minor and did not require circulation of a supplemental EIS.  They contend that differences in the sections of the EIS concerning wildlife merely indicate that the Forest Service was fulfilling its duty to respond to public comments while developing the EIS.

Not every change to an EIS requires an agency to recirculate the document for a new round of public comment. Marsh v. Ore. Natural Res. Council, 490 U.S. 360, 374 (1989).  To require that would endlessly bog down agency action.  Id.; see also Oregon Natural Desert Ass'n v. Jewell, 3:12-cv-0096-MO, 2013 WL 5101338 at *13 (D. Or. Sept. 11, 2013).  However, recirculation of a draft EIS is required when the draft EIS is "so inadequate as to preclude meaningful analysis."  40 C.F.R. § 1502.9(a).  Further, an agency may be required to circulate a Supplemental EIS when "(i) [t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c).

Relying on Oregon Natural Desert Ass'n, Intervenors emphasize that requiring a new round of commenting simply because a final EIS differs from a draft EIS would hamper

administrative efficiency.  2013 WL 5101338, at *13 ("If the agency were required to request

further comments every time it made changes to the final EIS, the process could become mired

in an endless loop of comments and the resulting changes until all parties were completely

satisfied with the EIS or had collapsed behind the tortoise at the finish line.").

This Court is sensitive to the parties' concerns about the efficiency of the administrative

decision-making process.  An agency does not need to provide a new round of commenting

simply because a final EIS includes a more detailed analysis than a draft EIS due to input from

the public or new scientific study in the ordinary course of agency procedure.  However, the need

for administrative efficiency does not relieve the Forest Service of its obligation to provide the

public with a meaningful opportunity for comment on the Project.  Moreover, many of changes

between the draft EIS and final EIS that Plaintiffs point out could not have been the result of

comments; they were instead the result of directly copying text from the previously undisclosed

Specialist Reports into the body of the final EIS.  E.g., compare AR 12385–90 (final EIS

concerning the pileated woodpecker) with AR 11987–97 (Specialist Report concerning the

pileated woodpecker).  By refusing to disclose the Specialist Reports, the Forest Service

insulated a portion of the Project from public scrutiny and deprived itself of public input.

The Forest Service's actions resulted in a final EIS that precluded meaningful analysis

regarding project impacts on the goshawk, American marten, and pileated woodpecker.

Interested parties and the public were denied the exact information that the Forest Service

referred them to if they wanted to undertake a detailed analysis of Project impacts on those

species.  The consequences of this omission are ongoing; because the draft Specialist Reports

have not been disclosed, this Court cannot assess the extent to which the Plaintiffs were harmed

by the Forest Service's error.

Accordingly, the Forest Service violated NEPA by failing to include the draft Specialist Reports in the appendices of the draft EIS, failing to make the draft Specialist Reports publicly available during the comment period, failing to ever disclose the draft Specialist Reports, and failing to disclose the final Specialist Reports until three weeks before the due date for Plaintiffs' administrative appeal.  This pattern of behavior is not acceptable under NEPA. The Court grants summary judgment to Plaintiffs on both of these claims.

      E.   <u>Failure to Ensure the Scientific Integrity of the Analysis</u>

Plaintiffs allege that, in choosing its preferred alternative for the Project, the Forest Service relied on faulty data and misrepresented current forest conditions. Specifically, Plaintiffs allege that the Forest Service violated NEPA when it failed to ensure the scientific integrity of the final EIS with respect to: (1) the age and description of large grand firs; (2) the categorization of "warm/very moist" grand fir forest; and (3) the Project's effects on carbon storage. Defendants argue that the Forest Service considered the best available science, reached reasonable conclusions and, thus, its decisions merit this Court's deference. The Court agrees with Plaintiffs that the Forest Service violated NEPA when it changed the way it categorized "warm/very moist" forests from the draft EIS to the final EIS without explanation. However, the Court finds no NEPA violation with regard to the final EIS's age and description of large grand firs or its analysis of the Project's effects on carbon storage.

When crafting an EIS, the Forest Service must "insure the professional integrity, including scientific integrity, of the discussions and analyses." 40 C.F.R. § 1502.24. "This duty require[s] the Forest Service to disclose its methodologies and scientific sources." <u>Save the Peaks Coal. v. U.S. Forest Serv.</u>, 669 F.3d 1025, 1038 (9th Cir. 2012) (citation omitted).  The agency

must also "explain the conclusions it has drawn from its chosen methodology." Lands Council v. McNair, 537 F.3d at 994.

When evaluating claims under 40 C.F.R § 1502.24, the court must be "at its most deferential" when reviewing scientific judgments and technical analyses within the agency's expertise. See Balt. Gas & Elec. Co., v. Natural Res. Def. Council, Inc., 462 U.S. 87, 103 (1983). See also Sierra Club v. U.S. Envtl. Prot. Agency, 346 F.3d 955, 961 (9th Cir. 2003) (explaining that in reviewing agency action "involv[ing] primarily issues of fact," and where "analysis of the relevant documents requires a high level of technical expertise," a court must "defer to the informed discretion of the responsible federal agencies") (citing Marsh, 490 U.S. at 377). Still, the court must independently review the record and determine whether the agency made a reasoned decision based on its evaluation of the evidence. League of Wilderness Defenders, 689 F.3d at 1073. And, the Court cannot "defer to a void" of evidence. Oregon Natural Desert Ass'n, 625 F.3d at 1121.

    i.    Age and Description of Large Grand Firs

Plaintiffs argue that, throughout the draft and final EIS, the Forest Service misrepresented the age of large grand fir trees, wrongly described them as "immature," and erroneously characterized the density of grand firs as the result of prior fire suppression activities; thereby misleading the public in a way that lacks scientific integrity. According to Plaintiffs, if the public had known the trees' true age, they may have opposed the logging or raised more concerns with the Project. Defendants and Intervenors respond that the Forest Service is entitled to deference to

the reasonable opinions of its own qualified experts and that Plaintiffs place undue emphasis on the importance of the age and size of grand fir trees to the Project. [17]

"When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." Marsh, 490 U.S. at 378. The court should not "act as a panel of scientists that instructs the [agency] how to validate its hypotheses . . . chooses among scientific studies . . . and orders the agency to explain every possible scientific uncertainty." Lands Council v. McNair, 537 F.3d at 988. However, an agency's misrepresentation of scientific information, whether intentional or not, is sufficient reason to find the NEPA analysis lacked scientific integrity. See, e.g., Earth Island Institute v. U.S. Forest Serv., 442 F.3d 1147, 1160–67, abrogated on other grounds by Winter, 555 U.S. 7 (finding that Forest Service's "highly misleading FEISs" based on the agency's mischaracterization of scientific data was a NEPA violation).

The parties disagree about the correct method to determine the age of grand firs. The Forest Service determined that the average age of the Project area's large grand firs was 93 years old. AR 7918. Plaintiffs argue that the Forest Service erred when it relied solely on the ring-count of tree core samples taken at breast height (4.5 feet) and did not add an estimated number of years to account for the time it took each tree to grow to breast height. Plaintiffs submit the declaration of Brian Kelly, Restoration Director for Hells Canyon Preservation Council (one of the Plaintiffs) and a former contract forester with the United States Forest Service who has

---

[17] Intervenors also argue that the Court should not consider Plaintiffs' declarations regarding tree samples and determining tree age, because they are extra-record materials. However, the Court may consider these materials if necessary to "determine whether the agency has considered all relevant factors and has explained its decision." Sw. Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996); see also Earth Island Inst., 442 F.3d at 1162.

conducted vegetation surveys on more than 70,000 acres of national forests. Mr. Kelly states that

he has "commonly experienced" the Forest Service's "standard practice in northeast Oregon" of

adding 5-10 years to a tree's age to account for the years it takes to grow to breast height. Brian

Kelly Decl. Supp. Pls.' Mot. Summ. J. ¶ 11. In response, Defendants submit the declaration of

Forest Service Silviculturalist Joe Sciarrino, who states that the age of trees greater than three

inches DBH is determined by making an increment boring at breast height and counting the

annual rings between bark and pith (the center of the tree). Mr. Sciarrino refutes Mr. Kelly's

assertions and declares that "it is not standard practice for the Forest Service in northeastern

Oregon" to add 5-10 years to the age of a tree as a matter of course to account for the time that it

took the tree to reach breast height. Fourth Joe Sciarrino Decl. Supp. Defs.' Mot. Summ. J. ¶ 10.

    In addition, both parties cite to the Common Stand Exam (CSE) protocols, which are

used by the Forest Service and provide national guidance for collecting stand examination data.

Plaintiffs point to the CSE protocol definition of tree age: "Total age of the above ground stem of

a tree (not age of the root stock or the total age from seed). Total age is usually the annual ring

count to the pith of the tree at breast height plus an estimate of the number of years it took the

tree to reach breast height." (NRIS FSVeg Field Guide/Common Stand Exam, Appendix M:

Glossary of Terms, p. 4,

http://www.fs.fed.us/nrm/documents/fsveg/cse_user_guides/APPEND_M_glossary.pdf

(emphasis added)). Based on this definition, Plaintiffs argue, the Forest Service should have

accounted for the number of years it takes a tree to reach breast height when calculating the age

of grand firs. Alternatively, Plaintiffs argue that the CSE protocols are used to ensure consistent

data measurements in the field, but are not guidelines on how to estimate the actual age of trees.

Defendants point to a CSE Protocol instruction to field agents to "[r]ecord the actual age

counted; do not add an estimate of the number of years to grow to breast height." Id. at 4-85,

http://www.fs.fed.us/nrm/documents/fsveg/cse_user_guides/Edited_Chapter_4_CollectRecord.pdf.

Plaintiffs also contend that because the Forest "skewed" the data to conclude the average age of large grand fir trees in the Project Area are less than 95 years old, then the Forest Service also wrongly labeled the firs as "immature" and "artifacts of fire suppression." Plaintiffs assert that the Forest Service never defined what constitutes an "immature" tree but that the same scientist the Forest Service relied on to provide a definition of "old" trees also deems trees older than 100 to be "mature." Pls. Memo. at 28 (citing Robert Van Pelt, Identifying Old Trees and Forests in Eastern Washington, Washington State Department of Natural Resources, 168 at p. 101 (hereinafter "Van Pelt")). According to Plaintiffs, the Forest Service's failure to disclose the true age of the grand firs "mislead[s] the public into believing thousands of large grand first slated for logging do not belong on the landscape and need to be removed to restore the forests." Pls. Reply Memo. Supp. Mot. Summ. J. at 19. In other words, if the trees' age had been properly measured, then the average tree age would be over 100 years old and, therefore, would be considered "mature," which would in turn make the public more opposed to the logging efforts.

Defendants and Intervenors respond that, while the Van Pelt paper does state that certain trees such as western larches can be considered "mature" at 100 years, Van Pelt does not state when grand firs reach maturity. See Van Pelt at 133–43. In other words, the evidence Plaintiffs offer doesn't conclusively establish at what age grand fir trees are considered "mature." More importantly, Defendants argue that even if the grand fir trees are about 105 or so years old (instead of the estimated average age of 93), they do not fit the Forest Service's Region 6 definition of "old" trees, which is trees 150 years old.

Even if Plaintiffs are correct in their interpretation of the purpose of the CSE protocols, this Court is left with competing declarations from Mr. Kelly and Mr. Sciarrino as to the proper way to measure a grand fir tree's age. And even if Plaintiffs are correct that the average grand fir trees in the Project area are older than the Forest Service estimates, the Court is left to speculate to what extent public opinion and comments would have been any different. The Court finds that this is not a situation where the Forest Service "understood but concealed and misrepresented the data." See Earth Island Inst. 442 F.3d at 1166-67. Rather, this is a situation where experts differ in their testimony and the Court is being asked to guess if public opinion would change based on adding several years to the average age of grand firs. In such a situation, the Court defers to the agency and, therefore, there is no NEPA violation.

> ii.    Categorization of Warm/Very Moist Forest

Plaintiffs allege that the Forest Service improperly categorized 1,238 acres of "warm/very moist" forest as "warm/dry" forest. Specifically, Plaintiffs contend that while the draft EIS categorized 1,238 acres as "warm/very moist grand fir forest," the final EIS categorized these same acres as "warm/dry grand fir forest." AR 7917, AR 12230-31. The distinction is important because the Forest Service has different logging prescriptions for these two different forest types. In other words, there are tighter restrictions on logging moist forests. Defendants counter that the 1,238 acres of "warm/very moist grand fir" were combined with "warm/dry grand fir" in the final EIS because they are both within the same biophysical group or biophysical environment. According to Defendants, Plaintiffs cannot establish a NEPA violation because the description of the 1,238 acres of grand fir relies on the Agency's scientific expertise and should be afforded considerable deference.

The final EIS explains that warm/dry forests have been substantially altered by years of fire suppression and past forest management practices. Grand firs are choking out the ponderosa pine and western larch trees that are more representative of the historical makeup of warm/dry forests and are causing the forest to be more susceptible to insects and disease. In warm/dry forest areas, the only limitation on logging large grand firs is on those with severe defects and over 150 years old. AR 12184, 12829. However, moist forests are less in need of the type of "restorative logging" the Forest Service believes is necessary to remove uncharacteristic trees and prevent catastrophic fires and insect infestation. Therefore, in contrast to warm/dry forests, in moist forests the Project only allows for logging of grand fir trees greater than 21 inches DBH if the trees are within 30 feet of a ponderosa pine or western larch tree. AR 12184.

In the draft EIS, the Forest Service divided the Project area into five "plant association groups," which included cold/dry, cool/moist, warm/very moist, warm/dry, and hot/dry. AR 7917 (Table 24). Then, each plant association group contained certain "biophysical groups." Throughout the draft EIS, the Forest Service grouped warm/very moist grand fir separate from warm/dry grand fir. AR 7923, 7928–29, 7932. However, in the final EIS, the Forest Service no longer included a category for warm/very moist grand fir. Instead, the final EIS only has two options for biophysical environments for grand fir trees: (1) cool/moist/dry and (2) warm/dry. AR 12208 (Table 12). Therefore, the 1,238 acres of warm/very moist grand fir that appeared as a separate category in the draft EIS and would have been subject to greater protection from logging are now part of the warm/dry grand fir category.

The final EIS dropped any discussion of the warm/very moist grand fir type without explanation. This unexplained re-classification, Plaintiffs assert, violates NEPA in two ways. First, the Forest Service must explain the conclusions it draws from its chosen method. And

second, logging the warm/very moist fir tree stands in the same way as the warm/dry stands is

inconsistent with the Forest Service's purported goal of properly managing forests to assure their

resilience and sustainability. Plaintiffs also argue that classifying warm/very moist grand fir with

warm/dry grand fir means that the two forest types are classified as having the same fire

regime—low intensity fires every 25 years or less. If the warm/very moist grand fir remained in

a separate category, its fire regime would be mixed intensity fires every 26-150 years. Therefore,

Plaintiffs argue that treating warm/very moist grand fir as warm/dry grand fir under the Project

will result in moving the warm/very moist grand firs even further away from their historic

conditions.

According to Defendants, the final EIS did not include the "warm/very moist grand fir"

category because the final EIS grouped and analyzed forest types based on biophysical

environment, whereas the draft EIS grouped based on plant associations. Essentially, Defendants

argue that it is inappropriate to do a side-by-side comparison of Table 24 in the draft EIS and

Table 12 in the final EIS because they do not present the information in the exact same way. In

addition, Defendants provide the declaration of Forest Service Silviculturalist Joe Sciarrino, who

states that characterizing the 1,238 acres as warm/dry fir is consistent with 1995 Regional

Forester Amendment 2. Intervenors add that "the classification of multiple vegetation types is a

highly technical issue," one where the agency receives deference.

The problem with Defendants' and Intervenors' argument is not that they fail to provide

an explanation for classifying the "warm/very moist" grand fir with the "warm/dry" grand fir, it

is that an explanation for the change in classification from the draft EIS to the final EIS is

nowhere to be found in the record. An agency "must explain the conclusions it has drawn from

its chosen methodology." Lands Council v. McNair, 537 F.3d at 994. The Court cannot

determine that the Forest Service's conclusion was "reasonable" because the record simply does not provide a rationale behind the decision. And Defendants' briefing, including Mr. Sciarrino's declaration, cannot explain the Forest Service's methodology in the absence of supporting materials in the record. In addition, even if the Court were to consider Mr. Sciarrino's declaration, it does not explain the Forest Service decision to change its classification system between the draft EIS and the final EIS, given that the Regional Forester Amendment he references is almost twenty years old. The Court agrees with Plaintiffs that the Forest Service's failure to explain the change in the final EIS violates NEPA's requirement for the agency to explain its conclusions. Therefore, the Court grants summary judgment to Plaintiffs on this part of their "scientific integrity" claim.

iii.    Climate Change

Plaintiffs argue that the Forest Service violated NEPA by not providing a "full and fair discussion" of the Project's impacts on the forest's carbon stores. Specifically, Plaintiffs argue that the Forest Service disclosed only one side of the issue—the beneficial impact of the Project on climate change and the forest's ability to store carbon—without considering the Project's short-term negative impact of removing 48 million board feet (mmbf) of trees, including one-third of the volume from large trees and old growth stands where substantial carbon exists.

In a final EIS, an agency must address "any responsible opposing view which was not adequately discussed in the draft [EIS] and . . . indicate the agency's response to the issues raised."  40 C.F.R. § 1502.9(b).  The EIS must "provide a full and fair discussion of significant environmental impacts." 40 C.F.R. § 1502.1. The "disclosure requirement obligates the agency to make available to the public high quality information, including accurate scientific analysis, expert agency comments and public scrutiny, before decisions are made and actions are taken."

Ctr. for Biological Diversity v. U.S. Forest Serv., 349 F.3d 1157, 1167 (9th Cir. 2003) (citing 40

C.F.R. § 1500.1(b)). However, NEPA only requires an agency to focus on the issues "that are

truly significant to the action in question."  40 C.F.R. § 1500.1(b).

        The Chief of the Forest Service recognized climate change as "one of the most urgent

tasks facing the Forest Service" and stressed that "as a science-based organization" the Forest

Service needs to consider climate change "any time [the Service] make[s] a decision regarding

resource management." AR 5461. However, when considering climate change in project-level

NEPA analysis and documentation, a Forest Service guidance document explains that it "is not

currently feasible to quantify the indirect effects of individual or multiple projects on global

climate change." Id. Therefore, "determining significant effects of those projects. . . on global

climate change cannot be made at any scale." Id. While quantifiable information about project

effects on global climate change is not possible, the Forest Service "recognized the relative

potential of some types of proposals and alternatives to affect or influence climate change and

therefore provide qualitative analysis to help inform project decisions." AR 5466-67. When

providing a qualitative analysis, the Forest Service is directed to "disclose the nature and

direction (short-term and long-term) of the impact as opposed to the specific magnitude of the

impact." AR 5465-66.

        Plaintiffs assert that while the Forest Service readily disclosed the Project's anticipated

benefits to climate change, it failed to address the short-term negative impact that removing trees

would have on the forest's ability to store carbon. In support of this argument, Plaintiffs point to

a recent District of Colorado case that found the Forest Service acted arbitrarily and capriciously

in presenting only the benefits of a proposed mining project without addressing its costs,

including greenhouse gas ("GHG") emissions. High Country Conservation Advocates v. U.S.

Forest Serv., 2014 WL 2922751, *9–10 (D. Co. 2014). The Forest Service in that case gave a general discussion about the impact of the project on climate change and otherwise claimed that quantitative analysis of the project's emissions on global climate change was impossible. Id. Plaintiffs argue that here, like in High Country, the Forest Service refused to present the negative impacts of the Project on carbon storage, even though such analysis was possible. Plaintiffs argue that the potential impacts to carbon stores could vary greatly under each proposed alternative and, therefore, the Forest Service was required to consider it when choosing a preferred alternative.

However, this case differs from High Country, where the agency had a tool—the "social cost of carbon protocol"—that it used in the draft EIS to quantify the project's contribution to costs and benefits associated with global climate change. High Country, 2014 WL 2922751 at *9. The agency omitted any mention of this tool in the final EIS and omitted a discussion of the costs of the project, while retaining a quantified projection of the benefits associated with the project. Id. at *9-10. The court held that the agency's behavior was arbitrary and capricious because  it quantified the benefits but claimed that it was impossible to quantify the costs, "when such an analysis was in fact possible" and was included in the draft EIS. Id. at *10.

Here, the Forest Service did not rely on a tool to provide a quantitative analysis of the cost or benefit of the Project in relation to climate change because "there are a number of different views on the topic and still no clear science as to the effect of forest thinning projects and carbon storage." AR 12761. Because there was no way to quantify the benefits or costs, the Forest Service did not selectively omit which data to share in the final EIS, as the agency did in High Country.

The Forest Service did, however, address the impacts of climate change and carbon storage in a qualitative format in the final EIS, in accordance with the Forest Service guidance document, "Climate Change Considerations in Project Level NEPA Analysis." See AR 5466-67. In response to one comment, the Forest Service explained that "carbon sequestration and its relation to climate change are not covered in detail in the FEIS because of the scientific uncertainty of this issue." AR 12761. The Forest Service also explained its conclusion that, in this case, the Project would "create forests" and "improve forest conditions and capacity to grow trees" and therefore, the Project would positively affect carbon sequestration long-term.  AR 12792.  The Forest Service also determined that the Project was consistent with recommendations from the Intergovernmental Panel on Climate Change (IPCC) to manage forests to "improve tree species and increase biomass." AR 12792.

Plaintiffs have not carried their burden on this particular issue to show that the Forest Service lacked scientific integrity. The Forest Service engaged in a qualitative discussion about the effects of the Project on climate change, while acknowledging the limitations of current science in this regard. Even if the Forest Service could have more explicitly acknowledged the potential short-term impacts of the Project on the forest's ability to store carbon, the failure to do so does not rise to the level of a NEPA violation.

## II.    NFMA Violation—Use of Site-Specific Amendments to the Forest Plan

Plaintiffs allege that the Project's two site-specific amendments to the WWNF Plan violate the National Forest Management Act (NFMA). Plaintiffs argue that site-specific amendments are meant to address unique characteristics of a particular forest area, not conditions that are common throughout the WWNF. Plaintiffs argue that by repeatedly using site-specific amendments instead of amending the whole Forest Plan, the Forest Service engages in a

"piecemeal abandonment" of the Plan without having to undergo the rigor of public input and review of a new Plan. Defendants and Intervenors argue that the amendments in this case do not violate the NFMA because the Forest Service provided a rational explanation and the amendments are not "significant" as defined by the NFMA. The Court finds that the Forest Service's decision to adopt site-specific amendments in this case was arbitrary and capricious because the ROD and final EIS do not adequately articulate a rational connection between the characteristics of the project area and the choice to adopt site-specific, rather than forest-wide, amendments.

The NFMA outlines a two-step process for forest planning. Id. at 897. First the Forest Service must develop a Land Resources Management Plan (also known as a Forest Plan). Id. The Forest Plan is then implemented at the site-specific level, and all activities in the forest, including timber sales, must be consistent with the governing plan. Id. Each Forest Plan must "form one integrated plan for each unit of the National Forest System." 16 U.S.C. § 1604(f)(1). The Forest Service can amend a Forest Plan in "any manner whatsoever." 16 U.S.C. § 1604(f)(4). However, the Forest Service must articulate a "rational connection between the facts found and the choice made" to enact a geographically-limited, site-specific amendment rather than a general amendment to the Forest Plan as a whole. Lands Council v. Martin, 529 F.3d 1219, 1228 (9th Cir. 2008). Any Forest Plan amendment that results in a "significant change" requires the Forest Service to prepare an EIS; non-significant amendments only require the simpler notice and comment process. Lands Council v. Martin, 529 F.3d at 1227.

A.  Eastside Screens and the Proposed Site-Specific Amendments

The Eastside Screens were adopted in the early 1990s in response to concerns about over-logging forests, including the WWNF, and were intended to retain old-growth trees and move

toward the HRV across the landscape. Among other requirements, the Screens prohibit the

logging of live trees over 21 inches DBH and prohibit timber sale harvest activities within late

and old structural (LOS) stages that are below their HRV.

In 2003, then-Regional Forester Linda Goodman provided guidance regarding the

implementation of the Screens. In a letter to Forest Supervisors, Ms. Goodman stressed the

importance of "retaining and recruiting large, old trees in the eastside landscape," but explained

that "practical experience in trying to meet these objectives. . . has sometime presented

challenges." AR 3429. She encouraged the foresters to consider site-specific Forest plan

amendments, "where this will better meet LOS objectives by moving the landscape towards

HRV, and providing LOS for the habitat needs of associated wildlife species." Id. The letter

included the following examples of when amendments may be appropriate:

- Moving multiple-layered ponderosa pine stands towards LOS of a single layer where the pine are competing with grand fir or other shade-tolerant species historically held in check by wildfire.
- Maintaining shade-intolerant desirable trees <21 in dbh where their recruitment into the >21 inch class is reasonably foreseeable in the near future, and when giving preference to them better meets LOS objectives.
- Harvesting >21 inch dbh mistletoe-infected trees when doing so best meets long-term LOS objectives and does not eliminate currently important wildlife habitat.
- Fuel reduction when in Scenario A to protect older trees (e.g., removal of smaller "ladder" fuels).
- Overstory removal of shade tolerant species to protect rare or declining understory elements, such as aspen or rare herbaceous plants.

AR 3432.

The Project includes two site-specific Forest Plan amendments to address conditions that

are similar to the examples the Regional Forester provided in her letter. The first amendment

allows logging in approximately 600 acres of LOS that are below HRV. AR 12830. The ROD

explains that treatments of these stands of trees are needed to "change multi-story stands

dominated by large grand fir trees to single story stands dominated by large early-seral

ponderosa pine and western larch trees" as well as to "maintain declining desired tree species, such as ponderosa pine and western larch, by reducing competition with over represented large grand fir." Id. The second amendment allows logging of trees 21 inches DBH and greater in situations where "there is excessive mistletoe infestation impeding development of healthy conditions in Douglas-fir or where large trees of other species are affecting the health and vigor of aspen stands." AR 12831. In addition, the amendment provides for the removal of a "limited amount of grand fir of any size." Id. The ROD states that this amendment is needed "to remove conifers within harvest treatment standards based on the greatest benefit to residual tree survival and stand sustainability rather than based on conifer diameter." Id.

B.  No Rational Basis for Site-Specific Amendments

Plaintiffs argue that the Project's site-specific amendments to the WWNF Plan violate the NFMA because the agency improperly limited the geographic scope of the amendments to the Project area even though the purported need for the amendments is forest-wide, not site-specific. In other words, the decision to use a site-specific amendment to address a forest-wide problem is not rational.

All parties point to Lands Council v. Martin, 529 F.3d 1219 (9th Cir. 2008) to support their argument. In that case, the Forest Service used a site-specific amendment to change the definition of "live trees" in order to facilitate a salvage logging project after the 2005 School Fire burned more than 28,000 acres of the Umatilla National Forest in southeastern Washington. 529 F.3d at 1222, 1224. The amendment ended the Eastside Screens' prohibition against harvesting trees that were not completely dead by adding a new definition of "live tree" that allowed logging of dying trees that were unlikely to survive based on a predictive model. Id. at 1224. The Forest Service limited the amendment's geographic and temporal scope by applying it only to the

salvage project area. Id. The Court rejected the plaintiffs' argument that the Forest Service "arbitrarily enacted a site-specific amendment, particular to this salvage project, rather than a general amendment, applicable to all parts of the forest." Lands Council v. Martin, 529 F.3d at 1228 (emphasis in original). The Court held that the "Forest Service's decision to limit the scope of the amendment was informed by site-specific characteristics and Forest Service expertise." Id. at 1228. Importantly, the record showed that the amended definition of "live tree" might not have been "appropriate to assess trees affected by prescribed burning, flooding, disease, insect infestation, or any number of other causes of tree mortality." Id. at 1228. Accordingly, the court found that the Forest Service "articulated a rational connection between the facts found and the choice made" sufficient to support the site-specific amendment. Id.

In the present case, Plaintiffs argue that Lands Council v. Martin stands for the proposition that a site-specific amendment to the Forest Plan must be based on unusual or unique aspects of the site itself when compared to the forest generally. Unlike the scorched salvage area in Lands Council v. Martin, Plaintiffs claim the Project Area does not have distinguishing characteristics that justify site-specific, rather than forest-wide, amendments. In fact, Plaintiffs point to a portion of the ROD in which the Forest Service admits the "Project area is representative" of western forest landscapes that are "at risk due to past fire suppression and logging activities." AR 12827. Plaintiffs attack the amendments as describing the forest conditions that supposedly justify the amendment but not explaining why those conditions are unusual or unique in the project area. Plaintiffs also point to extra-record evidence suggesting that the Forest Service believes that forest conditions and management issues addressed by the Project's site-specific amendments can be found in other areas of the WWNF and other Eastside national forests in both Washington and Oregon. This apparent lack of uniqueness, Plaintiffs

argue, leaves the Forest Service without a rational justification for adopting a site-specific amendment when faced with an acknowledged region-wide problem. Moreover, the repeated use of site-specific amendments allows the Forest Service to bypass any public consideration of the regional or forest-wide management implications of the amendments, and is inconsistent with NFMA's requirements for integrated forest plans.

Defendants and Intervenors argue that Lands Council v. Martin establishes a highly deferential standard under which the court should find the agency explanation unsatisfactory only in the "rare instance[] when an agency provides no explanation at all or when the explanation is so unclear or contradictory that there is doubt as to the reason for the change in direction." Intv. Resp. at 3 (quoting Lands Council v. Martin, 529 F.3d at 1224). In addition, Defendants argue that nothing in Lands Council v. Martin suggests that the Forest Service is prevented from adopting site-specific amendments simply because similar conditions exist elsewhere in the WWNF or other Eastside forests. Defendants argue that the Lands Council v. Martin court upheld the amendment once the Forest Service could demonstrate it reasonably exercised its expertise to determine that site-specific characteristics justified a site-specific amendment. [18]

However, a close reading of Lands Council v. Martin indicates there must be at least some characteristics unique to a site to support a site-specific amendment. Lands Council v. Martin, 529 F.3d at 1228. Here, Defendants and Intervenors fail to point to any characteristics unique to the Project area to support the site-specific amendment. Similarly, at oral argument

---

[18] Defendants also argue that Native Ecosystems, where a proposed timber sale involved a site-specific forest plan amendment, supports their position. 304 F.3d 886 (9th Cir. 2002). However, the issue in Native Ecosystems was whether the amendment at issue was "significant" under the NMFA. Because the Court finds that the decision to adopt a site-specific amendment was arbitrary and capricious, the Court does not reach the issue of whether it was significant.

when asked specifically to explain what conditions existed within the Project area that supported the selection of a site-specific amendment, the parties were unable to provide any explanation other than the fact that the amendment was tailored and applicable only for the Project area.

Simply explaining the purpose of the Project, the desired conditions for the Forest, or stating that the amendment is site-specific because it was designed for a specific site, does not satisfy the rational connection between the facts found and the choice made required by Lands Council. Because the Forest Service failed to explain why it chose a site-specific amendment, the Court finds that the decision to enact a site-specific amendment was arbitrary and capricious and grants summary judgment to Plaintiffs on this claim.

### CONCLUSION

Plaintiffs' motion for summary judgment [126], Defendants' motion for summary judgment [95], and Intervenors' motion for summary judgment [86], are granted in part and denied in part. Plaintiffs shall prepare an appropriate Judgment consistent with this Opinion, and after conferring with counsel for Defendants and Intervenors, shall submit it to the Court for signature. If the parties cannot agree on a Judgment, they should notify my Courtroom Deputy who will schedule a telephone conference.

IT IS SO ORDERED.

Dated this _____ day of December, 2014.

MARCO A. HERNÁNDEZ
United States District Judge